IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-143-RM

UNITED STATES OF AMERICA,

Plaintiff,

v.

FRANCISCO GARCIA,

Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE BOP GANG EXPERT TESTIMONY [ECF NO. 84]**

---

The United States Attorney's Office for the District of Colorado (the "Government"), by and through Assistant United States Attorneys Laura Cramer-Babycz and Andrea Surratt, respectfully submits this response to defendant's Motion to Exclude BOP Gang Expert Testimony, *see* ECF No. 84 ("Def. Mot.").

## I. BACKGROUND

### A. September 2, 2019 Assault

As the Court is aware from previous filings, the charge in this case is the result of an alleged assault that happened at the United States Penitentiary ("USP") in Florence, Colorado, on September 2, 2019. The Government alleges that defendant Francisco Garcia assaulted his cellmate, Osiel Cardenas-Guillen ("Cardenas"), while they were locked in their cell together. At trial, the Government anticipates calling Cardenas—the former leader of the Gulf Cartel—as a witness.

Cardenas was first interviewed about the assault on September 6, 2019, while he

was still in the hospital for injuries from the September 2, 2019 assault.  Since that date, he has provided a largely consistent recitation of the events of September 2, 2019.  In particular, Cardenas has consistently stated that, on the day of the assault, a member of the Mexican Mafia, Richard Santiago, approached Cardenas' cell that he shared with Garcia.  At the time, Santiago was "on range," *i.e.*, out of his cell, and Cardenas and Garcia were confined in their shared cell.  Santiago demanded that Cardenas deposit $10,000 into the accounts of Santiago, Arcadio Perez, and Phillip Segura.  Perez and Segura are also members of the Mexican Mafia.  According to Cardenas, he informed Santiago that he was not going to pay them.  Surveillance video from that date shows both Santiago and Perez going to Cardenas' cell multiple times between approximately 8:50 am and 9:00 am, at times appearing to speak with someone and at other times appearing to peer inside the cell door window to watch what is going on inside the cell.

Shortly after the extortion attempt, Garcia assaulted Cardenas from behind.  Cardenas remembers very little from the actual assault, but correctional officers arrived at Cardenas' cell at approximately 9:05 am.  By the time correctional officers arrived, Cardenas was on the ground bleeding, and Garcia continued to hit and kick Cardenas despite the correctional officers' repeated commands to stop.

Although Cardenas reported that before the assault he had a good relationship with Garcia, he has explained that Garcia is a Sureño and Santiago, Perez, and Segura are Mexican Mafia.  As discussed in more detail below, the Sureños act as foot soldiers, or enforcers, for the Mexican Mafia.  As indicated in various pretrial filings, Garcia's defense in this case is that Cardenas was the initial aggressor and that he (Garcia) acted in self defense.  *See* ECF No. 72 at 2; ECF No. 80 at 7.

**B. Bureau of Prisons Gang Expert**

Against that backdrop, Garcia's gang affiliation and relationship to the Mexican Mafia is crucial in allowing the jury to understand the context of this assault. For that reason, the Government included John Feeney, an Intelligence Officer with the Bureau of Prisons' ("BOP") National Gang Unit, in its expert disclosure. *See* Ex. 1 (Government's Notice of Expert Testimony). As set forth in the Government's Notice of Expert Testimony, Mr. Feeney has extensive experience with the Mexican Mafia and Sureños from working within the BOP for over 25 years. Over the course of his career, he has monitored and interacted with both gangs, and now specifically monitors members of those gangs who are incarcerated in BOP facilities throughout the United States.[1] He also monitors, to a lesser extent, members and associates of Mexican drug cartels within BOP facilities.

Mr. Feeney's proposed expert testimony falls into four general categories: (1) the structure and operation of the Mexican Mafia within the BOP; (2) the structure and operation of the Sureños within BOP and their relationship to the Mexican Mafia; (3) the relationship between the Mexican drug cartels, Mexican Mafia, and Sureños; and (4) the BOP's process of validating gang membership. At this time, the Government anticipates eliciting the following testimony from Mr. Feeney, which is slightly narrowed from the Government's Notice of Expert Testimony (testimony that the Government included in its Notice but no longer seeks to elicit at trial is indicated in strikethrough text):

---

[1] Given that the defendant does not object to Mr. Feeney's expert testimony on the basis that he lacks the requisite experience and specialized knowledge, the Government does not recite Mr. Feeney's extensive experience here but rather relies on Government Exhibit 1.

