

**U.S. DEPARTMENT OF JUSTICE**

**Cole Finegan**
*United States Attorney*
*District of Colorado*

---

*Laura Cramer-Babycz and Andrea Surratt*       1801 California Street, Suite 1600       (303) 454-0100
*Assistant United States Attorneys*            Denver, CO  80202                        FAX (303) 454-0405

April 18, 2022 *(via email)*

Timothy Patrick O'Hara
Matthew Belcher
Office of the Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, CO 80202

Re:   *United States v. Francisco Garcia*, 21-cr-143-RM
      Notice of Expert Testimony Pursuant to Fed. R. Crim. P. 16(a)(1)(G)

Dear Mr. O'Hara and Mr. Belcher:

The government hereby gives notice of its intent to call certain witnesses at trial and to elicit expert opinions.  This letter is tendered pursuant to the Discovery Conference Memorandum and Order [ECF No. 9], Judge Moore's Order Setting Trial Date and Deadlines [ECF No. 12], and Federal Rule of Criminal Procedure 16.  The government identifies the anticipated expert witnesses below and, pursuant to Fed. R. Crim. P. 16(a)(1)(G), provides a description of each witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

  I.   **John Feeney, BOP Gang Expert**

       The United States hereby gives notice, pursuant to Fed. R. Crim. P. 16(a)(1)(G), of its intent to call John Feeney, an employee of the Federal Bureau of Prisons ("BOP"), as an expert witness regarding the operation of the Mexican Mafia, Sureños, and Mexican drug cartels within the BOP.  In particular—and as detailed more fully below—the government anticipates that Mr. Feeney will testify about (1) the structure and operation of the Mexican Mafia within the BOP; (2) the structure and operation of the Sureños within the BOP, and, specifically, the relationship between the Mexican Mafia and the Sureños; (3) how members of Mexican drug cartels interact with the Mexican Mafia/ Sureños; and (4) the process for validating gang members within BOP.  A summary of Mr. Feeney's opinions and expertise has been produced at INV_3193–3196, and is supplemented by the information provided below.  Mr. Feeney's testimony will be elicited in the form of opinions or otherwise, as permitted under Fed. R. Evid. 701, 702, 703, 704 and/or 705.

       A.   Mr. Feeney's Qualifications

       Mr. Feeney is currently an Intelligence Officer with BOP's National Gang Unit—a position he has held since April 2020.  Since April 2020, he has also been a Task Force Officer with the

Federal Bureau of Investigation in Phoenix.  In those roles, Mr. Feeney specifically monitors members of the Mexican Mafia and Sureño prison gangs who are incarcerated in BOP facilities throughout the United States.  The purpose of that monitoring is to ensure that inmates are safely housed and to protect the public.  In order to monitor those inmates, Mr. Feeney has access to information about all validated members of the Mexican Mafia and Sureños, including telephone calls, inmate emails, financial data, and mail.   In Mr. Feeney's current roles, he also interacts directly with BOP facilities—including the United States Penitentiary that houses the stepdown unit for the Administrative Maximum ("ADX") in Florence, Colorado—regarding the placement and movement of Mexican Mafia and Sureño inmates.  Mr. Feeney also conducts and monitors, to a lesser extent, members and associates of Mexican drug cartels housed within BOP facilities.

Mr. Feeney also has 25 years of prior BOP experience.  In particular, he has been assigned to the investigative section of various federal prisons across the United States, including in Lompoc, California; Atlanta, Georgia; Safford, Arizona; Springfield, Missouri; New York, New York; Allenwood, Pennsylvania; Pollock, Louisiana; and Phoenix, Arizona.  Of particular relevance to his expertise in this case was his role as a BOP Special Investigative Agent from 1998 to 2015.  During that time, his duties included monitoring members of specific prison gangs and referring potential criminal actions to law enforcement.  Mr. Feeney's *curriculum vitae*, produced in discovery at EXP_003–005, includes detailed information about his professional experience.

In his various roles with the BOP, Mr. Feeney has monitored prison gangs since 1990.  His knowledge about prison gangs—and, specifically, the Mexican Mafia and Sureños—is based on his experience monitoring inmate communication and activity within BOP; participating in the process of validating gang members for BOP, which includes interviewing inmates who are self-admitted members of gangs; and investigating allegations of inmate misconduct.  Based on working in facilities with members of the Mexican Mafia and Sureños, interacting directly with them, and monitoring their communications and activities, he has learned firsthand about their rules, primary activities, organization, and structure.  Based on his experience monitoring prison gangs, he has also gained knowledge about members of Mexican drug cartels within the BOP and their interaction with members of the Mexican Mafia and Sureños.

