1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 21-cr-143-RM
3
UNITED STATES OF AMERICA,
4
     Plaintiff,
5
vs.
6
FRACISCO GARCIA,
7
     Defendant.
8
_____
9
                    **REPORTER'S TRANSCRIPT**
10
                  Trial Preparation Conference
11
_____
12          Proceedings before the HONORABLE RAYMOND MOORE, Judge,

13  United States District Court for the District of Colorado,

14  occurring at 10 a.m., on the 3rd day of May, 2022, in Courtroom

15  A601, United States Courthouse, Denver, Colorado.

16                          **APPEARANCES**

17          LAURA CRAMER-BABYCZ and ANDREA SURRATT, Assistant U.S.

18  Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

19  80202, appearing for the Government.

20          TIMOTHY O'HARA and MATTHEW BELCHER, Federal Public

21  Defenders, 633 17th Street, 10th Floor, Denver, Colorado,

22  80202, appearing for the Defendant.

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Tammy Hoffschildt, 901 19th Street,
25              Room A251, Denver, Colorado, 80294

1          **PROCEEDINGS**

2          (In open court at 10:00 a.m.)

3                *THE COURT:*  Please be seated.  All right.  21-cr-143,

4     United States versus Francisco Garcia.  We're here for a trial

5     prep conference.  Take appearances, starting with the

6     government.

7                *MS. CRAMER-BABYCZ:*  Good morning, Your Honor,

8     Laura Cramer-Babycz and Andrea Surratt on behalf of the United

9     States.

10               *THE COURT:*  I assume that the two behind you, are also

11    part of your minion?

12               *MS. CRAMER-BABYCZ:*  Yes.  Ms. Hammond and Ms. Nelson

13    are paralegals with our office, and will be helping during

14    trial.

15               *THE COURT:*  All right.  Good morning to them, as well.

16               *MR. O'HARA:*  Good morning, Your Honor.  Timothy O'Hara

17    here on behalf of Mr. Garcia.  He is seated to my left.  He is

18    appears in custody.

19               *THE COURT:*  All right.  Good morning to you --

20               *MR. O'HARA:*  And --

21               *MR. BELCHER:*  Matthew Belcher, as well.

22               *THE COURT:*  -- as well as to both counsel, as well as

23    to Mr. Garcia.  All right.  Lots of moving pieces here.  Let's

24    see what we can do in terms of addressing them.  What I want to

25    do, first, is deal with what I call the regular stuff, and what

1    I mean by that is, how I do things, how this is going to

2    present.  When we get through with that, there are a variety of

3    pending matters that I want to address, because they -- they

4    will shape the trial, whatever that ultimately means.

5         So, I think it's correct that none of the four of you

6    has appeared here for a trial, although, it may be that some of

7    you have popped in at various points in time, when others are

8    trying cases.

9         On the first day of trial, I ask you to be here at

10   8:30.  I come out at 8:30 to see whether there are any

11   last-minute issues.  I hope and expect there to be none.  I

12   have no such delusion in this case, but we will see.

13        If there is nothing or it doesn't take very long --

14   well, I want it to not take very long, because we are going to

15   get this jury up here at 9 o'clock, but if there is something,

16   we can resolve it.  If not, I go back out, and at 9 o'clock the

17   panel comes up and Ms. Pearson assumes the role of *woman in*

18   *charge*, and what I mean by that is, I don't come out until she

19   gets the group seated in the back, we get 13 in the box.  When

20   that's all done, then I come out, because, frankly, watching

21   her call names has excited me over the years, but it's a

22   process I can do without.

23        What I would probably ask, while we're kind of all

24   sitting here and looking at each other, is that any BOP and/or

25   U.S. Marshals people, all be in the well; meaning, front seat.

1    I don't care which side, but it's probably going to be a little

2    packed in terms of juror -- panelists in the back.

3           All right.  As I said, I put 13 in the box, and I

4    address my questions primarily to those 13.  To the extent that

5    there are substitutes, when a substitute enters the box, what I

6    simply ask him or her the following two questions, *Did you hear*

7    *the questions that were asked this morning?  Yes.  Did you have*

8    *any yes answers to any of the questions*?  Assuming they say

9    yes, we get out what it is they had yes answers to and we go

10   from there.

11          In terms of the 13, one of the seats is the alternate,

12   that seat is the seventh seat in the back.  It is the one --

13   you can look at it one of two ways, the uncovered juror,

14   because we're going to start at this end, filling across.

15   Okay.  So, when you put seven in the back and six in the front,

16   what I mean by the *uncovered juror*, there will be somebody in

17   the back that won't have somebody in front of them; that person

18   will also be in the back row closest to the exit door; that

19   person is the alternate, whoever he or she may be.

20          I give you each one additional strike that can only be

21   used on the alternate.  I don't care when you use it, but if

22   you are going to use it, it can only be used on the alternate.

23   In terms of strikes, I go six rounds.  What I mean by that is,

24   and I will give you the numbers, government, round one, you get

25   two, and then thereafter, one, one, one, one, one one.  I

1   probably am missing a *one*.  Two for the first one, only one

2   thereafter.  For the defendants, it is all twos, except for the

3   last one.  So, it's two, two, two, two, two, one.  Question

4   becomes, *What if you accept the panel*?  You accept the panel as

5   constituted, then you accept the panel as constituted, however,

6   let's just say that the government accepts the panel as

7   constituted.  Let's say Mr. O'Hara strikes juror number three,

8   juror number three is now replaced.  They are still live for

9   the government, but the government cannot challenge anything

10  except that live seat, or live seats, as may develop, and,

11  obviously, the reverse is also true.

12       They probably will be wearing masks, and I am not

13  going to do anything other than tell them that masks is their

14  choice.  If everything goes to form, what happens is, at the

15  beginning stages, everybody is masked, and within two hours of

16  an actual jury being selected, they begin to fall off, like

17  leafs in the autumn, and by the end of the day or second day,

18  essentially no masks over there, but I'm not going to require

19  them to mask up or down.

20       Let me stop.  In terms of where I am, right now, at

21  this -- thus far, questions?

22       *MS. CRAMER-BABYCZ:*  Not from the government.  Thank

23  you.

24       *THE COURT:*  You don't have to get up.

25       *MR. O'HARA:*  No questions.

1        THE COURT:  All right.  That brings to mind one other

2    thing that I should mention; and that is, when the jury comes

3    in and when the jury comes out, you don't stand; butts in

4    seats.  Again, it's just my own personal preference.  It

5    becomes an exercise where people try to shoot up ramrod

6    straight, backs straight, head held high, and it's actually, to

7    me, more comical than necessary, and so I will keep the

8    standing privilege to myself, selfishly to myself, and not

9    require that anyone stand up and down when the jury is coming

10   in or going out.

