IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 21-cr-143-RM

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

FRANCISCO GARCIA,

    Defendant.
_____

**REPORTER'S TRANSCRIPT**
MOTIONS HEARING
_____

    Proceedings before the HONORABLE RAYMOND MOORE, Judge,
United States District Court for the District of Colorado,
occurring at 1:30 p.m., on the 6th day of April, 2022, in
Courtroom A601, United States Courthouse, Denver, Colorado.

**APPEARANCES**

    Andrea Surratt and Laura Cramer-Babycz, Assistant U.S.
Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,
80202, appearing for the Government.

    Timothy O'Hara, Assistant Federal Public Defender, 633
17th Street, 10th Floor, Denver, Colorado, 80202, appearing for
the Defendant.

    TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1          **P R O C E E D I N G S**

2

3       (In open court at 1:31 p.m.)

4          *THE COURT:*  Please be seated.  21-cr-143, United

5    States versus Francisco Garcia.  We're here today to address

6    the pending motions, and I believe there are only three of

7    them.

8            With regard to that, I, earlier, had a phone call that

9    I know Ms. Cramer-Babycz was on, as well as Mr. O'Hara; whether

10   others were on or not, I can't remember.  But given where he is

11   being held and the difficulties of transport and all of the

12   rest of it, and these hearings -- today's discussions are not

13   going to take or require the taking of testimony or, in any

14   other way, present issues which might be -- well, which

15   Mr. O'Hara might be aided by, by having his client at his side.

16   I raised the issue of who we could do this with -- with him;

17   meaning, Mr. Garcia, appearing by video and it was agreed to.

18           So, with that, what I will do is take appearances, and

19   ask Mr. O'Hara, when we get to him, to confirm my

20   understanding, and, obviously, I can see that Mr. Garcia is on

21   the screen, from, it looks like, the law library, I would

22   assume is the USP or the ADX.  All right.

23          *MS. CRAMER-BABYCZ:*  Good afternoon, Your Honor.

24   Laura Cramer-Babycz on behalf of the United States and

25   Andrea Surratt.

1          *THE COURT:*  She is known to me.  Good afternoon to

2    both of you.

3          *MR. O'HARA:*  Good afternoon, Your Honor.

4    Timothy O'Hara, here on behalf of Mr. Garcia.  He is appearing

5    from ADX by VTC and I did have a conversation with him about

6    the hearing, and about the idea of him appearing by VTC, and

7    for this proceeding he is consenting to appear by way of VTC.

8          *THE COURT:*  All right.  And good afternoon to you, as

9    well, Mr. Garcia.  The way these cameras are situated, when I

10   turn to look at you, it looks like I am turning my head and --

11   because I appear, on camera, in profile, but I just want to

12   make sure that you can hear what is going on, so, if you can,

13   would you give me a thumbs up.  There you go.  All right.

14   We've got our thumbs up and we are good to go.

15         If, at any time, we lose the audio connection,

16   Mr. Garcia, what I would ask that you do is, to the extent that

17   you can, I understand that you are in restraints, and that

18   there are, undoubtedly, other people in the room with you, that

19   I cannot see, but to the extent that you can, would you just

20   try and catch someone's attention by moving your arms, or

21   otherwise creating some kind of sign that you are unable to

22   hear us?

23         All right.  With all of that, I suppose, I will put on

24   the record, since I spoke earlier about us having a phone

25   conversation, the other thing that I mentioned, I considered it

1   unimportant then, I consider it unimportant, now, but I will

2   put it on the record, because my prior phone conversation was

3   not -- it was with counsel, but I did not have a court reporter

4   there.  It was simply this, that for whatever it is worth, it

5   is my understanding that one potential witness, in this case,

6   is someone who, I don't know how many years ago it would have

7   been, whenever his case first was brought as a direct

8   prosecution before Judge Blackburn, that I performed the

9   administerial function of that, that the federal public

10  defender would do in that circumstance, which is, as best I

11  recall, to sit down with Judge Blackburn, and deliver a letter

12  to him or although it may have been done orally, I suspect I

13  did it by letter, but don't have a clear recollection, in any

14  event, passing on to him recommendations as to who might be --

15  who was the recommendation of the federal public defender for

16  appointment of both local counsel from the Death Penalty Panel

17  and learned counsel, after I consulted with Death Penalty

18  Resource counsel, I passed that along to Judge Blackburn and

19  the case went on its way, and I didn't have any other

20  involvement with it.

21        But I did put that in front of you all, both, because

22  I did not want to be perceived, in any way, shape or form, in

23  this case or in any other case, as, kind of, being anything

24  less than transparent, in terms of my dealings with counsel.

25        So, let's start with the issue of -- well, the

1   motion -- the two motions that are interrelated; that is,

2   **Number 32** and **33**, which are the implicit bias requests, and if

3   I can summarize it, there's a video that I have seen, because

4   it was given to me, in this case, and I have seen it beyond

5   that, I want to say, because it was raised in another case,

6   although I don't remember whether it was Mr. O'Hara. I deeply

7   suspect that it was. But in any event, it is out of -- it is a

8   video that is prepared by the Western District of Washington,

9   as part of their orientation for all jurors when they are all

10  in the jury assembly room, addressing the topic of implicit

11  bias, and that video has been provided to me, along with

12  another one, that I think little of, I want to say, from the

13  sound of it, it's some television show or.... but which

14  particular show, I either don't remember or it didn't say,

15  where they were demonstrating what happens when you have a

16  black guy -- young black man attempt to pretend to steal a bike

17  and a young white blonde woman attempt to steal a bike and the

18  reaction of the people in that neighborhood to those two

19  actors, and the request is that I show those videos, as well as

20  that I have a written questionnaire submitted that asks such

21  things as, *Does racial prejudice still exist in America*?

22          I swear, if I were a juror, I would be sorely tempted

23  and say, *Not since 1865*, just to see who the hell I was

24  irritating, but hopefully jurors, our real jurors, wouldn't act

25  in such manner; that's just the first question. There are ten

1    that have been submitted in connection with the motion.  And

2    then, additionally, it has been requested that I -- perhaps

3    it's in the alternative, in either event that I give counsel,

4    substantially, more time than my practice standards allow, to

5    address the jury, individually, so that he can explore the

6    implicit bias issue in more detail.

7         So, I think I have got it, Mr. O'Hara.  I don't think

8    I have been secretive about my view that this is not the

9    Western District of Washington, but before explaining myself

10   further, I will give you five minutes, or so, if you want to do

11   that.

12        MR. O'HARA:  That would be great, Your Honor.  Shall I

13   go to the podium?

14        THE COURT:  Yeah, that's fine.  It's going to be

15   better for Mr. Garcia, if we all speak from the podium, because

16   that's going to put you near that microphone.

17        MR. O'HARA:  And the Court -- Your Honor, the Court is

18   correct that these two are related, because one idea of whether

19   the Court asks questions of implicit bias, by way of a written

20   questionnaire, bleeds into the idea of how much time I have to

21   address that issue with the jury, and so one of the reasons for

22   my request to have this questionnaire, is that time need not be

23   spent to address certain issues, at the attorney-lead portion

24   of the voir dire, when they could be addressed by way of a

25   written questionnaire, and so I appreciate the Court addressing

 1   them together, because I think they are connected.