1. Structure and Operation of Mexican Mafia within the BOP

   a. The Mexican Mafia is, first and foremost, a prison gang. It was created in the mid-to-late-1950s in California to provide protection to its members from inmate-on-inmate physical and sexual abuse in prisons. Initially, the Mexican Mafia operated primarily within the California Department of Corrections.

   b. The Mexican Mafia began operating in the BOP by the late 1970s, when the first well-known members of the Mexican Mafia were incarcerated in BOP facilities. The Mexican Mafia orchestrated a number of murders in the BOP in California around that time to assert power and control. The Mexican Mafia continues to exert control within prisons, including BOP facilities, through fear and intimidation.

   c. There are currently approximately 35 active Mexican Mafia members in BOP facilities throughout the United States. There are approximately 10 Mexican Mafia members at the BOP complex in Florence, Colorado, including Richard Santiago and Arcadio Perez.

   d. In order to become a member of the Mexican Mafia, someone must be voted in by the membership. As explained more fully below, individuals must generally be a Sureño before they can become a member of the Mexican Mafia. Once someone becomes a Mexican Mafia member, they are able to get a "black hand," which is the Mexican Mafia tattoo. If someone who was not a Mexican Mafia member got a "black hand" tattoo, they would face significant retaliation from the Mexican Mafia.

   e. Richard Santiago's tattoo, documented at INV_3270–3271, is a Mexican Mafia

tattoo. In particular, Santiago's tattoo includes "the Eternal War," a tattoo that is earned and awarded by the Mexican Mafia for battle. In addition, the button of the helmet in Santiago's tattoo has the letter "M" for "Mafia." The Aztec Pyramid that is depicted has 13 steps, a number that is associated with and used by the Mexican Mafia. Santiago's tattoo also includes a black hand, which only Mexican Mafia members can wear.

2. <u>Structure and Operation of the Sureños within BOP and Relationship to the Mexican Mafia</u>

   a. In the 1990s, the Mexican Mafia created the Sureños to serve as the "foot soldiers" of the Mexican Mafia. When individuals are initially incarcerated, joining the Sureños gives them the benefit of protection from the Mexican Mafia and other Sureños. It also makes them eligible to, at some point, potentially become a full member of the Mexican Mafia; generally, someone must be a Sureño before they can be a Mexican Mafia member.

   b. Similar to the Mexican Mafia, the Sureños operate within the BOP and have been formally tracked since approximately 1990. There are currently approximately 2,000 Sureños in BOP facilities throughout the United States. There are currently approximately 3 to 4 Sureños at the BOP high level complex in Florence, Colorado, including Francisco Garcia. ~~There are less than 60 Sureños housed at the medium level facility.~~

   c. Sureños often have tattoos to identify themselves as a Sureño member. The most common tattoo utilized is the number 13. The number 13 is used as a mark to identify loyalty to the Mexican Mafia. The 13th the letter "M", and

    shows a Sureno to be a loyal solider for the Mexican Mafia. Sureno members will also tattoo the words “SUR” or spell out the whole word “Sureño.” Additionally, Sureño members will at times have their specific street gang tattooed or represent their gang by having Aztec numbers or Aztec Gods tattooed on themselves. If a Sureño had a street gang tattooed on him, it is not uncommon to see a directional tattoo such as the letters “N” “S” “E” “W” or the words “North”, “South”, “East or “West” to represent which side of a town or city the gang member if from.

d. Francisco Garcia’s tattoo, depicted at INV_305 and INV_421, reads “SUREÑO” and is a tattoo worn by Sureños.

e. Sureños are taught to be loyal to the Mexican Mafia, and must follow a strict set of rules implemented by the Mexican Mafia. Those rules may be conveyed orally or, sometimes, in writing. Mr. Feeney has seen confiscated copies of these written rules. The most important rule is that Sureños cannot snitch, *i.e.*, cooperate with law enforcement or any other authorities.

f. Sureños are required to carry out any orders they receive from the Mexican Mafia. As foot soldiers, Sureños often carry out illegal activities on behalf of the Mexican Mafia to ensure that, if anyone gets in trouble for those illegal activities, it is a Sureño and not a Mexican Mafia member.

g. Sureños generally cannot carry out any activities that affect the Mexican Mafia—including assaults—without permission. The Mexican Mafia may give advance permission for a Sureño to take some action, such as an assault, or may give a non-verbal signal in the moment.

    h. If, however, someone assaults a Sureño, it is understood that the Sureños will protect themselves and retaliate against that individual.

i. Similarly, if someone "snitches" on a member of the Mexican Mafia or Sureños, they put themselves at risk of retaliation.