 B. Summary of Anticipated Testimony

At trial, it is anticipated that—based on his training and experience—Mr. Feeney will provide expert testimony about the following topics.

 1. Structure and Operation of Mexican Mafia within the BOP

  a. The Mexican Mafia is, first and foremost, a prison gang.  It was created in the mid-to-late-1950s in California to provide protection to its members from inmate-on-inmate physical and sexual abuse in prisons.  Initially, the Mexican Mafia operated primarily within the California Department of Corrections.

  b. The Mexican Mafia began operating in the BOP by the late 1970s, when the first well-known members of the Mexican Mafia were incarcerated in BOP facilities.  The Mexican Mafia orchestrated a number of murders in the BOP in California around that time to assert power and control.  The Mexican Mafia continues to exert control

within prisons, including BOP facilities, through fear and intimidation.

  c. There are currently approximately 35 active Mexican Mafia members in BOP facilities throughout the United States.  There are approximately 10 Mexican Mafia members at the BOP complex in Florence, Colorado, including Richard Santiago and Arcadio Perez.

  d. In order to become a member of the Mexican Mafia, someone must be voted in by the membership.  As explained more fully below, individuals must generally be a Sureño before they can become a member of the Mexican Mafia.  Once someone becomes a Mexican Mafia member, they are able to get a "black hand," which is the Mexican Mafia tattoo.  If someone who was not a Mexican Mafia member got a "black hand" tattoo, they would face significant retaliation from the Mexican Mafia.

  e. Richard Santiago's tattoo, documented at INV_3270–3271, is a Mexican Mafia tattoo.  In particular, Santiago's tattoo includes "the Eternal War," a tattoo that is earned and awarded by the Mexican Mafia for battle.  In addition, the button of the helmet in Santiago's tattoo has the letter "M" for "Mafia."  The Aztec Pyramid that is depicted has 13 steps, a number that is associated with and used by the Mexican Mafia. Santiago's tattoo also includes a black hand, which only Mexican Mafia members can wear.

2. <u>Structure and Operation of the Sureños within BOP and Relationship to the Mexican Mafia</u>

  a. In the 1990s, the Mexican Mafia created the Sureños to serve as the "foot solders" of the Mexican Mafia.  When individuals are initially incarcerated, joining the Sureños gives them the benefit of protection from the Mexican Mafia and other Sureños.  It also makes them eligible to, at some point, potentially become a full member of the Mexican Mafia; generally, someone must be a Sureño before they can be a Mexican Mafia member.

  b. Similar to the Mexican Mafia, the Sureños operate within the BOP and have been formally tracked since approximately 1990.  There are currently approximately 2,000 Sureños in BOP facilities throughout the United States.  There are currently approximately 3 to 4 Sureños at the BOP high level complex in Florence, Colorado, including Francisco Garcia.  There are less than 60 Sureños housed at the medium level facility.

  c. Sureños often have tattoos to identify themselves as a Sureño member.  The most common tattoo utilized is the number 13.  The number 13 is used as a mark to identify loyalty to the Mexican Mafia. The 13th letter of the alphabet is "M," and shows the number 13 shows a Sureño to be a loyal solider for the Mexican Mafia.   Sureño members will also tattoo the words "SUR" or spell out the whole word "Sureño." Additionally, Sureño members will at times have their specific street gang tattooed or represent their gang by having Aztec numbers or Aztec Gods tattooed on themselves. If a Sureño had a street gang tattooed on him, it is not uncommon to see a directional tattoo such as the letters "N" "S" "E" "W" or the words "North", "South", "East or "West" to represent which side of a town or city the gang member if from.

  d. Francisco Garcia's tattoo, depicted at INV_305 and INV_421, reads "SUREÑO" and is a tattoo worn by Sureños.

  e. Sureños are taught to be loyal to the Mexican Mafia, and must follow a strict set of rules implemented by the Mexican Mafia. Those rules may be conveyed orally or, sometimes, in writing. Mr. Feeney has seen confiscated copies of these written rules. The most important rule is that Sureños cannot snitch, *i.e.*, cooperate with law enforcement or any other authorities.

  f. Sureños are required to carry out any orders they receive from the Mexican Mafia. As foot soldiers, Sureños often carry out illegal activities on behalf of the Mexican Mafia to ensure that, if anyone gets in trouble for those illegal activities, it is a Sureño and not a Mexican Mafia member.

  g. Sureños generally cannot carry out any activities that affect the Mexican Mafia—including assaults—without permission. The Mexican Mafia may give advance permission for a Sureño to take some action, such as an assault, or may give a non-verbal signal in the moment.

  h. If, however, someone assaults a Sureño, it is understood that the Sureños will protect themselves and retaliate against that individual.

  i. Similarly, if someone "snitches" on a member of the Mexican Mafia or Sureños, they put themselves at risk of retaliation.