11        All right.  Obviously, I do voir dire.  I'm giving you

12   15 minutes.  I previously ruled that I'm not doing the videos,

13   or allowing the extra time that has been requested.  I should

14   say what I do is I go through the voir dire, I have them

15   tell -- tell them -- tell you about themselves, by asking 13 or

16   so standard questions.  *What do you do for a living?  What's*

17   *your husband or wife do for a living?  What are your hobbies?*

18   *What television shows do you watch?  Newspaper?  Where have you*

19   *lived outside of Colorado,* that kind of standard stuff, to make

20   sure that everybody says something during the course of the

21   trial.

22        In terms of strikes, what happens is Ms. Pearson will

23   bring the sheet first to the government, write the names, show

24   it to defense counsel, but there's no reason for long

25   discussion here.  It's just so that they can know, in advance,

1    and know if they wish to approach the bench for a challenge,

2    that's the only reason I'm -- I'm saying to show it, and then

3    you simply announce who you are going to thank and excuse.

4    Same is true for the other side.

5         If there are challenges, it's on you to raise that.

6    I'm not going to do it; just have people parading up constantly

7    saying, *Are you sure?  Are you sure?  Do you have any*

8    *challenges*?

9         Okay.  Openings, I don't time them.  I don't do the

10   sun -- not the sundial or the hourglass or whatever it is that

11   some other people have done.  My view of it is, you be

12   professional and you won't have a problem with me.  You keep

13   mining the same little pile of dirt, and all of a sudden it's

14   going to be, you are interrupted by things like, *Can we move*

15   *along,* or whatever.

16        So, I guess I should say, while I'm not putting time

17   restrictions on you, the better you are, the better I will be.

18   How is that?

19        In terms of the evidence, I don't think there's

20   anything extraordinary there, except that I'm going to have

21   some people move around, as I told you at our earlier session,

22   and to some extent I'm going to need to know, roughly a day in

23   advance when I need your witnesses.  If I need your witnesses,

24   I may need them on different days, just because of the security

25   issues.  And, of course, I will get rid of the jury to move

1   them in and out.

2          I instruct after you close.  You close, I instruct.

3   The reason for that is the last voice is going to be mine.  It

4   is not the case that I want the last voice to be a party.  I

5   know which party it would be, it would be the government, but

6   that's not anything particular.  Frankly, if it were the

7   defendant, it would still be the same; that is, the last voice

8   is mine.  That always raises an argument -- an issue, I should

9   say, for some reason with, *Well, what do we do with the*

10  *instructions*?  I don't want you reading them to them.  I don't

11  want you holding them up.  I don't have any problem with you

12  saying things along the lines of, *We anticipate that the Judge*

13  *will tell you, that*... whatever it is, *reasonable doubt*

14  *means*... or whatever.  I don't want a bunch of slides that are

15  really my instructions.

16         I will instruct at the end, but I do understand that

17  there may be times where, like elements are critical to you,

18  and I don't have a problem with a slide that, kind of, shows

19  elements; not the whole instruction, but just the elements.

20  Beyond that, that's sort of how I do things.

21         I repeatedly urge people to get in touch with

22  Ms. Pearson about IT matters.  We've had issues, it's not

23  something that I could say is always counsel or always the

24  Court or always our connections, but we've had issues where

25  sometimes I have had Ipad connections that don't work, but

1    Windows connections do.  It's worth it to test the connections

2    either -- well, you can get with her and she can tell you when

3    you can come over, and make sure that those things work.

4         In terms of exhibits, at the end of the day, what I

5    want to send back is -- I'm assuming there's a book.  I want to

6    send back paper.  I also want to send back, to the extent that

7    I can, digital copies, so that if people don't want to touch

8    paper, they can use the digital copies.  The only other thing

9    that I will tell you is that, just like in all courtrooms,

10   certain monitors are live; meaning, you can draw on them.  The

11   persons who can draw on them are myself, whoever is at the

12   lectern and whoever is in the witness box.  The exhibits on the

13   tables -- I mean the monitors on the tables are not live in

14   that sense.  And how to draw and how to clear it, again, you

15   can get with Ms. Pearson with regard to that.

16        I do have one minor caution, with regard to the

17   government and its table; that monitor, its placement is not

18   the best for you, just as on the defense side, its placements

19   is not the best for you.  If, for whatever reason, Mr. Belcher

20   were to turn it a little bit towards him, so he could get a

21   better view, rather than having to lean into it, I wouldn't

22   care a whole lot; it's if Ms. Surratt did that, I would care a

23   whole lot.  The reason has nothing to do with you as individual

24   lawyers, it is the government's table is much closer to the

25   jury box, and exhibits come up on the screen for counsel and

1    the witness before they are admitted.  I don't want the jury

2    being able to see things before they are admitted, so I tend to

3    be a little more -- pay a little more attention to the

4    positioning of the government monitor, and every now and then

5    we've had scenarios where Ms. Pearson will just get up, walk

6    across and move it, and it seems strange, and you know, I don't

7    want a tug-of-war going on, because you will lose.  It's as

8    simple as that, but that's the reasoning for it.

9         I'm going to stop again, say, questions?

10        *MS. CRAMER-BABYCZ:*  Your Honor, we just wanted to

11   raise one issue with respect to exhibits.  There are a number

12   of physical exhibits that have both blood and OC or pepper

13   spray on them.  We will -- I think probably the best course is

14   to maybe not send those back with the jury.  The witness will

15   open them on the witness stand and identify them.  They are

16   aware of -- they will have gloves and everything like that.

17   They are aware of the bloodiness and the pepper spray that are

18   on them, but we just want the Court to be aware.

19        *THE COURT:*  I'm assuming whatever is on there is dry?

20        *MS. CRAMER-BABYCZ:*  It is, Your Honor.  But the pepper

21   spray --

22        *THE COURT:*  The pepper spray creates an odor, I get

23   that, that I can handle by simply warning them, that -- well,

24   there's two things; number one, do not take stuff out of the

25   bag just to show me, and have everyone in here now start going

1    (coughing) ... because -- air it out.  I don't know what to

2    tell you.  But obviously, I appreciate the notion that we

3    shouldn't send it back to the jury.  I can assure you that

4    Ms. Pearson is a lot closer to the jury (sic) and she is no

5    more interested in having OC smells going to her than any juror

6    would be, but I appreciate that.  Other than that?

7            MS. CRAMER-BABYCZ:  Nothing else.

8            MR. O'HARA:  Your Honor, does -- does the 15 minutes

9    for voir dire apply to subsequent jurors or is that just for

10   the original 13?

11           THE COURT:  The original.  Get out your questions and

12   we go from there.

13           MR. O'HARA:  All right.  So for each subsequent juror,

14   is there additional time?