 2          I'm going to focus most of my -- well, I should have

 3   known, at the outset, that the implicit bias motion, the

 4   government has -- does not object to the orientation video nor

 5   do they object to the preliminary instruction.

 6          THE COURT:  And as you know, that is always considered

 7   by me, but rarely is that dial moving for me.

 8          MR. O'HARA:  I hesitate to bring it up, oftentimes.

 9          THE COURT:  You don't need to hesitate.  I don't hurt

10   you.  And there's so much distance that if I wound up, you

11   would have plenty of time to even step to the side.

12          MR. O'HARA:  Such an agreement may cause the needle to

13   go in the opposite direction, but I bring it up, because it is

14   important to note that the government has evaluated this

15   issue --

16          THE COURT:  That's fine; that's fine.

17          MR. O'HARA:  They don't have a problem with those

18   portions of it.

19          As it relates to the additional time on voir dire, and

20   I am not familiar, particularly, with how the Court does jury

21   selection.  I haven't done a jury with this Court.  But I know,

22   generally, how Courts -- I have tried a lot of cases, I know,

23   generally, how Courts do it, and I imagine there's some amount,

24   pretty extensive questioning individually, both generally and

25   individually with this panel --

1          *THE COURT:*  Seated in front of me is Ms. Hoffschildt.

2    I generally do voir dire in pretty much the same way, every

3    time, at least in terms of trying to cover things.  She would

4    be more than happy to give you an expedited or regular copy of

5    the transcript of any of my voir dires in criminal cases.  I

6    want to say the most recent one -- well, a recent one was

7    *Ronquillo*, who is going to trial again, but certainly you can

8    look at the docket.  In fact, you should have, perhaps even

9    some over in your office, since other people have done trials

10   and ordered transcripts to the Circuit.

11         *MR. O'HARA:*  And I'm familiar with Mr. Ronquillo, as

12   well, if the Court will remember.

13         *MR. O'HARA:*  Oh, that's true, you were there.

14   Initially.  But, the idea being there's a large group of

15   individuals, sometime -- or somewhere around 30 individuals --

16         *THE COURT:*  Forty is probably better.

17         *MR. O'HARA:*  Forty.  The Court conducts initial

18   questioning, and then, boom, the attorneys are on stage for

19   their -- the Court's Practice Standards that say 15 minutes.

20         *THE COURT:*  Right.

21         *MR. O'HARA:*  I can use a recent experience, as

22   Judge Blackburn does it relatively similarly.  He calls 31,

23   there's more in the room, but 31 are assigned numbers and are

24   part of these -- this initial panel of questioning, and so

25   after the Court finished its questioning, I was allotted 20

1   minutes, and asked to question 31 jurors in that time, and

2   whether it's on just implicit bias or on other topics, that

3   came out during jury selection, I can say, generally speaking,

4   20 minutes is insufficient to question 30 to 40 individuals,

5   and that would be in any case, and I'm going to get to the

6   facts of this case that, I think, even further justify an

7   expanded voir dire.

8          It requires Morton's Fork-type decision, which is, do

9   I spend very little amount of time with more individuals or

10  actually listen and follow up with a lesser amount of

11  individuals, because most questions that I'm asking on voir

12  dire have follow-up questions to them in order to ask for

13  explanations.

14         I'm not inappropriate.  I don't get into -- I'm not

15  trying to pre-try the case; that's not my goal.  The goal is to

16  root out inherent or implicit bias in whatever form it may be.

17  There are some issues relating to this case that are

18  particularly going to be important, and by way of more of a

19  reply --

20         THE COURT:  None of them have anything to do with

21  young black men, young blonde, white women or bicycles, I

22  assume.

23         MR. O'HARA:  No.  And what I would say about that

24  video, Your Honor, why it's so powerful and helpful on this

25  issue --

1      THE COURT:  It doesn't become more powerful when you

2   pause and soften your voice and call it *powerful*.  It just

3   isn't.  I mean, what it reminds me of, there are millions of

4   these videos that you can find and go, *Oh my goodness, look at*

5   *that*.  There was one relatively famous in social science

6   circles where people don't pay attention and they can't count

7   the number of times somebody bounces a basketball.  There's

8   somebody dribbling a basketball on a screen.  Most people --

9   many people failed to notice, as they are watching the video,

10  that there's a guy in a gorilla suit that is walking behind the

11  dribbler, and are amazed to discover that their powers of

12  observation were not what they thought they were, because as

13  soon as they focused on one thing, they ignored something else.

14      I mean, this type of video, to make you go, *Oh my*

15  *goodness, I'm surprised*, yeah, they are a dime a dozen, but it

16  doesn't have a whole lot to do with this case, other than to

17  say, in general, in some circumstance -- and mind you, I don't

18  know the neighborhood or the circumstances or anything else, in

19  some circumstances, people accuse... people suspect people of

20  committing crimes on the basis of race.  Okay.  That's really

21  not what this case is, but, okay.

22      MR. O'HARA:  And one thing that's pointed out in the

23  motion, is in cases where race isn't explicitly an issue, it's

24  often implicit and even more dangerous, because it's not in

25  front of an individual's brain.

1        THE COURT:  So you can't lose.  So if it's a black

2   defendant, attacking a white victim, it's racial and you have

3   got to do the racial bias thing and if it's a black defendant

4   attacking the black victim, you have to do the racial bias

5   thing.  Do you have to do it for the white on a white?

6        MR. O'HARA:  I think it's more for the juror, and the

7   defendant is the particular potential for implicit bias, which

8   is, white juror, watching the actions both -- not really on

9   video, but in court, watching an individual, and making

10  determinations about what that individual did, and what I would

11  say, and I am going to leave that; it's called, *What Would You*

12  *Do*, was the name of the show, and there's -- there are a series

13  of, kind of, hypothetical situations, but this one, I do

14  believe, is powerful, because it shows in-the-moment decisions

15  that individuals make, based on, is it possible there was

16  another reason why those individuals interacted differently

17  with the black male than the white male or white female?  It's

18  possible, but ostensibly those individuals were saying and

19  doing exactly the same thing and people had drastically

20  different reactions, so that's what made it powerful --

21        THE COURT:  Maybe they will have drastically different

22  reactions to me, opposed to Judge Blackburn.

23        MR. O'HARA:  You are on to something, Your Honor.

24        THE COURT:  So, because Judge Blackburn told the

25  jurors, *Hey guys, don't be racist*, do you think it's going to

1    be exactly the same for Judge Moore to say, *Hey, guys don't be*

2    *racist*, or is that something that has not factored in or made

3    the subject of the T.V. video?

4         *MR. O'HARA:*  The point of the motion is to bring this

5    to the fore, to start a conversation with the jurors, and to

6    recognize this is a foreign concept to some people.  You and I,

7    who deal with issues of race, through the criminal justice

8    system every day, are much more familiar with this stuff that

9    the Court made a mention of, I think it was, in relation to

10   IDs, or that race could be a reason that an identification

11   could be less reliable across, racially.

12        We know things that these jurors, individuals who

13   don't come to the courthouse every day, don't know; and so,

14   when I -- if I'm Mr. Garcia, and I am sitting there, and there

15   are individuals that have my fate in their hands and why they

16   are making the decisions they are making.  We know a lot more

17   now than we did in 2015, even, 2010, 2005 on this issue, and

18   so, to not address this, or to address it very minimally, is to

19   pretend that it doesn't exist, and to, potentially, allow

20   jurors to retain these biases in their determination of causes.