3. Relationship between Mexican Drug Cartels, Mexican Mafia/Sureños

a. When members of Mexican drug cartels are incarcerated in a BOP facility, they do not wield much influence. They are, however, known for having money.

b. The leadership of the Mexican Mafia and various drug cartels generally get along well because they have separate roles and spheres of influence. In particular, cartels have lots of money and access to drugs, which can benefit the Mexican Mafia. The cartels do not generally have foot soldiers like the Mexican Mafia, which is able to exert control through the Sureños and acts of violence.

c. The relationship between Mexican Mafia and drug cartel leadership does not always trickle down to the lower levels. Accordingly, it would not be unusual for members of the Mexican Mafia to attempt to extort a member of drug cartel.

4. BOP's Process of Validating Gang Membership[2]

a. BOP has a process to validate inmates' gang membership. There are 10 to 12 different broad criteria that BOP considers, including whether the inmate

[2] The defendant does not move to exclude category four at this time, but rather states that its relevance depends on the testimony at trial. The Government agrees, and will only seek to admit testimony related to category four in the event that it becomes relevant over the course of trial.

      has any gang-related tattoos, whether the inmate admitted to membership, information from the media, information from inmate communications, and information from inmate activities.

b. If an inmate satisfies 3 of the listed criteria, he is validated as a member of that particular gang. If he satisfies 2 of the listed criteria, he is identified as an associate of that particular gang.

c. The purpose of validating an inmate's gang membership is to ensure that they are safely housed.

## II. ARGUMENT

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles or methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.

The Tenth Circuit has explained that "[t]his rule applies to experts beyond those in the field of science," and, accordingly, courts have "long recognized that police officers can testify as experts based on their experience." *United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014). The recognition that law enforcement officers can testify as experts based on experience is based on courts' acknowledgement that "the average juror is often innocent of the ways of the criminal underworld." *Id.* (internal quotation marks and citation omitted).

For the reasons set forth below, Mr. Feeney's proposed expert testimony set forth

in categories one through three, above, is admissible under Rule 702, and should not be excluded on any basis set forth in the defendant's Motion.

**A. Mr. Feeney's Proposed Testimony is Relevant, Reliable, and Helpful to the Jury**

As an initial matter, the defendant does not argue that evidence of his gang affiliation, or the gang affiliation of Santiago and Perez, is inadmissible. Nor could he. The gang affiliation of Garcia, Santiago, and Perez is an "integral and natural part" of the circumstances of the offense in this case and provides crucial context for the jury. *United States v. Allen*, 610 F. App'x 773, 781 (10th Cir. 2015) (affirming admission of defendant's "alleged affiliation with a violent gang" because it "provided the jury with relevant context for both [witnesses'] testimonies" and was an "integral and natural part of . . . their accounts of the circumstances surrounding the offense" (internal quotation marks and citations omitted)). Moreover, given the likelihood that Santiago and Perez will testify at trial on Garcia's behalf, *see* Def. Witness List, ECF No. 95, their affiliation with Garcia bears on their credibility. *See United States v. Tsosie*, 288 F. App'x 496, 499–500 (10th Cir. 2008) ("Evidence of gang affiliation is admissible for proving a witness's bias if a proper foundation is laid and the evidence is not more prejudicial than probative.").

This is not, however, a situation in which the jury will automatically understand the affiliation and loyalties between the Mexican Mafia and Sureños. The jury will hear that Garcia is a Sureño, and that the two inmates who approached Cardenas' cell door just before the assault were Mexican Mafia members. Mr. Feeney's testimony—based on his expertise derived over many years and from many sources, *see Kamahele*, 748 F.3d at 998–99 (finding gang expert's testimony sufficiently reliable when it was based on "expertise, derived over many years and from multiple sources")—will explain the

relationship between, and hierarchy of, the two groups, which goes to explain a potential reason why Garcia would engage in this assault. Without that explanation about the relationship and hierarchy, the jury could be left wondering if there is any actual connection between the two separately named groups.[3] Accordingly, the defendant's argument that the jury will have a sufficient understanding of how gangs operate without the proposed expert testimony, *see* Def. Mot. at 9–10, is without merit.