3. <u>Relationship between Mexican Drug Cartels, Mexican Mafia/Sureños</u>

  a. When members of Mexican drug cartels are incarcerated in a BOP facility, they do not wield much influence. They are, however, known for having money.

  b. The leadership of the Mexican Mafia and various drug cartels generally get along well because they have separate roles and spheres of influence. In particular, cartels have lots of money and access to drugs, which can benefit the Mexican Mafia. The cartels do not generally have foot soldiers like the Mexican Mafia, which is able to exert control through the Sureños and acts of violence.

  c. The relationship between Mexican Mafia and drug cartel leadership does not always trickle down to the lower levels. Accordingly, it would not be unusual for members of the Mexican Mafia to attempt to extort a member of a drug cartel.

4. <u>BOP's Process of Validating Gang Membership</u>

  a. BOP has a process to validate inmates' gang membership. There are 10 to 12 different broad criteria that BOP considers, including whether the inmate has any gang-related tattoos, whether the inmate admitted to membership, information from the media, information from inmate communications, and information from inmate activities.

  b. If an inmate satisfies 3 of the listed criteria, he is validated as a member of that particular gang. If he satisfies 2 of the listed criteria, he is identified as an associate

of that particular gang.

  c. The purpose of validating an inmate's gang membership is to ensure that they are safely housed.

## II. Dr. Christopher Capua, Oral and Maxillofacial Surgeon

The United States hereby gives notice, pursuant to Fed. R. Crim. P. 16(a)(1)(G), of its intent to call Dr. Christopher Capua as an expert witness regarding his evaluation and treatment of Oziel Cardenas-Guillen ("Cardenas") in September 2019. A summary of Dr. Capua's testimony and opinions, and the bases and reasons for his opinions, have been provided at INV_421–426, INV_450–451, INV_466–470, the report at INV_3191, and the report at INV_3265, and is supplemented by the information provided below. A copy of Dr. Capua's *curriculum vitae* is provided at EXP_001–002. Dr. Capua's testimony will be elicited in the form of opinions or otherwise, as permitted under Fed. R. Evid. 701, 702, 703, 704 and/or 705.

  A. Dr. Capua's Qualifications

Dr. Capua is an oral and maxillofacial surgeon. In addition to his private practice at Comfort Dental Oral Surgery in Colorado Springs, Dr. Capua is also an on-call surgeon for facial trauma and oral surgery for the major hospitals in Colorado Springs, including the UC Health Hospital, Penrose Hospital, and St. Francis Hospital. Dr. Capua has performed approximately 50 nasal bone fracture surgeries similar to the one he performed on Cardenas. Dr. Capua's qualifications are otherwise outlined in his *curriculum vitae*.

  B. Summary of Anticipated Testimony

At trial, it is anticipated that Dr. Capua will testify that he was on call for oral surgery consults on September 2, 2019. On that day, Dr. Capua received a call from the emergency room ("ER") physician at Penrose Hospital that a patient had arrived with facial injuries. Generally, after receiving such a call, Dr. Capua would first see the patient in an emergency room setting. Here, however, Dr. Capua recalls evaluating Cardenas in a standalone, closed-off room with armed guards. Dr. Capua, who speaks Spanish, attempted to conduct an initial evaluation of Cardenas, but Cardenas was not particularly verbal, and all Dr. Capua could elicit from Cardenas is that Cardenas's face hurt. Dr. Capua noted that Cardenas had a lot of blood on his face and a considerable amount of swelling and brusing, which made it difficult for Dr. Capua to conduct a thorough initial evaluation. Prior to Dr. Capua's evaluation of Cardenas, some of the lacerations of Cardenas's lip had been closed by Dr. Steuer, an ER doctor.