15           THE COURT:  No.

16           MR. O'HARA:  Okay.

17           THE COURT:  It's 15, use it or lose it.

18           MR. O'HARA:  Okay.  And then the Court, you mentioned

19   digital copies to the jury, of exhibits.  Do you want those in

20   advance on a flash drive?

21           THE COURT:  You can bring them on a flash drive;

22   however, if you want to, on the morning of trial, and give them

23   to Ms. Pearson, that's fine.  I mean, I'm not -- I looked at

24   the exhibit list briefly.  I want to say most of it is

25   photographs, and may be some items of clothing or something

1    like that, but that's fine.  And again, what always happens is

2    sometimes exhibits don't come in, so they need to be -- you

3    need to be able to respond to dumping things off of that drive,

4    if they don't come in.

5          I have -- I'm sorry, I didn't want to cut you off.

6          MR. O'HARA:  Nothing else.  Thank you.

7          THE COURT:  I have a question, and the question is

8    this; and that is, whether or not -- and I have seen this both

9    ways, so I'm not suggesting anything.  Mr. Garcia, will appear

10   as he does today; meaning, in his inmate attire, or are you

11   going to do suit?  Suit -- civilian clothing.

12         MR. O'HARA:  We will have civilian clothing for

13   Mr. Garcia.

14         THE COURT:  Obviously, you need to get with the

15   Marshal to make sure that that is brought up and available,

16   sufficiently, in advance.

17         Before I came out, Ms. Bader came out and gave you

18   each a copy of jury instructions, the modified Indictment and

19   verdict form; simply put, you got it to me, and so I figured I

20   would get it to you as quickly as possible.  Nothing there is

21   final.  I don't mean it to be.  But it's probably what I'm

22   leaning towards, and I'm not going to do it -- an instruction

23   conference now.

24         Let me just tell you some very brief things.  Number

25   one, in terms of the Indictment, I clean it up, to get rid of

1    numbering of defendants, because sometimes that might suggest,

2    you know, number one, there's a number two somewhere, or

3    whatever the case may be.  I get rid of that large block that

4    tends to be on the lower left-hand side, which is the US

5    Attorney's name and their office and all of the rest of it,

6    because I think that that's, essentially, some degree of

7    vouching, and I don't think it's necessary.  So, it gets

8    cleaned up in that way.

9         Number two, the verdict form, I want to say, without

10   material change, I may have -- I seem to remember moving a

11   paragraph setting in from the margin.  There may be some minor

12   other changes, but nothing significant.

13        In terms of the jury instructions, I'm not trying to

14   be tricky here.  I will tell you what I think are matters that

15   you will care about.  In terms of the government's

16   investigative techniques instruction, my leaning, at this time,

17   is not to include it and it's not in there.  The same is true

18   with regard to the gang instruction, but that may be subject to

19   some revisiting when I see what the evidence looks like.

20        In terms of the defendant, you just keep chopping at

21   that tree; that reasonable doubt instruction is not going to be

22   given.  And again, I understand -- when I say *you keep chopping*

23   *at that tree*, I understand that it is one that is preferred,

24   but it is not the Circuit instruction.  It is not something --

25   I believe there's been some opinion on it.  It's not required,

1   and I am not giving it.

2          As to you both, I didn't like the way either one of

3   you handled the self-defense, and all that I mean by that is,

4   the government's position -- instructions were most true to the

5   Circuit pattern instruction, but of course, the pattern

6   instruction leads you to some awkwardness, and what I mean by

7   that is this, at the end of the elemental instruction it says,

8   *If you find these things to be true, then you should find the*

9   *defendant to be guilty.*  Well, in a self-defense case, that's

10  not really the way it works, because there's this additional

11  issue that needs to be addressed.

12          The defendant tried to solve that issue by throwing,

13  *he did not act in self-defense*, in as an element.  Well, it's

14  not an element.  It's something else.  It's a defense and it's

15  not limited to whether he acted in self-defense.  There's also

16  an exclusion possible, because the response, although perhaps

17  appropriate self-defense, was not a reasonable response, and

18  that's not worked in.  So, I took a crack -- and I am telling

19  you it doesn't come from anywhere.  I took a crack at trying to

20  address the element and the approach to the self-defense issue

21  more out of my head, than grabbing something from somewhere

22  else.  I'm calling it to your attention simply to say, you may

23  both want to look at it.  Obviously, you want you, but I'm just

24  being upfront with you, that that's sort of where I came down,

25  as a way of dealing with it.  It is a little wordy, but I am a

1    little wordy.

2         All right.  One more thing, you, Mr. O'Hara and

3    Mr. Belcher, you obviously try your case, and whatever you do

4    is whatever you do.  What I want to be clear about is this, the

5    fact that I have set these instructions as including a

6    self-defense instruction, does not mean you get the

7    self-defense instruction regardless of what you do.  I'm not

8    trying to tease out the two pieces, but the two pieces are

9    obviously the -- the violence and the -- the threat.  The other

10   piece is the immediacy.  If I don't have both pieces, do not

11   assume that you are going to get a self-defense instruction.

12   That's all.  And again, I'm not trying to prejudge anything,

13   I'm just saying that's the way it's ultimately going to work.

14        All right.  I stop again.  Anything?

15        MS. CRAMER-BABYCZ:  Your Honor, just one minor thing.

16   On the jury instructions, which is the -- throughout, we will

17   need to change Mr. Cardenas-Guillen's first name to be spelled

18   O S not O Z; that's something that he just recently told us.

19        THE COURT:  How is it spelled, now?  O Z I E L?

20        MS. CRAMER-BABYCZ:  Yes.

21        THE COURT:  Deanne, do a word search on O Z I E L, and

22   change is to O S I E L.  Thank you.

23        MS. CRAMER-BABYCZ:  Thank you.

24        THE COURT:  And obviously if that's the biggest thing

25   that's an issue, we've all succeeded tremendously.

1          I do this *Wizard-of-Oz thing*, that I speak out into

2    the clouds.  I can tell you that Ms. Bader heard me.  She is

3    making the change.  I'm not going to bother printing it out

4    now.

5          Okay.  Now, let's turn to -- before we turn to the

6    various things that are pending, let me see if there's anything

7    else that anybody wants to ask about anything having to do with

8    the trial?  Government?

9          *MS. CRAMER-BABYCZ:*  Not from the government.

10         *THE COURT:*  Defendant?

11         *MR. O'HARA:*  No, Your Honor.

12         *THE COURT:*  All right.  So, let me just give you this

13   kind of global view of how I see things, as they relate to

14   different issues, and it will serve two purposes; one, it will

15   inform you as to how I see things; and two, it will inform

16   other things that are to come.