21        What I will say, Your Honor, that I think also bears

22   mention, as it relates to expanded voir dire, the government,

23   in their response, has painted this case, in a very simple

24   fashion, and their statement is, the question for the jury will

25   be whether the defendant assaulted another inmate and caused

1    serious bodily injury.  The facts and legal concepts are not

2    complex.  That's one way to describe the case.  It's an

3    assault, in one of the most dangerous prisons, alleged assault

4    in one of the most dangerous prisons in the United States, USP

5    Florence, high-level facility.  It was a one-on-one fight,

6    inside of a cell, a locked cell, and there's going to be

7    evidence, potentially, of gangs.  The gangs of the individuals

8    involved.  The -- that there was a potential extortion attempt

9    by one group, of the alleged victim, and whether or not my

10   client acted in self-defense.

11          So, implicit bias, that's just the tip of the

12   iceberg --

13          THE COURT:  No, no.  I appreciate that, because,

14   frankly, I was going to ask you, since I have got you all in

15   the room now, to give me a general sense of this, because my

16   assumption is that there either is no video or to use that

17   fine, legal expression, crappy video; but there's not good

18   video, or else some of these things that seem to be in contest,

19   the case isn't presenting to me as if good video is there.  I

20   could be wrong.  You tell me, is it no or low quality?

21          MR. O'HARA:  The answer is that the entirety of

22   alleged assault occurred behind the cell door of Cell 120.  So

23   the window of the video, the only thing about the assault that

24   one could see, looking at the video, is through this four

25   inch --

1          THE COURT:  I know what it looks like.

2          MR. O'HARA:  One-foot tall window that has a barbed or

3    wired gate, so there is no -- there's no video of this assault;

4    this is the best way to say it.  I don't think I'm putting

5    words in the government's mouth by saying that.

6          So, this is not a simple case of, maybe the parties

7    involved might be identified, but even that, Your Honor, the

8    government, based on the discovery we received, believes that

9    there was a visit to the cell door immediately preceding this,

10   by other individuals, and that that constituted some kind of an

11   extortion attempt against the alleged victim, and that provided

12   the motive for this assault.

13         We're going to be denying that, and so the

14   circumstances of the assault are very important.  The potential

15   gang affiliation is going to be important.  Those are --

16         THE COURT:  Let me guess, the gangs are multicultural,

17   diverse associations of males, or are they, what I deeply

18   believe them to be, formed along racial lines?

19         MR. O'HARA:  Well, the --

20         THE COURT:  The only reason I ask is that one of the

21   things that you want me to do is to suggest to the jurors that

22   talking about race, in general, is some kind of a taboo topic,

23   when it's, potentially, the case that the evidence about race

24   is going to be coming up during the course of the trial.

25         MR. O'HARA:  I think that the fact that -- all of the

1   individuals, I believe, Your Honor, both witnesses and parties

2   are of Hispanic dissent.

3          THE COURT:  Okay.

4          MR. O'HARA:  And so -- but they are, potentially,

5   different factions or creations of the world that is of the

6   USP.

7          THE COURT:  No.  And I am familiar with that world,

8   and I don't mean to be suggestive of anything negative.  It's

9   just there's a reality to the way things work behind bars that,

10  in and of itself, is going to be different than what jurors are

11  used to seeing or hearing or talking about.  It's just, you

12  know ... it ... strikes me, as a little bit inconsistent, that

13  this picture of how the case may unfold, is a little

14  inconsistent with this notion that is permeating some of this,

15  that any discussion of race means that the jury is doing

16  something wrong, when there may be discussion about race or

17  nationality or other things coming from various gangs in the --

18  not the ADX -- the USP, that's all.

19         MR. O'HARA:  Yeah, Your Honor, and I think that's

20  right, I.  Don't think that it's -- what I'm trying to get at

21  is whether these jurors have biases against my client.  The

22  government probably should be worried, I'm not -- they could be

23  worried about whatever they want, but their witness is Latino,

24  as well, and so, a similar concern; but these jurors could,

25  potentially, have the idea, you know what, this is a group of

1    Latinos in a prison.  Who cares about what they did or they

2    didn't.  They are guilty.  All of them.  And I -- and that

3    could be a mentality, and so I'm trying to avoid that.  If I'm

4    being unreasonable about that, as a potential mentality of a

5    set of jurors, then we are being overly precautious in

6    addressing this issue; that's it.

7          But I will say this, to the Court's point, that just

8    because it's not white on Latino or black on Latino, I don't

9    think that makes it a moot point that suddenly bias is no

10   longer an issue.

11         *THE COURT:*  No.  I understand that.  All that I mean

12   to suggest by that is that you present it to me as if it's such

13   a straightforward, easy issue of fairness and interpretation,

14   and that your view of it is the only rational view, and the

15   fact of the matter is there's a lot of factors that go on, that

16   are very difficult to analyze and figure out.  I mean, when I'm

17   looking at these 14 people, am I saying, *Oh, I'm just talking*

18   *to the white people now*; *you guys don't be racist.*  I mean, the

19   fact of the matter is, you could have any number of things

20   going on.  To say that blacks identify with Latinos.  You would

21   be, I would say, wrong, to assume that that is always the case.

22   To say that, I don't know, someone who is an immigrant who was

23   made a naturalized citizen from Mexico, would identify with

24   somebody who, potentially, was under charges, here, because he

25   or she had come into the country illegally.  To assume that

1  they would identify with each other, I wouldn't go there

2  either.

3          There's a lot of different layers to this, other than

4  this jury, regardless of their composition, is going to be anti

5  this defendant, because of his race.  It is a way more

6  complicated subject.  If we wanted to have the academic debate,

7  than simply showing some video of, it amuses me, and because it

8  amuses me, I say it, an old white guy, meaning the Chief Judge

9  of the District of -- Western District of Washington, telling

10  other white people how to behave in court.  Okay.  Whatever.

11          *MR. O'HARA:*  I think, Your Honor, the last thing I

12  will say is -- and one thing I'm sure the Court is cognizant of

13  and concerned with is the creation of a circus atmosphere,

14  where suddenly we're talking about things that don't have any

15  relation to the case, and that sparks debate about something

16  that really isn't an issue in this courtroom.  And so, I'm sure

17  that's a concern of the Court, because I have tried enough

18  cases to know that jury selection is done by the Court, often,

19  so that the Court can make sure it's done well and done right,

20  and that, outside issues aren't just thrown in there

21  improperly, because the Court wants to preserve the group of

22  individuals that has come here, spent their time and doesn't

23  want to waste their time, and so what I can say about that

24  issue is, I will submit a list of questions in advance, on this

25  topic, if the Court would like.  I mean, the Court does require

1   that, so I will do that as part of the practice standards.