Moreover, contrary to the defendant's assertion, this is not a case where "[t]he jury only needs to find that Mr. Garcia assaulted Mr. Cardenas-Guillen, that the assault caused serious bodily injury, and that the assault occurred in the special maritime jurisdiction of the federal government." Def. Mot. at 9. Rather, the jury will *also* be asked to decide whether Garcia was acting in self defense, and whether the force he used was reasonable. That self-defense claim makes the reason for the assault even more relevant: the jury will have to decide whether Garcia was acting in self defense or whether the assault was in retaliation for Cardenas' refusal to accede to the Mexican Mafia's demands. Mr. Feeney's testimony about the operation of, and relationship between, the Mexican Mafia and Sureños is, therefore, highly relevant and helpful to the jury.

Nor does the fact that Mr. Feeney's expert testimony will corroborate some aspects of Cardenas' testimony render that expert testimony inadmissible. *See* Def. Mot. at 9. "[T]he mere fact that expert testimony tends to corroborate the testimony of another witness is not grounds for exclusion; indeed, it is surely the case that most expert opinion

[3] Based on his experience in BOP, Cardenas understands the Mexican Mafia to be "the bosses" of the Sureños. Given that the defendant will likely portray Cardenas as fabricating his testimony, however, it is not sufficient for the Government to rely solely on Cardenas' view of the Mexican Mafia and Sureño relationship.

evidence proffered by litigants is paired with lay evidence that is in some fashion supported by the expert opinion." *United States v. Fuertes*, 805 F.3d 485, 496 (4th Cir. 2015) (affirming admission of expert testimony that corroborated victim's account of how she sustained her injuries); *see also United States v. Archuleta*, 737 F.3d 1287, 1294–95 (10th Cir. 2013) (affirming, on plain-error review, admission of expert testimony regarding structure and operation of Sureños where "[t]he logic behind offering [the expert's] testimony was simple: If the coconspirators' description of the events leading up to and on July 2 is consistent with the typical operation of a Sureño gang, then it is more likely that the coconspirators testified truthfully"). Here, the Government no longer intends to ask whether it would be unusual for Mexican Mafia members to attempt to extort a member of the drug cartel, or to ask whether Sureños need permission to carry out activities, such as assaults, on behalf of the Mexican Mafia. Rather, Mr. Feeney's expert testimony will largely focus on the operation of, and respective relationships between, the Mexican Mafia, Sureños, and drug cartels within the BOP. Not only is that evidence relevant and helpful with respect to the reason for the assault, it will also assist the jury in assessing witness credibility.

**B. Mr. Feeney's Proposed Testimony Does Not Violate the Confrontation Clause**

The defendant further argues that Mr. Feeney's proposed expert testimony violates the Confrontation Clause because it is based on intercepted BOP communications and statements made during BOP investigations. *See* Def. Mot. at 10. That argument fails.

Although it is well settled that an expert may not "simply parrot[] another individual's out-of-court statement," an expert may "convey[] an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion." *United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015). "An important

consideration in distinguishing proper testimony from parroting is the generality of or specificity of the expert testimony." *Id.* Here, Mr. Feeney will not testify as to any testimonial statements whatsoever. Rather, he will (1) provide the jury with background for his expertise—including intercepting BOP communications and investigating gang-related incidents within BOP—to allow the jury to assess his testimony; and (2) testify—based on synthesizing information learned over the course of over twenty years—regarding categories one through three, discussed above, that relate generally to the Mexican Mafia, Sureños, and drug cartels. Such testimony does not raise Confrontation Clause concerns, and should not be excluded on that basis. *See Kamahele*, 748 F.3d at 1000 (concluding that gang expert testimony did not violate Confrontation Clause where there was no indication that expert "parroted a testimonial fact learned from a particular interview," but expert instead "applied his expertise, formed by years of experience and multiple sources, to provide an independently formed opinion").

**C. Mr. Feeney's Proposed Testimony Does Not Violate Rule 704(b)**

Nor does Mr. Feeney's testimony violate Federal Rule of Evidence 704(b). *See* Def. Mot. at 11. Rule 704(b) states, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." The Tenth Circuit has interpreted Rule 704(b) as "preventing experts from expressly stating the final conclusion or inference as to a defendant's mental state, but not preventing the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state." *Archuleta*, 737 F.3d at 1297 (internal quotation marks omitted).