Cardenas was brought to the operating room ("OR") so that Dr. Capua could operate on Cardenas's face. Once Cardenas was under anesthesia, Dr. Capua cleaned up Cardenas's face, which allowed Dr. Capua to better see Cardenas's facial trauma. Dr. Capua close the lacerations on Cardenas's face that had not been closed in the ER. Specifically, Dr. Capua closed a one cm laceration on the bridge of Cardenas's nose and a one cm laceration in one of his nostrils. Dr.

Capua used deep sutures to close the wounds because of the location of the wounds, their severity, and because Dr. Capua assumed he would not see Cardenas again for post-operative care.

Dr. Capua diagnosed Cardenas with a bilateral comminuted nasal bone fracture. This means that the entire nasal bone was shattered into many small pieces. During surgery, Dr. Capua performed a closed reduction of the nasal bone fractures. A closed reduction means that, during surgery, it was not required that Cardenas's skin be peeled back from his nasal bones in order to repair the break. During the procedure, Dr. Capua first inserted cotton material soaked in Afrin into Cardenas's nose. This restricts the constriction of the mucosa, which reduces the bleeding that occurs when surgery begins. Surgery involves re-fracturing some of the nasal bones as they are set into place, which can cause bleeding. Dr. Capua used a "boies elevator" during surgery, which is a tool used during reconstructive surgery to manipulate and align bone fragments in order to reduce the nasal septum and nasal bones. Next, Dr. Capua placed Doyle splints into both nostrils. These splits help align the nasal tissues and bones as they heal, and also has a hole through the middle to allow the patient to breathe, although they often get plugged with blood and mucus post-surgery. The splits are held together with a stitch that is placed through the splints and through the nose. Finally, a Denver splint was placed across the patient's nose. The Denver splint is held in place with adhesive and gives support to the bones and soft tissue as they heal.

Dr. Capua will refer to INV_298–302 when describing the operation on Cardenas. Cardenas's face in these photos is less bloody than when Cardenas arrived at Penrose, presumably because Cardenas kept bleeding en route to the hospital.

The splints placed during surgery are designed to be removed in about seven days, which is long enough to develop primary fibrosis, or healing of the tissues that hold the bony pieces in place. It takes two to three months for ossification of bones to set, but a patient undergoing this type of procedure is not fully healed for about six months post-surgery. The stiches that Dr. Capua used to suture Cardenas were self-dissolving and did not need to be removed.

Dr. Capua performed Cardenas's surgery at around 5:00 p.m. on September 2, 2019. He did a follow-up with Cardenas on September 4, 2019, while Cardenas was still at Penrose Hospital.

From Cardenas's medical records, Dr. Capua understands that Cardenas was given fentanyl. This is prescribed for pain and is given based on a patient's vital signs and subjective pain assessment.

In terms of the nasal and facial injuries only, Dr. Capua expects that Cardenas would make largely a full recovery in time, though he will likely have some scarring and a missing tooth.

In Dr. Capua's opinion, the injuries sustained by Cardenas would have been very painful. In Dr. Capua's opinion, the injuries to Cardenas's face were not sustained by a single blow or accidental fall in which Cardenas hit his face on something. Rather, Dr. Capua's opinion is that the injuries appear to be from multiple strikes to the face. Dr. Capua's opinion is that the trauma to Cardenas's face was not from a high-velocity impact like a car accident, but rather was from

repeated lower-velocity strikes. Based on his training and experience, Dr. Capua was surprised that Cardenas sustained only the nasal fracture given the extent of swelling and bleeding present.

### III. Jeremy Kammrad, Bureau of Prisons Paramedic

The United States hereby gives notice, pursuant to Fed. R. Crim. P. 16(a)(1)(G), of its intent to call Jeremy Kammrad as an expert witness regarding his evaluation and treatment of Oziel Cardenas-Guillen ("Cardenas") on September 2, 2019. A summary of Mr. Kammrad's testimony and opinions, and the bases and reasons for his opinions, have been provided at INV_274–276 and the reports at INV_761 and INV_3262, and is supplemented by the information provided below. A copy of Mr. Kammrad's *curriculum vitae* is provided at EXP_006–009. Mr. Kammrad's testimony will be elicited in the form of opinions or otherwise, as permitted under Fed. R. Evid. 701, 702, 703, 704 and/or 705.