17         Obviously, in this type of case, with this type of

18   charge, there's a question, and that question is -- surrounds

19   the issue of violence, and so in an assault case, can you, the

20   defendant, put on evidence of the victim's propensity for

21   violence, notwithstanding the fact that ordinarily propensity

22   evidence is not allowed?  The answer is yes, in my view, to a

23   degree; and what I mean by that is, that regardless of whether

24   or not Mr. Garcia testifies, propensity evidence as to the

25   victim can be introduced, but it is confined to reputation or

1    opinion evidence, and I don't know that this -- I don't think

2    anybody really disagrees about any of this, but I'm just laying

3    out how I see it.

4         So the question is, what reputation evidence is going

5    to be allowed?  And there are -- there have been requests made,

6    whether it be by government motion in limine or defendant

7    motion in limine, for me to shape the scope of the reputation

8    evidence.  I am not going to allow reputation, preconviction in

9    Mexico, into evidence.  I think it's simply three things;

10   number one, it's disconnected by way of the circumstances; that

11   being said, I don't rely on that terribly.  What I mean by that

12   is what somebody does when out on the street in Mexico is not

13   necessarily relevant to what one does in a BOP setting.  But as

14   I said, I don't really rely on that.

15        The two things that shape my decision are these;

16   number one, it's got to be something that is not too remote in

17   time, and then it's got to be in the right community.  If I

18   were accused of something, and it turns out that when I was in

19   college, I had a reputation on the East Coast as being, I don't

20   know, a particularly violent "Yalie", which means I said *boo*

21   *boo* or something like that, because they tend not to be very

22   violent at that institution, and more nerdy than anything;

23   myself included.  Whatever that reputation was, it really

24   doesn't have a whole lot to do with anything here, in Denver,

25   now.  And what we're talking about in terms of a reputation, in

1    Mexico, and bringing people up to say, as to what he was like

2    in Mexico, and what he did prior to being charged and arrested,

3    is we're talking about things that, on one hand, are, I think,

4    the timeframe is right, pre-2007, and then, certainly, prior to

5    conviction would be pre-2010, there was a period of time when

6    the victim here, whose name I will continuously screw up,

7    Cardenas, was in prison in Mexico, and he was eventually

8    brought to the United States, some time later, probably 2009 or

9    thereabouts.  I don't have that quite lined up in my head.

10          So, as far as I'm concerned, all of this stuff about

11    bringing up somebody from Texas, an AUSA who was a prosecutor

12    and saying what his reputation was in Mexico, is simply too

13    remote in time and not the right community.

14          The question is what, of course, is the right

15    community?  And from my perspective, there are two.  One is the

16    inmate community in the, let's say, Florence campus, but in the

17    BOP is what I'm really referring to.  The other is, the BOP

18    community.  It's an odd scenario, but one could have, for

19    example, different reputations with each of those two layers,

20    and I don't exclude one and elevate the other.  They are

21    different communities.  There's an artificiality there, but the

22    artificiality is due to the fact that it's a prison.

23          So, what am I saying and not saying?  What I am saying

24    is the reputation among the inmates in the BOP is whatever it

25    is, and to be clear, if the reputation is, and I don't know

1   what it is, there's a lot of noise going back and forth about,

2   you know, don't put this in, put that in, we will see what it

3   is, but if the reputation is, well, he -- and I am using this

4   as a broad example -- he is a violent individual who has, in

5   the past, or has in Mexico, had people killed.  Am I letting

6   that in?  Yes.  Assuming that that is the reputation that he

7   has in the inmate community at the BOP.  Sorry.

8            Am I letting in people from Houston or Mexico or

9   wherever, testify as to what was really going on in Mexico?

10  No.  I don't think -- I think the reputation is whatever the

11  reputation is, and I don't get to limit it or restrict it,

12  based on what it is based on.

13           So, I'm drawing a line, and I hope you both understand

14  it.  It is, essentially, that we're not getting into this

15  proving up and bringing AUSAs from the Southern District, up

16  here to say what do they know or FBI agents about what do they

17  know that he did back in Mexico.  The reputation in the BOP is

18  the reputation in the BOP.  The inmate reputation is whatever

19  it is.

20           In terms of the -- let me be clear, the inmate

21  reputation is whatever it is.  Whatever the reputation is at

22  the BOP level, is an additional form of reputation that I will

23  allow.  I'm not making a clear ruling with regard to the Sam's

24  issue, but I'm more open to the Sam's issue than to some ...

25  well, some DOJ or somebody talking about what his -- what he

1    did or -- what they believe he did or did not do in Mexico.

2    It's what -- what was his reputation within the BOP structure?

3          Now, to some extent, that may be subject to being kept

4    out as simply too remote.  There's a gray area here.

5    Obviously, I'm not saying -- when did this was happen?  2018?

6    '19?

7          MR. O'HARA:  Nineteen.

8          THE COURT:  Nineteen.  Obviously, I'm not saying it

9    has to be within the six minutes before the assault, and I am

10   clearly saying that, you know, the decades-plus stuff that you

11   have introduced or requested of me is too remote.

12   Twenty-fifteen?  Maybe.  Twenty-ten?  Probably not.  And the

13   only reason I'm saying maybe, is I have seen some of it.

14         Mr. O'Hara chose to, I don't know, tease me, gives me

15   one page, but doesn't give me any other page.  I don't know

16   what the heck is on it.  I'm not really terribly ticklish.  I

17   don't care to be teased.  I can resolve that at a later point

18   in time.  What I'm telling you, the two of you, I mean both

19   sides can talk about that, but that's, in broad strokes, how

20   I'm seeing this.

21         We are not having a trial with everybody from Mexico

22   or everybody from the Southern District of Texas or everybody

23   who investigated the case for which Mr. Cardenas stands

24   convicted, coming in and telling us about all of this stuff

25   that happened back then.  What his reputation is, is what his

1    reputation is.  I'm assuming that you can put on the correct

2    foundation, I will allow the reputation in, and you live with

3    it; both sides, reputation, of course for violence, they can,

4    of course, challenge with reputation evidence, as well, for

5    peacefulness, and we see where we are.

6           Next question, what about bad acts?  Can we get

7    into -- yes.

8           *MR. O'HARA:*  Your Honor, may I just put the document I

9    gave to the Court in context?  The --

10          *THE COURT:*  I thought I did; you wanted to tease me

11   with something; you did.

12          *MR. O'HARA:*  No.  It really was to provide a complete

13   copy of something that's already been tendered to the Court

14   which was in through **Document 82**, my Motion To Compel,

15   Unredacted Information, that's the first page in the document

16   that the Court has already received.  If you see at the bottom

17   it's INV_953.  The Court has received it at **Document 82-1**, as

18   INV_954, so I didn't submit it, because there was nothing

19   redacted on it.

20          *THE COURT:*  Okay.  Okay.

21          *MR. O'HARA:*  But that puts it in context.  Thank you.