2   This is not, and I can use my experience three weeks ago as an

3   example, it was not a circus, in the least.  In fact, it was

4   a -- what I thought was a very interesting and educating

5   discussion between individuals, and both the parties learned a

6   lot of information that they were able to use in selecting a

7   jury; and so, to end, I will say, the parties are in the best

8   place.  We've told -- I have told the Court a little snippet

9   about this case.  We're in the best place to know, and after --

10  by --

11          THE COURT:  That's always true.  That's always true.

12          MR. O'HARA:  That's right.

13          THE COURT:  And if counsel had their way, and I don't

14  mean this in any way, shape or form as a negative comment nor

15  do I mean it as a comment that's directed to you as defense

16  counsel, if counsel had their way we would do it the old state

17  court way, where the Judge shuts up, and you guys get to talk

18  to the jury, and say, *Well, how do you feel about this*?  And

19  *How do you feel about that*?  And, *How do you feel about the*

20  *other thing*?  And it goes on for days and days and days and

21  days, and we're not doing that.

22          MR. O'HARA:  I understand.  But I think the hour, for

23  each side, and I may not use the whole hour, it really is

24  allowing, if there's a lot of topics to discuss, it allows room

25  to -- I think an hour is conservative, and to allow each party

1  an hour --

2       THE COURT:  Depends how you look at it, which end of

3  the pipe you are looking down; that's not the word that I would

4  use.  Go ahead.

5       MR. O'HARA:  From my perspective, I have done voir

6  dire longer than an hour, I don't waste anybody's time.  It's

7  not only interesting, it's informative.  So anyway, Your Honor,

8  I have made my point.

9       THE COURT:  No, you have.  And to be clear, let me be

10 clear, because you and I have debated various issues over the

11 years, in court, and Mr. Garcia does -- has not had the

12 pleasure, so to speak, of observing those debates.  I don't

13 mean anything personal to you or personal to him, in some of

14 these retorts that I will toss your way, to see how quickly

15 they get volleyed back at me, and so I'm not suggesting, in any

16 way, shape or form, that you or government counsel are really

17 looking to do something that the Court is not interested in.

18      The notion of the fact that, you know, there could be

19 biases here, you know, I -- look, obviously, every case carries

20 its own baggage.  I don't pretend to know, on a scale, whether

21 or not -- what the value of race is, in this case.

22      It's worth some questioning about.  The other thing

23 that's worth a considerable amount of questioning about is the

24 fact that we're dealing with the USP, because that, too,

25 carries it's own baggage, and there may be other things about

1    the case, and that's why I asked, kind of, *What does this case*

2    *look like*?  The more I understand it, the better I will be able

3    to, at least, make sure that in the Court order -- the Court

4    conducted portion of the voir dire, I'm touching on things that

5    need to be touched upon.

6            So, I don't mean to suggest by anything here that

7    these are topics that are out of bounds or improper or anything

8    else.  Am I terribly much persuaded by the fact that you had an

9    enjoyable time in front of Judge Blackburn, paren, where you

10   got a not guilty, closed paren?  No, I'm not terribly much

11   persuaded by that.  It's not because you got a not guilty or

12   because it's Judge Blackburn.  It's a different case.

13   Different cases are different cases.

14           Obviously, there are similarities, but my hesitancy to

15   adopt some of this, really doesn't have anything to do with a

16   criticism of you or your client or bringing these issues up to

17   me.  It is, simply, I don't think it's necessary or that it

18   can't be handled by me appropriately.

19           Some of it, for example, clearly the bicycle thing,

20   you know, save that for sociology class.  There's nothing I'm

21   going to say about that.  It doesn't have anything to do with

22   anything in this case, other than to say that there may be

23   circumstances which are not present in this case, where, if

24   they saw Mr. Garcia trying to steal a bicycle, and he was down

25   in Cherry Hills Village, somebody might think something of him

1    differently; whereas, if they saw you trying to steal a

2    bicycle, they would write it off, because, I don't know, you

3    fit in there better at Cherry Hills Village than Mr. Garcia

4    does.

5            I just think that video is so far afield that the

6    answer, in terms of, *Am I going to show it*, is *No*.  End of

7    discussion.

8            In terms of the other one, I got a lot of reactions to

9    it.  The first is, it's more useful as an orientation, than it

10   is as voir dire.  It's really not a voir dire video.  It's an

11   orientation video, and I have said this to you before, if you

12   or others on your side of the bar, either arm-in-arm with the

13   U.S. Attorney's Office, or separate and apart from them, want

14   to approach the Court from the perspective of showing this

15   video along with whatever other videos, and I honestly don't

16   know.  Oddly, I know what they show in state court, because I

17   have been summonsed -- subpoenaed to come to jury selection in

18   state court on a number of occasions, but I'm assuming that

19   there's some generalized, educational thing that goes on down

20   there, and it probably -- it may have, I shouldn't say probably

21   have, it may have a video component or, you know, something

22   along those lines.  If that is something that you think is

23   useful, you can petition the Court.  But I don't think it's a

24   voir dire video, because it's not, in any way, really focused

25   on anything that is particular to this case.  It -- it is a

1    broad-based thing that is for jurors in civil cases, in

2    criminal cases and it's non-accusatory, because it is in a

3    different context than it would be here in this courtroom where

4    what we're talking about is pretty damn obvious.  So, that's

5    number one.

6           Number two, I don't think it's necessary.  The concept

7    of whether or not a juror has a bias, and that they need to

8    keep that out of their minds, that's something that I will

9    touch upon in my voir dire.  I don't think it needs to be an

10   hour.  I don't think it needs to be you.  If you are so

11   enamored of the Judge in the Western District of Washington

12   making inquiry, I feel hurt, pained, that you are not equally

13   enamored of my ability to inquire of people as to what is or is

14   not relevant.  Obviously, I don't mean that and your smiling at

15   me shows that.

16          It is also simply raising an issue that -- and

17   injecting it into the case, if not handled correctly.  I

18   suppose that, you know, one way of interpreting it is that you

19   are concerned about, you know, the jury's impression or feeling

20   or response to your client and his nationality.  I get that.

21   Another way of saying it is, *Hey, don't side with those white*

22   *guards*.  I don't know who the guards are.  I assume there's

23   going to be some.  And having been at the ADX, the USP, the

24   FCI, and the camp, odds are, at least one of them is going to

25   be white.  Maybe I'm wrong.  I don't know.  But, again, you

1    know, you're lobbing grenades into a fact pattern by some video

2    that's produced without any understanding or knowledge of any

3    of this.  I just don't think it's necessary.  I think I can do

4    an adequate voir dire.  I don't think this is an issue that

5    needs to go on for an hour.

6          I agree that if I were you, I would want an hour.

7    Truthfully, if I were you, I would want more than an hour, and

8    it doesn't matter what race the defendant is, I would always

9    want as much time as I could get in of a jury.  I get that.

10          My leanings here are not disguised, but let me hear

11    from the government.

12          *MS. CRAMER-BABYCZ:*  Thank you, Your Honor.  I think

13    the government's positions are not disguised either, as we've

14    set them forth in the written responses.

15          *THE COURT:*  I don't mean to suggest that Mr. O'Hara's

16    position is disguised.  His is not -- we are all pretty much

17    being upfront with each other, here.

18          *MS. CRAMER-BABYCZ:*  Yes.  So, as Mr. O'Hara mentioned,

19    we do not object to showing the Western District of Washington

20    video.

21          *THE COURT:*  Congratulations.  I appreciate that.  I'm

22    not showing it.

23          *MS. CRAMER-BABYCZ:*  Understood.  We also don't object

24    to the preliminary instruction that Mr. O'Hara has proposed,

25    which I believe also derives from the Western District of

1    Washington, but I think going beyond that, as the Court noted,

2    the Court will, obviously, ask questions regarding implicit

3    bias; raise the topic.  Mr. O'Hara is certainly permitted to do

4    so during his time.  I think that's more than sufficient to

5    address this topic, in this particular case.