Mr. Feeney's proposed expert testimony falls within the latter category of permissible testimony. He will testify that the Sureños are foot soldiers for the Mexican

Mafia and, as such, are loyal to the Mexican Mafia and carry out orders on their behalf. Again, he will not testify that a Sureño would require Mexican Mafia permission in order to assault another inmate. Although Mr. Feeney's testimony that the Sureños carry out orders on behalf of the Mexican Mafia, that opinion only provides one fact "from which the jury could conclude or infer" that he acted intentionally in assaulting Cardenas. In order to reach that conclusion, however, the jury would also have to find that in this case, Garcia had received such an order from the Mexican Mafia—an issue on which Mr. Feeney will not provide any testimony or insight. Nor does the Government intend to pose any hypotheticals to Mr. Feeney that involve similar facts to this case. *Cf. Archuleta*, 737 F.3d at 1298 (questioning permissibility of hypothetical posed to gang expert that "involved the same facts as in [the defendant's] case, and directly posed the question of whether a person in [the defendant's] position could lack the requisite mens rea," but ultimately concluding admission of testimony was not plain error).

**D. Rule 403 Does Not Preclude Mr. Feeney's Proposed Testimony**

Rule 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The defendant argues that Mr. Feeney's proposed expert testimony is outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Def. Mot. at 11–12. His argument is without merit.

Mr. Feeney's testimony, as discussed above, is highly relevant to the issues in this case; indeed, the operation of, and relationship between, the Mexican Mafia and Sureños within BOP is integral to Cardenas' recollection of the assault in this case. That relevance is not "substantially outweighed" by unfair prejudice, confusing the issues, or misleading

the jury. Mr. Feeney will not testify at any length about specific acts of violence committed by the Mexican Mafia or Sureños. Nor will he testify about the likelihood of the Mexican Mafia attempting to extort other inmates, or the Sureños generally committing assaults on behalf of the Mexican Mafia. The fact that Mr. Feeney's testimony will provide some indirect corroboration for Cardenas' testimony does not constitute "unfair prejudice." *See Archuleta*, 737 F.3d at 1293 ("[U]nfair prejudice must do more than simply harm a defendant's case. . . . Evidence becomes *unfairly* prejudicial . . . when it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." (emphasis in original, internal quotation marks and citations omitted)).

To the extent the defendant raises concerns about confusing or misleading the jury, such concerns are unfounded. There will be no confusion about Mr. Feeney's limited role in this trial. This is not a situation where he is serving as both an expert and fact witness. The jury will also receive an instruction regarding expert witnesses, and the Government has proposed an instruction regarding the relevance of Garcia's gang affiliation. Those instructions mitigate any outstanding concerns about prejudice or confusion. *See United States v. Lujan*, 603 F.3d 850, 860 (10th Cir. 2010) (explaining that potential for prejudice or confusion resulting from admission of certain evidence could be cured by a jury instruction, which juries are presumed to follow).

**E. Mr. Feeney's Proposed Testimony is Not Impermissible Character Evidence**

In a final attempt to exclude Mr. Feeney's proposed expert testimony, the defendant argues that it constitutes impermissible character testimony under Federal Rule of Evidence 404(a)(1), which prohibits "[e]vidence of a person's character or

character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." Mr. Feeney's testimony, however, is not designed to demonstrate the "character" of a Sureño (and, again, he will not testify about Sureños generally engaging in assaults on behalf of the Mexican Mafia). Rather, his testimony provides background about the operation and relationship between the Mexican Mafia and Sureños. Any testimony that Sureños are foot soldiers for the Mexican Mafia does not constitute what is generally considered to be "character" evidence. *See, e.g.*, *United States v. Williams*, 900 F.3d 486, 490 (7th Cir. 2018) ("Although it is difficult to give a comprehensive definition of 'character evidence,' we generally interpret it as evidence that 'refers to elements of one's disposition, such as honesty, temperance, or peacefulness,' which shows a propensity to act a certain way in a certain situation." (internal citations and quotation marks omitted)). Accordingly, Rule 404(a) does not provide a basis to exclude Mr. Feeney's proposed expert testimony.

## III. CONCLUSION

For the reasons set forth herein, the Government respectfully requests that the Court deny the defendant's Motion to Exclude BOP Gang Expert Testimony.

Dated: May 2, 2022

Respectfully submitted,

COLE FINEGAN
United States Attorney

By: s/ *Laura Cramer-Babycz*
Laura Cramer-Babycz & Andrea Surratt
Assistant U.S. Attorneys
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0406
E-mail: laura.cramer-babycz@usdoj.gov
Attorneys for Government

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2022, I electronically filed the with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

By: s/ Deana Ambrosen
Legal Assistant
United States Attorney's Office