#### A. Mr. Kammrad's Qualifications

Mr. Kammrad is a paramedic at the U.S. Penitentiary ("USP") in Florence, Colorado. Mr. Kammrad received his associates degree in Emergency Medical Services in 2013 and then passed the National Registry of Emergency Medical Technician ("EMT") test to become a licensed EMT in January 2014. Mr. Kammrad began working for the Bureau of Prisons ("BOP") as a paramedic in 2016. As a paramedic, Mr. Kammrad specializes in emergency medicine. Mr. Kammrad also has certificates in advanced cardiac life support, pediatric advanced life support, CBR, and tactical combat casualty care. Mr. Kammrad estimates that he has treated over 400 inmates after assaults, so he is familiar with what inmates look like after a fight. Mr. Kammrad's qualifications are further outlined in his *curriculum vitae* and EXP_10–22.

#### B. Summary of Anticipated Testimony

At trial, it is anticipated that Mr. Kammrad will testify that, on September 2, 2019, Mr. Kammrad began attending to Cardenas after Cardenas was pulled from his cell. Mr. Kammrad noticed that Cardenas was bleeding from the facial area and his face was so swollen that it was unrecognizable. Cardenas's head was also very swollen. Mr. Kammrad may refer to INV_298–302 when describing the injuries. Given the injuries, and the amount of blood, Mr. Kammrad recognized that Cardenas would need to go to the hospital, so Mr. Kammrad told the lieutenant on the scene to call 911.

Cardenas was semi-conscious. He was grunting in pain and breathing, but did not appear to know what was going on. Cardenas was not responding to stimuli. For instance, Mr. Kammrad yelled at Cardenas, did a chest rub, and pinched his fingernails, but Cardenas did not respond. Mr. Kammrad attempted to check Cardenas's pupils. One eye was normal, but the other could not be checked because the eye had swollen shut.

Cardenas was bleeding from his mouth, head, and nose. Mr. Kammrad observed that Cardenas had a hole in the top of his nose that had blood spilling out of it like a whale spout. Cardenas kept trying to clear his airway with what appeared to be reflexive coughing, which was not effective. Once in medical, Mr. Kammrad tried to scoop and suction blood out of Cardenas's

7

mouth. Cardenas's oxygen saturation dropped to 83 at one point, which meant he was not getting enough oxygen to his brain, which could cause cellular death or permanent disability. Oxygen saturation should be over 90. Mr. Kammrad cleaned the blood out of Cardenas's mouth and placed a rebreather mask on Cardenas to attempt to increase his oxygen levels. Eventually, Cardenas's oxygen saturation reached 97.

Mr. Kammrad also assessed Cardenas's other injuries. Mr. Kammrad thought Cardenas might have skull fractures, but it was hard to tell because of the swelling. Cardenas had a hematoma on the back of his head that was so big that Mr. Kammrad could stick his whole fingertip into it. Cardenas's injuries were focused on the head.

Mr. Kammrad noticed that Cardenas did not have any defensive injuries consistent with defending himself in a fight, such as abrasions or lacerations to hands or knuckles. Mr. Kammrad's opinion is that Cardenas was knocked unconscious with a first blow and was unable to fight back. It is Mr. Kammrad's opinion that Cardenas was the victim of a beat-down rather than someone involved in a fight. Further, given Cardenas's injuries, it is Mr. Kammrad's opinion that Cardenas's injuries came from multiple blows to the head, not a single blow.

It is Mr. Kammrad's opinion that, absent the medical intervention described above, Cardenas would have choked on his own blood and died. In Mr. Kammrad's experience as a paramedic at the BOP, Cardenas's injuries are some of the worst he has ever seen. On a scale from one to ten, Mr. Kammrad assessed this injury to be a nine.

**IV.    Testimony Regarding Jurisdictional Element**

On April 7, 2022, the government inquired as to whether the jurisdictional element of the charge in this case—*i.e.*, that the September 2, 2019 incident charged in the Indictment occurred at the United States Penitentiary in Florence, Colorado, which is within the territorial jurisdiction of the United States—is disputed. You have not yet provided a substantive response to that inquiry. In the event that Mr. Garcia disputes that element, the government intends to call a land surveyor to testify to that element. The government provides this notice in an abundance of caution, but does not concede that such testimony would constitute an expert opinion as opposed to lay opinion.

**V.    Government's Satisfaction of Discovery Obligations**

With the provision of this notice pursuant to Fed. R. Crim. P. 16(a)(1)(G), and the discovery materials referenced throughout this letter, it is the government's position that all documents which are appropriate for pre-trial discovery in relation to the above-described testimony have been disclosed. If counsel believes any predicate materials are missing from discovery, then the government will work to provide supplemental materials upon request, if appropriate for disclosure.

        Sincerely,

        Laura Cramer-Babycz
        Andrea Surratt
        Assistant United States Attorneys