22          *THE COURT:*  Okay.  Bad acts.  Generally, they are out.

23   Specific instances of conduct, they are going to stay out here,

24   as well.  But I can't make a particular ruling, because I don't

25   have a particular thing in front of me.  What I mean by that

1    is, I, somewhat, feel like I'm in those old Warner Brother

2    Cartoons with the little devil on one shoulder and the little

3    angel on the other.  Sadly, neither the little devil or little

4    angel is the same on each issue.  It's, you keep changing,

5    going from halo to horns and back and forth and back and forth.

6    I don't really know what specific acts anyone is interested in

7    arguably bringing in, but in general, they are not coming in,

8    subject to an additional footnote.  The additional footnote is

9    this, *What if the defendant testifies and he has personal*

10   *knowledge of a specific act of violence?*  In that instance,

11   would I let it in?  The answer is, *I probably would*, because in

12   that scenario it goes -- if it goes to propensity of the

13   victim, perhaps it does, but what it really goes to is the

14   reasonableness of the response, and I am not going to keep it

15   out if it goes to the reasonableness of the response which, of

16   course, depends upon the belief of the defendant.

17          That being said, I am not letting reputation be used

18   as a backdoor way of getting into specific acts of conduct.

19   What I mean by that is this, *Oh, his reputation in BOP is that*

20   *he killed a guy in, I don't know, Mexico City, on October of 19*

21   *... pick a year, let's say 2000*.  Well, if that's the

22   reputation and that comes in, the fact that it is a precise

23   reputation that goes to some belief as to specific degrees of

24   dangerousness, does not mean that I'm requiring the government

25   to turn over evidence with regard to such things or allowing

1    you to prove them up, because all that that is doing is taking

2    reputation evidence, and saying it is the key to opening the

3    floodgates to anything that is the subject matter of

4    reputation.

5         If there's going to be some bad act evidence, I'm

6    going to look for some connection, some personal connection

7    between the defendant and said bad act.  Now, I'm not saying --

8    well, I am saying, that if -- if it is -- I stood there and

9    witnessed it, obviously that's pretty good connection.  I'm not

10   saying where -- that it has to be *I witnessed it*; but I am

11   saying that I'm not -- it has to be something that gets you

12   from just randomly throwing stuff out there, saying it's

13   reputation, or quote, I heard that, and therefore I get to

14   prove that; that's not the way that this is going to work.

15        So, that's the backdrop against which I now come to

16   these various things that have been presented to me.  I'm going

17   to make clear, now, that I am going to speak of -- well, that

18   all of the things that have been presented to me, some of them

19   have been filed with various degrees of restriction, and those

20   various degrees of restriction still hold.  I'm not intending

21   to get into having argument, because you each briefed this out

22   adequately, as far as I am concerned, and we get into the

23   tricky scenario of asking for supplemental argument in a public

24   setting with regard to something that is in a restricted

25   filing.

1          I am going to say that there will be times when I am

2    going to use an expression, *assuming arguendo*, and what I mean

3    by that lawyer term, is I'm not saying something is or is not

4    the case.  I'm saying, it doesn't really matter to me, and even

5    if I assumed that it was the case, here is what my ruling would

6    be.

7          First thing I address is government motion at limine,

8    which I think is **Number 61**, and I think there may have been a

9    supplement, because I also got **76**.  With regard to that, yeah,

10   ... let me deal with them as follows.  Let me deal with **61**

11   first.  I'm going to grant it in part and deny it in part.  In

12   terms of the part that is granted, it is based on what I

13   currently know.  I am excluding evidence of specific acts and

14   the victim's reputation outside of prison, but I think I have

15   already said that and tried to be very clear in terms of how

16   I'm categorizing different potentialities.

17         In terms of whether or not the defendant's prior

18   conviction -- excuse me -- the victim's prior conviction comes

19   in, all of them, the answer is yes.  I'm not going to overly

20   sanitize things, especially when I am aware of the fact that

21   equally disturbing convictions might exist for others in this

22   case.  More than that, again, we're talking about an ADX USP

23   case.  If any of the jury really believes that this is the home

24   of the wrongly convicted, well, there's going to be all kinds

25   of trouble with the jury verdict in this case.  I don't know

1   that there needs to be a whole lot more said about that, with

2   regard to that.

3         In terms of the supplement, let me just back up one

4   little bit.  As I have been talking about reputation, I have

5   been talking about reputation as it pertains to propensity of

6   the victim.  There's also reputation evidence that can come in

7   with respect to truthfulness or untruthfulness, and obviously,

8   that reputation evidence, if we're talking about generalized

9   reputation can come in.  It is also the case that if attacked

10  as untruthful, I can allow specific instances of conduct, if it

11  goes to truthfulness to be admitted; and what I'm going to do

12  is say that I think this is fair, **76**, goes to specific

13  instances of conduct relating to a document -- actually three

14  documents.

15        I'm granting the motion in limine that has been

16  requested with respect to those documents, and I am not going

17  to get into any great discussion, at this time, beyond saying

18  there was some question as to whether I had seen said

19  documents.  The answer is yes, but I think that there's a

20  balancing under 403 that has to occur, where issues that I

21  consider to be irrelevant are not going to be dragged back into

22  this trial, and we're turned into sideshows, if we can find

23  another means of getting it in.

24        In terms of the document that is being referenced,

25  that only counsel has seen, you can, in fact, Cross-examine,

1    with respect to the fact that the victim lied on forms that

2    were submitted on three occasions to the BOP.

3            I am not restricting the Cross-examination to where

4    you need to trivialize the matter to the point where it could

5    be what he wants for dinner that night.  I don't have a problem

6    with, on three occasions he was presented with forms from the

7    BOP.  I don't have a problem with those were important forms,

8    that are important both to you and the BOP.  I don't have a

9    problem with, *Those forms are relied upon by the BOP*.  I don't

10   have a problem with, *And you lied with respect to matters on*

11   *those forms*, and that lead up is -- that's as far as it goes.

12   And I have considered all of the material that's been submitted

13   to me, and on a 403 balance, I think that that is the

14   appropriate way of resolving this; and if not, well, the

15   Circuit will say.

16           The next thing I want to deal with is, I believe it is

17   **ECF Number 80**, which is a Motion To Compel Discovery with

18   regard to what the defendant believes to be cooperation that

19   the defendant believes must have occurred.