6         So, we do object to the written questionnaire and I

7    understand the Court's ruling on the --

8         THE COURT:  I'm not doing the written questionnaire,

9    either.

10        MS. CRAMER-BABYCZ:  Understood.  And with respect to

11   the 60 minutes that Mr. O'Hara has requested for voir dire to

12   explore this topic, we do object to that; the 45 additional

13   minutes.  And when I said the case is straightforward, I only

14   meant to convey, as I'm sure the Court understood, that this

15   case is not unique in this courthouse, such that the extra 45

16   minutes are really necessary.  I'm happy to provide a little

17   additional context for the case, if the Court is interested in

18   that.

19        THE COURT:  Look, in terms of -- I don't want -- I

20   don't want to fall into a hole you dug.  I like to dig my own

21   holes.  And what I mean by that is, the case does not have to

22   be unique to the building or the district in order for the need

23   for additional voir dire, to be, at least theoretically

24   necessary.  So I'm not sure that the nonuniqueness of the case

25   really has any bearing on my decision, with regard to it.

1            Let me just park that for the moment, and why don't

2    you tell me what this case is about, from your perspective.  At

3    least, again, I know that this is not binding on you or the

4    defendant or anybody else.  I'm not trying to lock somebody

5    into some position.  I'm just trying to get a broader

6    understanding, as early as I can, about what the case is about.

7    In terms of an assault, what are we talking about?  Video.  Are

8    we talking about, you know, fists on head or shank in the

9    liver, what are we talking about in terms of this kind -- in

10   terms of this particular case, at least as you understand it

11   now, subject to change.  I'm just -- speaking in broad strokes.

12           *MS. CRAMER-BABYCZ:*  And I appreciate that.  I do agree

13   that it's helpful for the Court to have that information, so

14   that it will, obviously, come up over the next month as we

15   continue to have hearings.

16           In September of 2019, the government believes the

17   evidence will show that two inmates, not Mr. Garcia or the

18   victim Mr. Cardenas, went to their cell.  Mr. Garcia and

19   Mr. Cardenas were cellmates.  Two inmates approached the cell

20   and asked the victim, Mr. Cardenas, for money.  He refused.

21   Those inmates then left, at some point.

22           There's video, as Mr. O'Hara said, of the outside of

23   the cell.  So you can see some of the comings and goings, but

24   you don't see what's going on inside, with Mr. Garcia and

25   Mr. Cardenas, very clearly.

1          THE COURT:  Unless -- unless those camera have

2     changed, it's the common area -- the cameras are placed in the

3     common area.  You can see the doors, but, your ability to see

4     into a room is very, very limited, you can tell when someone is

5     near the window, but you really can't see what's going on

6     inside.  I'm assuming that's what we're dealing with here?

7          MS. CRAMER-BABYCZ:  That's exactly what we're dealing

8     with here.

9          So some time after that interaction is when Mr. Garcia

10    then assaulted Mr. Cardenas, and it's been described by some of

11    the responding guards as the worst head stomp that they've seen

12    that did not result in a fatality.  So that's the -- the

13    conduct that we're dealing with here.  Mr. Cardenas was treated

14    at a hospital, and then went to a rehab facility.  He had

15    lacerations on his face, extreme swelling of his head, and a

16    broken nose that was treated.

17         THE COURT:  But it's -- it's -- again, not to use this

18    as an accurate description, but it's a mano-a-mano type thing

19    opposed to a weapon attack?

20         MS. CRAMER-BABYCZ:  Yes.  We don't have any

21    information that there were weapons involved.

22         THE COURT:  Okay.

23         MS. CRAMER-BABYCZ:  The other aspect of this, that Mr.

24    O'Hara alluded to is that there are gang and other affiliations

25    at play.  So the two individuals who go up to the door are

1    believed to be Mexican Mafia members.  Mr. Garcia is believed

2    to be a Sureno, which is associated with the Mexican Mafia, and

3    the victim in the case, is -- has, at some point, been

4    associated with the Gulf Cartel, in Mexico.

5         THE COURT:  Okay.  All right.  All right.  I don't

6    need anything more.

7         MS. CRAMER-BABYCZ:  Thank you.

8         THE COURT:  In terms of **Number 32** and **33**, I'm denying

9    each of them.  I think I have, largely, said what I need to

10   say.  I don't think that these -- either the questionnaire

11   that's being asked or the -- either of the two videos is; one,

12   necessary; two, I don't really think that -- particularly with

13   respect to the videos that they have, that they are, in any

14   way, shape or form, properly described as voir dire.  One is an

15   orientation video for a jury, and the other is, as we said --

16   as I said, and as Mr. O'Hara acknowledged, something from some

17   T.V. show, particulars of which I don't recall, and I don't

18   mean to suggest that some, you know, extreme television show or

19   anything like that, it's -- I don't know Dateline or something

20   comparable to that.

21         In any event, I also think that the issues can be

22   addressed, succinctly, and they can be addressed by me, and

23   that 15 minutes is more than enough time to ask any additional

24   questions or raise any additional matters that you wish to

25   raise, but notwithstanding it's educational value or other

1    value in another case, that is a different case, before a

2    different Judge.  I'm simply not going to expand this into two

3    hours of attorney-conducted voir dire, along with videos and

4    other things that are unnecessary.  An adequate voir dire can

5    be done by the Court.  Frankly, and adequate voir dire can be

6    done by the Court, period, but in -- notwithstanding that, I

7    give each side 15 additional minutes, and that's what I'm going

8    to do, as I have done in every other case.  **Number 32** and **33**

9    are denied.

10            Let's switch over to the remaining motion, which is

11   **ECF Number 34,** which is the Motion To Produce Giglio Material,

12   and I will hear from Mr. O'Hara, briefly, and I will probably

13   leave you alone for the most part, as well.

14            I do want to know whether there's a particular thing

15   that you are hunting, here?

16            *MR. O'HARA:*  So, yes.  I think the answer is, in a

17   case like this, where self-defense is likely a defense, that

18   there's particular pieces of evidence that are going to be

19   really important.  Now, let me give you some info on the

20   individual who is the alleged victim here.

21            *THE COURT:*  I think I have a sense of him, but go

22   ahead.

23            *MR. O'HARA:*  Sure.  He was not -- and I am not

24   speaking out of turn.  There's one point that I would like to

25   approach or have a brief conversation off the record.  I have

1       spoken to counsel about this.

2               *THE COURT:*  That's fine.

3               *MR. O'HARA:*  I'm pulling information off a Plea

4       Agreement that's publically available in the Southern District

5       of Texas, Brownsville Division, an FBI press release from 2010,

6       and a news report from the Dallas News in 2016, about this

7       individual.  He is the former head of the Gulf Cartel.  He was

8       indicted in 2000, extradited from Mexico in 2007, charged with

9       drug trafficking and two counts of assault on federal officers.

10      He pled guilty to drug distribution and two assaults of federal

11      officers and received a sentence of 25 years.