20           I have looked at this issue, and to be clear, the

21   defendant has his beliefs.  The government has not and is not

22   confirming or denying the accuracy of those beliefs.  So what I

23   have is one side standing across the room saying, *The victim*

24   *must have cooperated, because a bunch of newspaper stories say*

25   *so, and we think so*; and the government saying, *Whether he did*

1     *or he didn't, we are not talking about that in one way or the*

2     *other.  We are not confirming it; we are not denying; it just*

3     *doesn't have anything to do with anything and so we're not*

4     *getting into this and are resistent.*

5         What I am saying is that I'm denying the motion

6     because I have looked at the possibilities, I have looked at

7     the way it has been framed and presented to me, I have looked

8     at it myself.  I consider the request to be a fishing

9     expedition with regard to matters that are irrelevant, more

10     prejudicial than probative, and matters that would take the

11     jury off, if they were shown to exist, into mini trials and

12     extraneous presentations that, frankly, is a waste of time and

13     is excludable under 403.

14         To be as clear as possible, I understand that there --

15     and I am not accusing anybody of anything, but I understand

16     that there may be two tactical reasons why such a request has

17     been made; if, in fact, you have got your finger on the pulse

18     of something that the government cares so much about, that they

19     would dismiss the case, clearly, you want to put pressure on

20     that pressure point.  I don't know whether they would or they

21     wouldn't, but to me, that's a side issue that has nothing to do

22     with the trial.

23         The other thing is this kind of information, if you

24     can find it, obviously is worth something in the BOP, and when

25     I say it's worth something, I mean it's worth something if it

were true to people who could wander around holding things or saying things.  This type of information is what has historically led, in the past, to PSR parties that are conducted at institutions; at demands that you write your lawyer and get your *paper*, your paperwork.  It's even led to the judicial counsil coming up with some rule or suggestion that this District doesn't follow about filing plea agreement supplements in every case so that nobody can know, because -- and I am not being facetious here, people die over this kind of stuff.  So, I'm not saying it's there, I'm not saying it isn't, but I'm saying, apart from the tactical reason, I don't see an evidentiary basis for any of it, even if I were to assume that there was something there, whether it be minor or substantial.

I'm told it's for impeachment purposes, in terms of the form on the BOP.  I have already addressed that; that is coming in.  I'm told it's been made a part of this case by the victim.  I dismiss that entirely.  I looked at what has been submitted to me, as I understand it, in coming up with explanations when asked as to what might have happened, he said something along the lines of, *The blacks might have said that I was cooperating.*  Okay.  So, quote, *The blacks* unquote, *might have said something along these lines*; that doesn't make it part of this case.

Bias, I -- again, if there's some truth, it's a non sequitur.  Somebody who cooperates in the course of

1   prosecution, does so not because he or she is bias in favor of

2   the government.  They do it to reduce the time; that's what

3   happens every day.  To say they are biased because they are

4   cooperating, I don't even understand that from a logical

5   standpoint, but more importantly, I suppose, I don't understand

6   it from an evidentiary standpoint, because what, *I'm biased in*

7   *favor of the government, therefore, I'm going to testify that*

8   *this defendant did it, not because I believe he did it, but*

9   *because they wrongly believed that he did it, and I want to*

10  *help them get the wrong...*  The whole thing just turns into a

11  bunch of gibberish as far as I'm concerned.

12          Now, it's not impeachment, it's irrelevant, it's

13  remote, it's prejudicial, it is a waste of time.  Don't bring

14  it up.  Now, that being said, let me be clear about something,

15  if there is any form of current cooperation with the BOP, I

16  expect that to be turned over.  If there is any promise,

17  inducement for Mr. Cardenas' testimony, given to him by the DOJ

18  or the BOP, I expect that to be given over, but this notion

19  that I'm going to allow this side show of discovery into

20  anything that maybe happened or didn't happen or might have

21  happened or that the press thinks happened, it really just --

22  it doesn't -- it's not coming in, and my reasons are as I have

23  explained.

24          There is another motion to compel me to look at

25  redacted -- at redactions.  As far as I can tell, what the

1    government's view of this is, it's a waste of judicial

2    resources.  Give them to me by the end of tomorrow.  I will

3    look at them and I will decide how to waste my own time.  I'm

4    not saying it is a waste.  I'm not saying it's not a waste.  I

5    am saying, you should, by now, be able to predict what it is

6    that I would consider turning over, and what it is that I would

7    not.  I don't know what's in the redaction, because I can't

8    read behind black -- blackout anymore than anybody else can,

9    but I will look.  That does not mean that I will order.  I will

10   try and get you a TOE, saying I'm ordering a disclosure or no

11   additional disclosure some time Thursday.

12         There is, I believe ... a Motion To Amend The Second

13   Protective Order.  Again, this goes back to documents that I

14   have talked about previously, that motion is denied.  I'm aware

15   of what has been presented to me as basis for having the order

16   amended, so that these documents can be presented to

17   Mr. Garcia.  I don't find any of it compelling or convincing.

18         I understand the burden is on the government, but I

19   think that the protective order is appropriate, in this case,

20   and insofar as there are attempts to, kind of, bleed this into

21   some kind of an ethical issue, my view is, it simply is not.

22         The defendant needs to see it so that he can decide

23   whether he wants to go to trial or to testify.  He wants to go

24   to trial.  I have been told that since this case has been

25   filed.  There's nothing in that document that's going to make

1    him say, *Oh my goodness, I don't want to go to trial.  I want*

2    *to plead*.  It's something that attacks the truthfulness of a

3    witness against him.  It's just simply that he needs to see

4    this to make that decision is farcical.  Whether he testifies

5    again, there's no reason.  In terms of what it is, what's being

6    admitted, is what is going to be admitted in front of the jury;

7    and that is, that there were lies on forms of important nature

8    and it ends there.  That he needs to be told, as a matter of

9    ethics?  Ethics are, you do -- there's a protective order in

10   place, and it is not the case to complying with the protective

11   order is a violation of some code of professional

12   responsibility.  I don't think there's any good cause.

13          I think there's cause and good cause for the second

14   protective order, that's why I signed it.  I don't think it

15   inhibits the defendant, the trial, preparation for the trial or

16   anything else, and the motion is denied; that's **75**, Cathy.

17          *THE COURTROOM DEPUTY:*  Yes, Your Honor.

18          *THE COURT:*  I think the last one is **ECF Number 84**,

19   which is the Motion To Exclude Gang Testimony.  That is granted

20   in part and denied in part.  Again, let's be clear, what we're

21   talking about is BOP testimony about prison gangs.  It is

22   opinion that -- we will need to have a foundation laid in the

23   course of the trial, but I don't think it's any kind of *Daubert*

24   scenario, with regard to methodology or anything else, because

25   it's not scientific.  We're not talking about, you know,

1    testing or things of that nature.  It is specialized knowledge

2    that is akin to police experts who testify as to gang activity

3    or perhaps whether or not drug quantities are distribution

4    amounts or personal amounts.  Would the opinion assist the

5    trier of fact in understanding matters in issue?  Yes, I think

6    so, at least to the extent that I intend to introduce it.