12              In the -- he is serving that sentence today.  In the

13      FBI press release, they describe him as using violence and

14      intimidation as a means of furthering the goal of his criminal

15      enterprise; specifically, in May of '99 that he threatened to

16      kill a Cameron County Sheriff's Deputy, who was working in an

17      undercover capacity.  Later, in November of 1999, while

18      traveling in an official vehicle through Matamoros, Tamaulipas,

19      Mexico in performance of their duties, a DEA agent and an FBI

20      agent were surrounded by he, Mr. Cardenas, and his gang and

21      threatened at gunpoint.

22              This then in his -- the case was moved from

23      Brownsville, I believe, to Dallas, because of the security

24      concerns that existed for him.  This article, from the Dallas

25      News, whose reporters were, I believe, were responsible for

1    unsealing a lot of material in his underlying case, describes

2    his impact on the Gulf Cartel, which split from the Zetas, and

3    resulted in a significant amount of violence.

4         At one point in the article it's describing him as

5    contributing to the deaths of hundreds, if not thousands of

6    people.

7         This is the individual that the government, I believe,

8    intends to call, in its case, in chief, as the victim in this

9    case.

10        There's one other piece of information, that if I

11   may -- if we may approach briefly?

12        *THE COURT:*  Um, yes.  Let's do it this way.  You come

13   down to Tammy.

14    (At the bench:)

15        *THE COURT:*  The only reason I'm doing this here, I'm

16   furthest away from my microphone.  There's a microphone there,

17   there's microphones there.  I don't mind walking down a few

18   steps.  What is it that you wish to tell me.

19   ████████████    ████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████

23        ██████████████    ████████████████████████████

24   ████████████

25        ██████████████    ████████████████████████████████



1 ██████████   ████████████

2       (Back on the open record.)

3       *MR. O'HARA:*  So, Your Honor, the -- there's this prior

4 proceeding, in which Mr. Cardenas was prosecuted by, not these

5 lawyers, not even the District of Colorado, he was prosecuted

6 in --

7       *THE COURT:*  Texas.

8       *MR. O'HARA:*  The District of Texas, and it moved, but

9 it was their office that was prosecuting him, and so, when the

10 Court asks, you know, what are you barking at --

11       *THE COURT:*  Hunting is what I think I said, but in any

12 event.

13       *MR. O'HARA:*  In a case like this, which is -- in which

14 there are two real witnesses to this assault, alleged assault,

15 Mr. Garcia and Mr. Cardenas, this type of information is

16 particularly important.

17         As far as the rules that are in play here, his

18 character, particularly, for being aggressive, could be deemed

19 and I would argue should be deemed, in this case, admissible,

20 under 404(a)(2), under 405(a)(1)(A)(ii).

21       *THE COURT:*  We're drifting.  We're drifting.  I mean,

22 not because I'm trying to say the answer to that is yes or no.

23       *MR. O'HARA:*  Yes.

24       *THE COURT:*  But the issue of whether or not it's

25 *Giglio* or not is a different issue from whether or not you can

1    introduce that which you already have.

2         MR. O'HARA:  Right.  Right.  To focus on the Court's

3    specific question about *Giglio*, which is what the basis of the

4    motion is, I believe there to be information, that the

5    government has in its control, and has had in its control, for

6    some time, on this witness, and so that's primary.

7         Secondary, is there are CO's, correctional officers,

8    that came to the scene, and will be testifying about what

9    occurred inside of the cell, and they also had, at their

10   disposal, the records and the information from the Bureau of

11   Prisons, and so those would be the two particular areas of

12   potential *Giglio* material that I think exist, but as the Court

13   knows, it's not up to me to guess this --

14         THE COURT:  No, I understand that, and believe -- just

15   so that you understand, it wasn't ... it wasn't the case that

16   when I was saying, *Are you hunting anything in particular*, that

17   I was making some accusation; rather, it is the case that you

18   know what *Giglio* is, I know what *Giglio* is and they know what

19   *Giglio* is and they have got an obligation to produce it, and

20   without the motion saying it, it seemed to me that this much

21   effort would not be put into a motion saying, *Give me that*

22   *which the law requires you to give me*, without there being some

23   back story that I -- that I was not necessarily informed of;

24   mind you, because what I feel like I'm smelling something, I'm

25   going to see if I can tell where the scent is coming from.  I

 1   did my own poking around, and learned much of the things that

 2   you have already told me, and it gave me some sense of what

 3   might be going on, but I didn't have an opportunity to ask you

 4   directly, so, let me hear from the government.

 5          MR. O'HARA:  Your Honor, may I just say one more

 6   thing?

 7          THE COURT:  Yeah.

 8          MR. O'HARA:  The timing question, obviously, is an

 9   important one, and I have searched the law for some sort of

10   definition of a timeline that applies here, talk about a

11   mishmash of during trial, the day before trial, it's -- there's

12   no standard, as far as when information should be tendered.

13   What I can say is I'm trying to avoid a continuance here.

14   That's --

15          THE COURT:  Well, I get that, and I also get that

16   that's ... potentially a hollow threat; not that you mean it as

17   a threat.  What I mean by that is, this is a very different

18   scenario.  I can give you a month, send your investigator out,

19   unless he can go around AD/MAX or USP, he isn't going to come

20   up with anything.  You can wander around Brownsville, Texas or

21   Dallas, or wherever you want to, to dig up stuff from 20 years

22   ago.  If you want to do that, you send him or her on their way,

23   because you already know what you need to know, and I don't

24   think that Mexican Mafia or any of these gangs is going to do

25   much of a sitdown with your investigator.

1          So, I don't mean to be critical.  I'm just saying,

2    it's not a scenario where you find out, on the eve of trial,

3    yeah, he told Sally Sue something on Tuesday, and then you have

4    got to go find out what Sally Sue has to say about it.  It is

5    an odd scenario, in the sense of it makes your position more

6    interesting and perhaps more urgent, because the only way you

7    are going to get this information is if it comes from them.

8    You pretty much can't dig it out yourself.  I get that.  But

9    that -- but what's curious about that is that it impacts, you

10   know, this continuance, and -- but I agree with you, I don't

11   want stuff being dumped in your lap on the eve of trial, if

12   that's avoidable.

13          *MR. O'HARA:*  And one other thing that I think bears

14   mentioning, as it relates to the case law, is there seems to be

15   a misunderstanding, maybe it's just a lack of acknowledging

16   what it means to prepare for trial, and the amount of time and

17   energy it takes to prepare jury instructions and

18   Cross-examination and all of that, and then the expectation

19   that we, as defense attorneys are just... deal with it, when it

20   comes; like, one day should be enough, and that idea, I think

21   it's outdated I don't think it's realistic.

22          *THE COURT:*  If you are asking me to say that the

23   Federal Courts uniformly don't understand how difficult your

24   job is, you are asking for a little too much.

25          *MR. O'HARA:*  I'm saying, Your Honor, in this specific

1    area, where there seems to be not a ton of sympathy for defense

2    attorneys who --

3           THE COURT:  I don't think that's the right way of

4    putting it.  I think the right way of putting it is, there is

5    not a lot of law that dictates that the government obligation

6    is broader than what they represent, and so when there is not

7    law that is made, one does not, as a jurist, fill that gap with

8    sympathy.

9           MR. O'HARA:  Yes; that's right.  But that gap in

10   instruction on when they have this obligation to tender it, can

11   allow a Court to say, listen this is information -- a lot of it

12   is not new, and so anyway I have made my point and thank you.