7          Whether the expert has the requisite special

8    knowledge?  I believe so, but I will need to hear the

9    testimony.  What's been proffered to me suggests that it is.  I

10   think the testimony is relevant, and I don't think methodology

11   is so much an issue, but to the extent that the knowledge fits

12   the testimony, I think that there is going to be a

13   hand-in-glove fit there, and whether the probative value is

14   outweighed by unfair prejudice, confusion of the issues or

15   undue consumption of time, to the extent that I grant the

16   motion, I think the probative value is not substantially

17   outweighed by these matters.

18         So, what is it that I'm going to allow?  What I'm

19   going to allow is the individual to testify twice; that will

20   make more sense as I walk through this.  I'm operating on the

21   basis of an assumption that I believe is correct, and I will

22   ask the sides to confirm this, not as fact, but as alleged

23   fact.  Santiago and Perez are both witnesses and persons that

24   will be said to be Mexican Mafia.  People who were outside of

25   Mr. Garcia and Mr. Cardenas' cell, allegedly engaged in

 1   extortion or seeking money or something along those lines; is

 2   that right?

 3          MR. O'HARA:  That's been alleged.

 4          MS. CRAMER-BABYCZ:  That's what the government

 5   alleges.

 6          THE COURT:  All right.  So, as I understand it, they

 7   are Mexican Mafia, or at least that is what the testimony would

 8   be, and Mr. Garcia is Surenos; again, do I have that right?

 9          MS. CRAMER-BABYCZ:  That's the government's

10   allegation.

11          MR. O'HARA:  Yes.

12          THE COURT:  When I say *right*, I'm simply meaning what

13   people are claiming.

14          MR. O'HARA:  Yes.

15          THE COURT:  And they are also reputation witnesses.  I

16   think that the witness can testify that there are prison

17   gangs -- it's not I think -- I rule that he can testify that

18   there are prison gangs.  He can name some of those prison

19   gangs.  He can testify that some of these gangs are affiliated,

20   and that two of them that are affiliated are the Mexican Mafia

21   and the Surenos.  He can testify that they are affiliated, and

22   there is a degree of loyalty.  He can testify that Surenos are

23   foot soldiers for the Mexican Mafia, and from time to time

24   perform tasks.  He can testify that, in his opinion, Santiago

25   and Perez are Mexican Mafia, and he can explain why, and he can

1   testify that, in his opinion, Mr. Garcia is Surenos, and he can

2   explain why and then it stops.  These are not three random

3   people that are meeting or around Mr. Cardenas moments before

4   an assault occurs, but we're not -- I am not going to allow

5   testimony along these lines, *It's not unusual for members of*

6   *the Mexican Mafia to extort cartel members*.  No.  Mexican --

7   *Surenos are required to carry out the orders of the Mexican*

8   *Mafia*.  No.  *Surenos, cannot attack someone without permission*

9   *of the Mexican Mafia*.  No.  These types of things, and anything

10  beyond what I have already identified, starts to bleed into

11  just kind of vouching for the government's position.  It's not

12  as if there's some fact that is otherwise in evidence, like the

13  amount of dope, and somebody is opining as to that fact as to

14  what it means.

15        When you -- to the extent that there's a relationship,

16  fine.  To the extent that you are nibbling into the description

17  of the relationship in such a way as to opine that the only

18  thing that makes sense here is that Mr. Garcia is a Sureno, who

19  attacked because of the order of Mr. Santiago and Mr. Perez,

20  that's not opinion that's helpful to the jury.  It's basically

21  doing the jury's job, and it's just literally more vouching

22  than anything.

23        So, I am allowing, broad strokes, relationship, but

24  not this fine level of detail that has been explained that

25  really is suggesting, *Hi, I'm an expert.  In my opinion, these*

1  *guys assaulted that guy, because that's what they do*; that's

2  too much.

3          Now, one of the things that I have left out is whether

4  they can talk about snitch code?  The answer to that is yes, on

5  rebuttal.  I don't think you get to impeach somebody before

6  they testify.  I think we probably should have Santiago and/or

7  Perez testify, and then I will allow testimony as to snitch

8  code, on rebuttal.

9          *MR. BELCHER:*  That's the second part of two times that

10  he can testify.  Gotcha.

11          *THE COURT:*  That's it.  I want to ask -- okay.

12  Because of the way I have handled this, this is what I want to

13  do, I'm not going to ask you to make your record now.  If

14  you -- if you want to -- well, asking me to reconsider is

15  something that I'm not inclined to do.  So, let's not kill a

16  digital tree asking that.

17          However, there are matters that either side may want

18  to preserve for review by a higher Court, and you may want to

19  make your record with respect to the opposition or why you are

20  opposed.  It isn't going to change my mind, but what I would do

21  is say, to the extent that you want to file some -- something

22  protecting the record, you can do so by close of business

23  Friday, subject to the same restriction level as to the thing

24  to which you are making your record.

25          What I want to know is whether I have missed anything

1    that's hanging out there?

2              MS. CRAMER-BABYCZ:  Not from the government's

3    perspective.

4              MR. O'HARA:  You have not missed anything, Your Honor,

5    from our perspective.

6              THE COURT:  Again -- whether there's anything that

7    have has led to the need for clarification, not

8    reconsideration, but you are just not sure what it is that I'm

9    actually saying?

10             MS. CRAMER-BABYCZ:  I do have just one followup on the

11   gang expert testimony.  I completely understand that it will be

12   limited to broad-strokes relationship, will that include the

13   Mexican drug cartels to the extent that the expert has

14   knowledge of that relationship --

15             THE COURT:  If what you are asking me is that the

16   Mexican Mafia can/will extort cartel members?

17             MS. CRAMER-BABYCZ:  No.  So the portion of that expert

18   opinion is generally that the Mexican Mafia and the members of

19   the Mexican drug cartels can have a good relationship; they

20   operate in different spheres; and that the Mexican drug cartels

21   are known for having money, essentially.  So not going the step

22   to extortion?

23             THE COURT:  No.  The answer to your question is no.

24             MS. CRAMER-BABYCZ:  Thank you.

25             MR. O'HARA:  What was the original question,

1    Your Honor?  I'm sorry.

2         THE COURT:  The original question is, can I snuggle up

3    to the extortion issue by asking whether or not the cartel

4    people, in terms of prison environment, are known for having

5    money?  And the answer is no.  I'm focused on the associations

6    of the people who are there, and leaving it at that.

7         MS. CRAMER-BABYCZ:  Understood.

8         MR. O'HARA:  Does that also go for the opinion,

9    Mexican drug cartel, members of drug cartels, do not yield very

10   much influence in the BOP?

11        THE COURT:  Correct.  Do you have anything?  Again,

12   I'm trying to choose my words here so as not to be unduly

13   confusing to you.  Have I confused you in any way that I can

14   clarify now?