13          THE COURT:  I almost feel like insisting that I hear

14   from Ms. Surratt, but I won't do that.  Go ahead,

15   Ms. Cramer-Babycz.  It's just I find it interesting when

16   additional people come and never get to speak.

17          MS. CRAMER-BABYCZ:  I promise the Court will get to

18   hear a lot from her going forward.  She very generously just

19   joined me on this case.

20          THE COURT:  I understand that, and she knows, as well,

21   sometimes I tease Mr. O'Hara.  I'm teasing her.  So go ahead.

22          MS. CRAMER-BABYCZ:  I don't have much to add,

23   Your Honor, in addition to what was provided on our written

24   response.  I will continue to reiterate the government

25   understands our *Giglio* and *Brady* obligations.  I'm not trying

1    to make Mr. O'Hara's job more difficult than it is.  We will

2    make every effort to disclose what we are required to, so that

3    he can prepare and investigate and be ready for trial, but I do

4    think that a deadline, a month in advance, goes far beyond what

5    our obligations are.

6         THE COURT:  Let me address some things with you, and

7    let's see where we end up.  I don't -- you understand your

8    *Brady* obligations; fine.  I don't think *Brady* has really been

9    raised with me, in any particular way.  Some of what has been

10   raised with me is -- are things that really aren't *Giglio*.

11   They are matters of character or evidence relating to the

12   nature of the victim, which I understand Mr. O'Hara will be

13   vigorously saying should come in, and I have no earthly clue

14   what you are going to be saying, with regard to some of those

15   matters, and I am not asking for that to be resolved now.

16        I just don't want the focus of this motion to be

17   interpreted as having drifted off of the subject of *Giglio*, and

18   into all of these other things; that being said, I'm also not

19   unmindful of the fact that Mr. O'Hara is skilled at dealing

20   with matters off the cuff, and I don't want to be dismissive of

21   potential issues either.  What I mean by that is, in a case

22   where, potentially, self-defense is relevant, the

23   characteristics of the victim might, if extreme enough, be

24   viewed by Mr. O'Hara as some kind a *Brady* obligation.  So I get

25   that, as well.  I mean, these things are not -- they don't fit

1    into the neat little boxes that they -- that they ordinarily

2    might.  I'm not trying to resolve the chalk marks on the floor,

3    so to speak.  What I am doing is just wanting to make sure of a

4    couple of things; number one is, that I don't fall into a

5    tactical request; and what I mean by that is set some arbitrary

6    deadline and then it turns out that you don't tell him

7    something and he finds out about it otherwise, and then we get

8    into some sidebar, or never-ending argument about, you breached

9    an order of the Court, therefore this sanction, that sanction,

10   the other sanction is appropriate.  Clearly, you breach an

11   order of the Court, I'm going to come after you.  There's no

12   doubt about that.  I'm just saying I'm not trying to create

13   artificial issues, in a case, by setting arbitrary -- purely

14   arbitrary deadlines that really have more potential value as a

15   tactical matter than as a trial preparatory matter.

16        I have no interest in having things dumped on a

17   defendant on the eve of trial, and then, you know, having this,

18   in-the-box/out-of-the-box jury, while I give him, what, two

19   hours to investigate something that he can't investigate,

20   because it occurred down -- inside the walls of the USP,

21   Florence.  There's a silliness factor, which is not a legal

22   silliness, but it's just -- it's just a reality of this case,

23   that he, perhaps, is more dependent on the government in this

24   case, than he would be in another case, to go out and scour the

25   bushes, et cetera, et cetera, and find things.  That's not

1    because you structured anything in any particular way or

2    because you have done anything wrong or because anybody has

3    done anything wrong.  It's just the reality of the case.

4           So, where I'm inclined to come out is this, I'm not

5    here to say whether any particular thing is or is not *Giglio*.

6    I have not been asked to do that, yet.  I suspect there may be

7    a point in time when there's an argument about that.  Some of

8    the things, for example, that we discussed at sidebar, for lack

9    of a better term, are matters which I can -- I don't consider

10   to be frivolous, but by the same token, I'm not saying that

11   that means that anything and everything that pertains to that,

12   is matters that I would put the label of *Giglio* or *Brady* on.

13          It is a matter that is going to need to be discussed,

14   between counsel and the Court, and I am not sure when and where

15   that's going to happen, but I am going to say that the

16   obligation to produce *Giglio* is one which you acknowledge that

17   you have, and you acknowledge compliant with.  Are we on the

18   same page, thus far?

19          *MS. CRAMER-BABYCZ:*  That's correct, Your Honor.

20          *THE COURT:*  Then what I would -- what I'm looking to

21   do is to say this, with respect to the victim, provide what

22   *Giglio* you have that has not already been provided two weeks

23   from today.  I don't think that that's a terribly hard find,

24   and you have obviously known that this person was going to be a

25   witness, presumably, since the case was initiated, and I don't

1   think that's imposing possession or putting some difficult

2   burden on the government or tipping the government's hand or

3   anything else.

4        With respect to the other witnesses, I don't know who

5   they are.  I suspect you have an idea, but you have not made

6   firm decisions, because you haven't had to.  What I would say

7   is to the extent that you identify witnesses at the trial

8   preparation conference, which is set for the 29th of April,

9   which is about ten days before trial, produce whatever *Giglio*

10  is associated with them on the 29th.

11       To be clear, I'm tying that production to the date of

12  the 29th, and what I mean by that is, if, because I have got a

13  trial going on that week, I end up moving the trial prep

14  conference up or back, the obligation doesn't slide with the

15  conference.  And then, with respect to other matters that come

16  to your attention later, as soon as practicable.  To be clear,

17  what I'm not doing is saying, if there's something that is not

18  handed over by the trial preparation conference, you are barred

19  from going into it or you're in violation or something else.

20  Things come up.  The more you get ready for trial, both sides,

21  the more you dig, the more you scratch, the more you itch, it's

22  the bumper sticker, *Stuff Happens*, and so, I'm not, by virtue

23  of what I'm requesting, which is, I suppose, a very mild way of

24  saying *ordering*, is not meant to say that if something isn't

25  produced by the 29th, that there's some witness preclusion or

 1    fact sanction or other thing that's going to go on.

 2          I'm simply setting three things, one for the

 3    witness -- victim -- for the victim, two weeks.  For other

 4    witnesses, trial prep conference.  And if there is additional

 5    material that the government does not yet have, and does not

 6    acquire, until some time after these two events, as soon as

 7    practicable.

 8          MS. CRAMER-BABYCZ:  I -- I understand those

 9    obligations, and will comply with them, Your Honor.  Just one

10    point of clarification on -- with respect to the victim.  When

11    we say *what the government has*, I'm taking that to mean, what

12    the U.S. Attorney's Office for the District of Colorado has, in

13    our actual possession, within the next two weeks, we will

14    disclose.