15        MR. O'HARA:  One point, Your Honor, and I think it

16   didn't relate to a motion that would require

17   attorneys'-eyes-only restriction.  This is about the reputation

18   evidence that may be admitted on Mr. Cardenas.  The Court has

19   ruled that evidence from outside of the prison doors, his

20   reputation is not necessarily relevant, however --

21        THE COURT:  No, I didn't use the word *necessarily*.

22        MR. O'HARA:  Yeah.  However, if it is part of the BOP

23   reputation, and as part of the reputation among the inmates,

24   then a knowledge of that by the inmates, I would ask for

25   clarification on that point.  If it's -- if part of his

1  reputation in the BOP is based on information that occurred --

2          THE COURT:  I don't care what it's based on.  What I

3  care about is what is the reputation for violence, that's it.

4          MR. O'HARA:  Okay.

5          THE COURT:  He either has such a reputation or he does

6  not.  I don't think anything in the rules requires an inquiry

7  into whether or not the reputation is well-founded or what it's

8  founded on or anything else.  Reputation is the reputation.

9  May be right, it may be wrong, but it is, at least as the rules

10 currently exist, probative of the issue of propensity for

11 violence.

12         So don't misunderstand, it's -- it's his propensity

13 for violence.  Not, *Oh, the cartels, oh my goodness, they do*

14 *this, they do that, they do the other*.  We're talking about

15 him.

16         MR. O'HARA:  Okay.  Thank you.  That clarifies it.

17         THE COURT:  Have I confused anyone over here, to my

18 left, the government table?

19         MS. SURRATT:  On that same point, Your Honor, it's our

20 understanding of the way that inquiry would work, as to a

21 witness for whom a proper foundation has been laid, is *Are you*

22 *familiar with Mr. Cardenas' reputation for violence in the*

23 *prison or relevant community*?  *Yes, I am*.  *He has a reputation*

24 *for violence*.  Stop.  There's no going on about, *Yes, I am*

25 *aware that he killed this person and this person, so therefore*

1  *he is violent.*  It's reputation for violence and not a

2  discussing of the basis for that reputation of violence.

3      *THE COURT:*  Yes and no.  I mean, I'm not going to cut

4  it off that sterilely, but we're not going to go on for 20

5  minutes over, *Yeah, I heard that, you know, these people have*

6  *killed those people, and then they started a war that resulted*

7  *in 28,000.*  We're not going to milk the cow.  All right.  But

8  I'm not going to sterilize the matter excessively either.  It

9  has -- to the extent that it is admissible evidence for

10  propensity for violence, the skeleton gets to have some meat on

11  its bones; it doesn't get to have a whole lot of fat on the

12  meat on the bones.

13      *MS. SURRATT:*  That's fair, Your Honor.  And we put

14  this in a footnote in **ECF Number 61**, to the extent the

15  defendant does successfully attack Mr. Cardenas' reputation for

16  violence, we intend to rehabilitate it, likely through the use

17  of BOP officials who are familiar with Mr. Cardenas in the

18  prison environment.

19      *THE COURT:*  And his reputation.

20      *MS. SURRATT:*  His reputation for peacefulness or

21  nonviolence.

22      *THE COURT:*  That's fine.  And then the 12 decide.  All

23  right.  Anything else?

24      *MS. CRAMER-BABYCZ:*  Not from the government,

25  Your Honor.  Thank you.

1          MR. O'HARA:  No, Your Honor.

2          THE COURT:  I will see you Monday.  So, just to be

3     clear, you better give me the un-redacted version.  You are

4     going to both -- you are going to give me un-redacted versions

5     by tomorrow.  You are going to both file whatever you want to

6     file by way of making a record, preserving your position on

7     whatever.  I don't -- I don't, frankly -- don't get me wrong,

8     I'm not saying you need to do it, but sometimes lawyers will

9     think that they need to make something clearer for the Circuit

10    that they didn't waive or give something up or whatever.  All

11    I'm saying is to the extent that you wish to speak to them in a

12    pleading, you may do so by close of business Friday.

13         And there is one last thing, and it may be that I

14    looked at this quickly and didn't get it, for some reason --

15    well, for no particular reason, other than wanting to have --

16    since I know that -- look, there's not going to be a whole lot

17    of agreement going on as this thing is developing during the

18    course of the trial.  Maybe -- maybe I'm wrong.  Maybe I'm

19    reading into it.  But one of the things that I wanted to do was

20    to at least get an understanding as to what prior convictions

21    are and things of that nature.  I'm not sure that I have the

22    full record for Mr. Cardenas.  The only reason I say that is if

23    you look, again I know that there are four matters which he was

24    convicted of, I think the records you gave me speak of two, and

25    I am not sure what happened to the other two.

1          *MS. CRAMER-BABYCZ:*  And, Your Honor, on the N.C.I.C.

2     report, unfortunately those are not perfectly clear documents,

3     so I did provide a letter to clarify that it does not include

4     all of the offenses for which he was convicted.

5          *THE COURT:*  Okay.  All right.  As long as there's no

6     confusion over to my right from the defendant that there are

7     two additional convictions that aren't on the N.C.I.C.  Look,

8     he has got a conspiracy, he has got a possession with intent

9     and he is got two, threatening a federal official.

10          *MR. O'HARA:*  The judgment from that case is that --

11     yes.

12          *THE COURT:*  I just want to make sure that nothing --

13     because the N.C.I.C. seemed weird to me, that somebody wasn't

14     operating under some misunderstanding or delusion as to what

15     the scope of situation was.

16          *MR. O'HARA:*  Sure.

17          *THE COURT:*  And you are not, so.  I'm happy.

18          *MR. O'HARA:*  One last thing, Your Honor, is where

19     Mr. Garcia will be until trial?

20          *THE COURT:*  Talk to the Marshals.

21          *MR. O'HARA:*  And if there is an issue -- well, it's

22     my -- impression he is going to remain in the Denver --

23          *THE COURT:*  Talk to the Marshals.

24          *MR. O'HARA:*  Okay.  Sure.

25          *THE COURT:*  I believe that to be the case, as well,

 1   but I'm not terribly interested in spraying on the record where

 2   he is going to be, and this, that and the other thing.  Talk to

 3   them.

 4          *MR. O'HARA:*  Sure.

 5          *THE COURT:*  What I'm telling you is, my understanding,

 6   generally, comports with yours.

 7          *MR. O'HARA:*  Okay.  Thank you.

 8          *THE COURT:*  All right.  Recess.

 9          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

10      (Recess at 11:21 a.m.)

11                          **REPORTER'S CERTIFICATE**

12      I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.  Dated

14   at Denver, Colorado, this 4th day of May, 2022.

15

16                                    *S/ Tammy Hoffschildt*

17                                    Tammy Hoffschildt

18

19

20

21

22

23

24

25