15          THE COURT:  I'm saying that, yes, but let me be clear,

16    I'm also not building a castle wall around you.  Obviously,

17    U.S. Attorney's Office, what you have in your actual

18    possession, ordinarily, would be next to nothing, and what I

19    mean by that is there's no reason for you to have files on

20    inmates or other things.  Obviously, there's an obligation to

21    get some information.  Whether it be from the BOP or other

22    sources, I don't know whether you have -- I don't know what was

23    filed in Mr. ... I can't remember his name, because I don't

24    have it anywhere.  I will say *Mr. Victim's* case, in Texas, I

25    don't know what filings there were, if there's information

 1   there that's readily obtainable by you, I expect that to be

 2   included, as well.  I'm not trying to say that you will be held

 3   accountable for a delay not of your making, but I am saying,

 4   you are not in a circumstance where you can cross your arms

 5   across your chest and say, *Well, I didn't have it.  Hey, sorry,*

 6   *FBI has it.  I didn't know anything about this*.  There's

 7   certainly -- this is not an individual who I would anticipate

 8   would be a stranger to your side of the aisle, and that there

 9   is information there.

10          So, without being too specific, in terms of line

11   drawing, information that is available to you, consistent with

12   your obligation to try and obtain information.

13          *MS. CRAMER-BABYCZ:*  I understand.  We will certainly

14   make any of those necessary area inquiries before that date.

15   Thank you.

16          *THE COURT:*  You want any further record?

17          *MR. O'HARA:*  No, Your Honor.  I'm clear.  Thank you.

18          *THE COURT:*  I think we're done.  At least in terms of

19   motions, unless I have missed one?

20          *MR. O'HARA:*  Nope.  Those were the three, Your Honor.

21          *THE COURT:*  Further consistent with my wanting to be

22   transparent, let me tell you a couple of things, and I am

23   telling you this as a matter of my current leanings, so that

24   you can be educated about it, and if it creates an issue, you

25   can raise the issue with me in advance of the trial.

1          One or the other or both of you either characterized

2    or acknowledged that the inmate witnesses in this case are not

3    relatively ordinary Jimmies and Joes, so to speak, and I don't

4    mean that in a -- using the term Jimmy and Joes, I'm not using

5    it as a way to distinguish one racial group from another, but

6    that there are security concerns that the Bureau of Prison and

7    probably the Marshal Service has, with regard to said persons.

8    My inclination is that it is highly probable that these will be

9    rules that I will put in place and I want to tell you now.

10         Number one, no more than one sensitive witness per

11   day.  I understand that may cause me more problem than you, but

12   the local jails just are not secure facilities on the level of

13   USP, and what I'm trying to do is have people be able to be

14   round tripped, if you would, bring them in, they testify, they

15   go back.  And presumably they would be -- it would be better if

16   they were kind of an afternoon or at least a midmorning,

17   because, what is it, depending on traffic, it could be as much

18   as a three-hour drive to get from ADX -- excuse me -- from the

19   USP, from the Florence campus, let's call it that, down here,

20   and that's not even considering things like weather that may or

21   may -- it could rain.  It could do anything.

22         In terms of witnesses -- now, that obviously does not

23   include, Mr. Garcia, obviously.  He would be here throughout

24   the trial, along with whatever other person may or may not be

25   deemed a sensitive witness.  All right.

1          To be clear, I will not have Mr. Garcia leg ironed,

2     body chained or cuffed.  I will have sensitive witnesses in

3     that jury box (sic) leg ironed, which means that I will have

4     them brought in and brought out of the courtroom outside the

5     presence of the jury, and what event I will invent in order to

6     move that jury in and out of the courtroom, we will see.  Maybe

7     I will get a phone call.  Maybe I will have an emergency

8     contact.  Maybe I will just tell them, you are in recess, we

9     will figure that out later.

10         The other thing is that when the victim is testifying,

11    what I'm calling a sandwich will occur.  Mr. Garcia will be in

12    the seat that you are now occupying, Mr. O'Hara.  You have your

13    choice, one, either you or Mr. Belcher, will be to his right,

14    and the other of you will be to his left; so that there is one

15    attorney on each side of the table.

16         I tell you that because I don't care whether you adopt

17    that seating posture for the entirety of the trial or you swap

18    it for just that witness.  I will say that if you swap it for

19    just that witness, I will require the government to change,

20    swap a seat, as well.  And I don't care whether that is

21    Ms. Cramer-Babycz and Ms. Surratt being on the same side of the

22    table or swapping seats or doing something, but it will be the

23    case that musical chairs would be played, and it would not be

24    musical chairs just being played by one table.  I'm not saying

25    that that is going to be the end-all and be all of things.  I

1    don't know what other people are going to raise.  I don't know

2    what, if anything, people in charge of security may raise with

3    me, but I would be more than a fool to think that nobody

4    connected with the BOP or the U.S. Marshal's Service is going

5    to think the following word, *Utah*.  They are going to think it.

6    And if you don't know what I mean, I suspect you do, or you can

7    Google it, but there was a little incident in a courthouse

8    where it ended up being the case that somebody got shot by

9    security and executed because events transpired.  I am not

10   saying these events will transpire.  I am not even concerned or

11   suggesting, *Oh my God, I have to be overly concerned about*

12   *anything.*  But I am saying that some reasonable preventative

13   measures to create -- to prevent any scenario, that might be

14   misinterpreted by security, is something that I probably will

15   accommodate.  And up to now, I just wanted to put these three

16   things in front of you, way in advance, so that you can think

17   about it.  I'm not asking for comment or reaction or anything

18   else.  Again, I'm trying to adhere to a policy of transparency.

19   Questions?

20        *MS. CRAMER-BABYCZ:*  No.  Thank you, Your Honor.

21        *THE COURT:*  Questions?

22        *MR. O'HARA:*  Your Honor, has there been a discussion

23   about when Mr. Garcia will be brought up to this area?

24        *THE COURT:*  I have not had a discussion.  I do -- I

25   will of -- I will require him for the trial prep conference.

1          MR. O'HARA:  Thank you.  I would ask that, and I would

2     ask that -- and I will talk to the Marshals about this, but

3     just putting it on the Court's radar, I think he will be

4     brought up in the week before and placed in a local facility,

5     but I would like to have access to him, as the case leads up to

6     trial, rather than traveling down to ADX to see him.  So, I

7     will talk to them --

8          THE COURT:  I understand that, but by the same token,

9     I mean, I'm not -- I don't want to be flippant.  They have

10    hotels.  Now, does that mean that I'm -- you know, condemning

11    you to Florence, Colorado for a month?  No.  I'm not trying to

12    do that.  I'm just trying to say, it's not as if, if you need

13    to see him, he needs to be right here, every day, and I don't

14    know how many days in advance.  I believe that he will be here

15    in advance of the trial.  I am telling you that I am going to

16    tell the Marshal Service and, Cathy, why not just let them know

17    now, that I'm going to want him here for the trial preparation

18    conference on the 29th, and we will see where it goes.  If you

19    would keep in touch with them --

20         MR. O'HARA:  Sure.

21         THE COURT:  -- as issues arise, and let me know, as

22    soon as you perceive there to be a difficulty, I can address it

23    as quickly as I can.  I think I'm going to be in trial the week

24    before that, but you never know.

25         MR. O'HARA:  Sure.

1          THE COURT:  Anything else?

2          MR. O'HARA:  Nothing else.

3          THE COURT:  Good to see you all.  We will be in

4   recess.

5          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

6      (Recess at 2:49 p.m.)

7                        REPORTER'S CERTIFICATE

8

9      I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

10

11     Dated at Denver, Colorado, this 4th day of January, 2023.

12                       s/Tammy Hoffschildt

13                       _____

14                       Tammy Hoffschildt, FCRR,RMR,CRR

15

16

17

18

19

20

21

22

23

24

25