**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 21-cr-00143-RM

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**FRANCISCO GARCIA,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Sentencing Hearing)**
_____

       Proceedings before the HONORABLE RAYMOND P. MOORE,
Judge, United States District Court, for the District of
Colorado, commencing at 9:00 a.m. on the 22nd day of
November, 2022, Alfred A. Arraj United States Courthouse,
Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
ANDREA LEE SURRATT and LAURA CRAMER-BABYCZ, U.S.
Attorney's Office, District of Colorado, 1801 California
St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
TIMOTHY PATRICK O'HARA, Office of the Federal Public
Defender, 633 Seventeenth St, Suite 100, Denver, CO 80202

1                    **NOVEMBER 22, 2022**

2           (Proceedings commence at 9:00 a.m.)

3           THE COURT:  Please be seated.

4           21-cr-143, United States of America v. Francisco

5    Garcia.  We are here today for sentencing.

6           Appearances, please.

7           MS. SURRATT:  Good morning, Your Honor, Andrea

8    Surratt with the Government.

9           THE COURT:  Good morning to you.

10          MR. O'HARA:  Good morning, Your Honor, Timothy

11   O'Hara here on behalf of Mr. Garcia.  He is seated to my

12   left.  He is in custody.

13          THE COURT:  Good morning to you, as well as

14   Mr. Garcia.

15          All right.  Two things by way of introduction.

16   Number one, the latest update in the continuing saga of is

17   he dangerous or not -- and I am referring to myself, not

18   to Mr. Garcia -- as everyone knows, I had COVID.  I went

19   through the five days of isolation.  I went through the

20   subsequent five days of masking and, on top of that, I

21   have tested negative twice within 48 hours, the last time

22   being about 30 minutes ago.  So, I shouldn't say within 48

23   hours, twice 48 hours apart.

24          So by all measures of the CDC and science, as I

25   have access to it, I am fine.  I don't mean by that to

1    suggest -- and this is facetious -- that there was some

2    large line of persons wondering if I was healthy, but

3    there was a large line of persons wondering if I was

4    bringing them to court in a dangerous situation.

5          Earlier this week, as well as towards the end of

6    last week, I had certain masking requirements that were in

7    place.  That is all over.  You all are now are up to date

8    and need not be concerned.

9          Number two, as I said, we are here today for

10   sentencing.  There was no plea agreement in this case, but

11   I do want to note for the record that the case is a little

12   bit unusual, in the sense of I know the facts better than

13   I would normally off of a mere plea.  What I mean by that

14   is the case resolved on the eve of trial, and because of

15   that timing, I was provided with and have had access to

16   and have with me here today, all of the trial exhibits,

17   both the government's and the defendant's, including the

18   photographs, the videos, and others matters.  I have

19   obviously not had the physical exhibits, but the physical

20   exhibits I don't think are necessary to understand the

21   case.

22         The third thing that I should mention is that the

23   record here is a little bit strange and confusing, if you

24   look at it as an outsider, and that is because of

25   something that happened that was my doing.  At some point,

1    because I knew that this was going to be a contested

2    matter, I looked at the files before the addendum had come

3    up just to see what, if anything, caught my eye and that I

4    needed to spend more time with in advance of sentencing.

5           One of the things that caught my eye was that I

6    noted that Mr. Garcia's currently serving a sentence of, I

7    believe, 270 months, or thereabouts, out of the District

8    of North Dakota, a federal sentence.  And when I looked at

9    the facts, it was essentially, I believe, 44 grams of meth

10   and a gun, something along that line.  And my reaction

11   was, wait a minute, this seems like an awful lot of time

12   for 44 grams and a gun -- not to be questioning another

13   judge, but simply to be unable to understand it when

14   reported in that negative fashion.

15          So I went to the docket to look and see if I could

16   better understand what was going on, and when I was there,

17   what I discovered was that I could understand it, he was

18   sentenced as a career offender.  But that raised a

19   concern, because the original presentence report had

20   Mr. Garcia as having two convictions prior to his federal

21   conviction that he is now serving out of North Dakota.

22   The two convictions were out of the State of Minnesota

23   when he was age 14, and one when he was age 17.

24          One those was called a juvenile conviction, one of

25   those was called an adult conviction, but it appeared as

1 if they both should be classified as adult convictions for

2 a variety of reasons, not the least of which is in North

3 Dakota they were both treated as not only adult

4 convictions but as the predicate convictions for a career

5 offender sentence.

6    I contacted the probation office, and did not tell

7 them what to do, but indicated that I had concerns about a

8 particular issue, explained it as I understood it, and

9 then immediately called counsel, because sentencing was, I

10 want to say, the next week, something like that, it was

11 coming up pretty close, and it was not going to be a lot

12 of time before what I anticipated was going to be a change

13 in the presentence report and the time of sentencing.

14    By the next day, probation had some additional

15 information, and I again called the parties and told them

16 what I thought probation would be doing.  Some of that was

17 right, some of that was wrong, which I suppose indicates

18 that, again, I didn't tell them what to do, but I gave the

19 parties continuous updates.

20    Well, it ended up being that we continued the

21 sentencing anyway for reasons that had nothing to do with

22 Mr. Garcia or counsel, it had to do with the fact that he

23 had been moved back to ADX, unbeknownst to the marshals.

24 And you simply can't get ADX to function or respond to

25 getting someone to court that quickly.

1          So when we go through things, there are going to be

2     issues that are objections to the presentence report, but

3     they don't address this latter issue.  I am going to go

4     through what was ultimately the original set of objections

5     and then I will come back to each side and see, with

6     regard to the subsequent matters, where we stand.

7          So that is an extended and protracted introduction.

8     As I said, there is no plea agreement in this case, so

9     there is nothing to accept or refuse.  The defendant pled

10    guilty without a plea agreement.

11         Mr. O'Hara, have you received copies of the

12    presentence investigation reports that have been prepared,

13    as well as the addenda that have been prepared, and had

14    sufficient time to review them and discuss them with

15    Mr. Garcia?

16         MR. O'HARA:  Yes, I have.  And, yes, I have.

17         THE COURT:  And, Ms. Surratt, is the same true for

18    you?

19         MS. SURRATT:  Yes, Your Honor.

20         THE COURT:  In terms of what has been filed, let me

21    start with the Government.  The Government filed an

22    objection to the presentence investigation report.  The

23    Government also filed a response to the Defendant's

24    objections to the presentence investigation report.  The

25    Government filed a motion for upward variance.  And

1    finally, the Government filed a response to a court order

2    that I had entered when I continued this matter, saying,

3    in essence, hey, let me know your position with respect to

4    these recently discovered events that I have discussed

5    with the parties.

6         The defendant has filed his own objections and

7    clarifications to the presentence investigation report.

8    He has responded to the Government's objections to the

9    presentence investigation report.  He has filed his motion

10   for a variant sentence, that variance being a downward

11   one.  And he has finally filed a, similar to the

12   Government, a response to the matters revealed by me in

13   the various telephone conversations.  His is styled a

14   response to probation department's addendum.

15        I think that is everything.

16        MR. O'HARA:  I agree, Your Honor.

17        THE COURT:  Ms. Surratt?

18        MS. SURRATT:  Yes, Your Honor.

19        THE COURT:  Then let's start with the objections.

20   And let me begin, I suppose, with the Government's

21   objections.  And as I have it noted, my understanding of

22   the Government's objection is an objection with respect to

23   whether or not Mr. Garcia should receive acceptance of

24   responsibility.  To be clear, the Government has not filed

25   a motion for the third point for acceptance of

1    responsibility, nor has anyone argued that they should or

2    are required to or equitably I should adjust for that.  As

3    I said, the matter was pled on the eve of trial.  But the

4    probation office assessed 2 points for acceptance of

5    responsibility.  The Government has objected to that and

6    suggested that no acceptance of responsibility credit

7    should be awarded, and there is basically two positions

8    with regard to that.

9         Number one is that the limited admission of facts

10   contained within his plea documents are so bare that they

11   don't constitute an admission of all relevant facts.  And

12   then number two, that he waited so long, he shouldn't get

13   responsibility.

14        Ms. Surratt, I will hear from you.

15        MS. SURRATT:  Very briefly, Your Honor, since I do

16   think this has been briefed fairly adequately.

17        THE COURT:  I agree with that, as well.

18        MS. SURRATT:  So, Your Honor, I will clarify

19   slightly the first reason that the Court articulated.  It

20   is not that the facts were bare.  In fact, when I draft

21   plea agreements to present to defendants, I tend to error

22   on the side of bare facts.  It is more that the defendant

23   has not -- seemingly not swayed from his position that

24   this was some sort of mutual combat situation.  And,

25   again, this has been briefed not only in the Government's

1    objection to the presentence report but also in the

2    Government's motion for upward variance, so I will clarify

3    that.

4         And I will only respond in terms of the timing,

5    also, I think, adequately briefed, Mr. O'Hara said that to

6    do something other than giving the 2 points for acceptance

7    would disincentive late pleas.  And to that I would say,

8    yes, it would, and good, frankly.  There is no reason to

9    incentivize someone to take a plea on the eve of trial.

10   And so I think, if anything, denying the points here, to

11   the extent it would incentivize an earlier plea, then also

12   good.  That is good for economies and efficiencies.

13        THE COURT:  All right.  Let me say a couple of

14   things.  I will hear briefly from Mr. O'Hara.  There is an

15   issue that will become a theme of this sentencing, which

16   first presents in the Government's motion, at least first

17   presents because I have raised it as the first thing I

18   wish to consider, and that is what I will call, what is

19   the background or motivation for the assault to which

20   Mr. Garcia pled guilty?  There are very competing

21   explanations, and each side is vigorously holding to its

22   explanation.

23        The Government's explanation -- and I am

24   simplifying this, but the Government's explanation is this

25   was an extortion attempt by the Mexican Mafia, more

1    specifically the Mexican Mafia acting through Santiago and
2    Perez, who were two individuals outside of the cell, that
3    Mr. Garcia is a Sureños; in simplified terms, the foot
4    soldiers for the Mexican Mafia.  When Cardenas, the
5    victim, resisted the extortion demand, Garcia assaulted
6    him for his noncompliance.
7         The Defendant's position is that there was some
8    mutual combat -- well, it is one of two things.  Number
9    one, there was some mutual combat situation that escalated
10   into a circumstance where Cardenas was essentially
11   defeated and unresponsive, and Mr. Garcia continued,
12   rather than backing off, continued to assault him, thereby
13   causing serious bodily injury.
14        When I say "one of two things," I think what I just
15   said I think is the constant.  In front of that is perhaps
16   another explanation of what occurred by way of motivation,
17   and by way of motivation it was Cardenas was violating
18   cell etiquette and that came to the attention of Perez and
19   Santiago.  Cardenas became concerned about the Mexican
20   Mafia being involved in the cell etiquette issue, and that
21   then raised tension in the cell to where the mutual combat
22   began.  And that is a fair explanation of each side, and
23   each side will make this argument repeatedly throughout
24   and will get to how I will resolve it eventually.
25        But, let me hear from you briefly, Mr. O'Hara.

1          MR. O'HARA:  Good morning, Your Honor.  Good to

2    hear you are feeling better.

3          THE COURT:  You are the first and only one.

4          MR. O'HARA:  I will start out with likening it to a

5    detention hearing in which we deal with these presumptions

6    of detention in certain cases.  And this is a situation

7    like that in which there is a presumption of acceptance,

8    because when an individual pleads before trial it

9    constitutes significant evidence of acceptance.  So it is

10    almost like the scale is now tipping in favor of his

11    receiving the 2 levels of acceptance.

12          This is not a situation like an individual charged

13    with re-entry who is waiting until the last minute to see

14    if all of the pieces are in place and if they are going to

15    get their witnesses together and if this can be some sort

16    of speedy trial delay.  There is no evidence of purposeful

17    delay.

18          In fact, the wheels, as I put it in here, were very

19    much still moving at the time that he admitted guilt.  We

20    had a very, very substantive pretrial motions -- pretrial

21    conference that week of, I think it was either the Tuesday

22    or the Wednesday before the trial.  Many issues that were

23    up in the air were decided by this Court.  And it was my

24    first time speaking with him after that, with any

25    substance at the jail, and that is when he decided to

1    plead guilty.

2            THE COURT:  And I want to say, I am not sure this

3    memory is a hundred percent accurate, but I want to say

4    the Thursday of that week, perhaps it was Friday, was the

5    first time that I was able to demonstrate to the parties

6    the skirts that I was going to use around the tables, and

7    I believe Mr. Belcher came over to the Court in place of

8    you because you were at the FDC or FCI, wherever you were,

9    you were on the local Englewood campus communicating with

10   Mr. Garcia.

11           MR. O'HARA:  That is fair.  That is fair, Your

12   Honor.

13           So their not filing a motion for the acceptance due

14   to the inconvenience of the Government, he is not getting

15   the 1 level off for that, that is sufficient.  The law and

16   the evidence supports the inclusion of 2 levels for

17   acceptance, and I think the Court should give it, and the

18   Court very much can and should.  Thank you.

19           THE COURT:  All right.  I am going to deny the

20   motion, but I want to explain, you know, in a little more

21   detail why.

22           To some extent, these matters are kind of tied up

23   in how the guidelines are being approached, both by

24   probation and by the parties.  What I mean by that is, if

25   either side was arguing -- well, there is only one side

1    that would have been arguing, but if the Government had

2    been arguing for more than minimal planning, meaning

3    Garcia and Santiago and Perez, Mexican Mafia and Sureños

4    had put together this plan as to how to go about

5    approaching and the consequences of refusal when

6    approached by Mr. Cardenas, we would have a discussion as

7    to whether or not that was in play.

8         And if, in fact, that were in play, it would

9    trigger, potentially, 2A2.2(b)(1), an adjustment for more

10   than minimal planning.  But there is no such argument or

11   contention being made.  And as a consequence, this notion

12   of whether or not they were all part of it or all planned

13   together, isn't really going to anything that is either

14   the offense of conviction or relevant conduct.

15        Similarly, there is -- there is an indication in

16   the presentence report coming from the Government's

17   people -- and I use that term broadly, not to refer to

18   Ms. Surratt particularly, but more particularly the BOP

19   personnel -- that this was because, at least in part,

20   Mr. Garcia was up for his "black hand."  And, again, I am

21   not saying what either side should or should not have

22   done, but if, in fact, it was presented to me as that

23   being an issue that was a guideline-relevant issue, then I

24   would expect to see someone, whether it be probation or

25   the Government, urging the application of 2A2.2(b)(5),

1    which is the assault was motivated by either a payment of

2    money or other thing of value, and certainly I would find

3    no difficulty in concluding that in a prison context, the

4    award of the "black hand" would be a thing of value.

5         But these things are not being proffered by either

6    probation or the Government, and obviously Mr. Garcia

7    would not be advancing either of them.  And so I don't

8    have anything that tethers these disputes as to the

9    motivation or the events preceding the offense as being

10   relevant either to the issue of guilt or to the issues of

11   the guidelines and, as a consequence of that, narrow,

12   barebones, yes.  But can I say that he is holding to a

13   position that falls short of acceptance of responsibility,

14   it is hard for me to do that, and I won't do that when it

15   doesn't tether to anything that is in the guideline.

16        Is it late?  Yes.  But again, I don't have anything

17   that I can point to that suggests that it is some kind of

18   a tactical decision.  There may be any number of things,

19   and my imagination can run wild, just as anyone else's.

20   Maybe it is, as Mr. O'Hara says, that it was as soon as he

21   had an opportunity to have a discussion with Mr. Garcia

22   following the rulings that were made at the trial

23   preparation conference on a variety of issues.

24        Maybe it was because I was going to control the

25   movement of people throughout the courtroom.  Maybe it was

1    because it was clear that the trial was not going to be an

2    avenue by which an answer to the question, what was the

3    role of Mr. Cardenas in connection with his sentencing and

4    his relationship with the Government?  That question was

5    not a relevant one and was not going to be responded to or

6    answered.

7          It may be that he "saw the light."  I don't know

8    which of those things it is, but I am not going to presume

9    one when I don't have any clear indication of tactics or

10   delay or advantage, nor do I have any clear indication

11   that the matters that he holds to -- again, I have not

12   gotten to the point of what do I believe, but the matters

13   that he holds to are matters that impact the sentencing or

14   that are either matters that go to guilt or relevant

15   conduct within the guideline definition of the term,

16   meaning it affects some adjustment up or down.

17         So, with all of that, I am going to deny and

18   overrule the Government's objection.  It does not mean

19   that I accept the Defendant's explanation, it just means

20   that I think looking at it in the context that I need to,

21   the objection is overruled.

22         I now turn to the Defendant's objections, and those

23   are multiple.  I have got to get there.  Give me a minute.

24   All right.  At the beginning, there is a section that

25   talks about matters that impact the guidelines, and the

1    answer is that there are none.  There is this footnote

2    that is dropped that suggests an overrepresentation of

3    criminal history departure may be appropriate, and that

4    footnote doesn't get picked up anywhere else.  I will come

5    back to it, but I will come back to it only after dealing

6    with the objections.

7         The objections, again, we're back to what I said is

8    a theme of this sentencing, there are any number of things

9    that are objected to.  Paragraphs 9, 10, and 11, the

10    objections are to the Government's statement that the

11    assault was motivated by the extortion attempt.

12         My answer to the objections to paragraph 9, 10, and

13    11 are simple, and it is this.  The objection is

14    overruled.  Paragraphs 9, 10, and 11 are the Government's

15    statement of its position.  The Government has the right

16    to state its position.  What is in paragraphs 9, 10, and

17    11 is their factual statement, their interpretation of

18    events, and I am not going to muzzle them through the

19    presentence report by having their view, again, which I

20    have not accepted or rejected, but by having their view

21    kind of sanitized.

22         There are two competing motivations for this

23    offense, and this is simply the Government's motivation or

24    their explanation, and it is in that section of the report

25    that makes clear that this is the Government's statement

1    of facts.  So while I understand that this dispute exists,

2    I overrule the objection for the reasons stated.

3         You can make whatever additional record you wish to

4    with regard to 9, 10, and 11.

5         MR. O'HARA:  Your Honor, I think, just briefly, the

6    intent in making the objection was not to strike the

7    Government's argument, merely to point out that the facts

8    alleged in the Government's argument are not true.  So to

9    the extent that that is preserved and will be addressed

10   later on, I think the Court has addressed it.

11        THE COURT:  I am going to get to where I come down

12   on this ultimately, but I am not going to get to it by

13   kind of endorsing one side's objection over the other

14   side's objection.  Your position is noted and

15   acknowledged.

16        The next is paragraph 17 and, again, there is an

17   objection there.  I think what I said before is not quite

18   the same as what I can say now.  The reason is, this is in

19   a section of the report that is called "additional

20   information," and so it's source is the probation office

21   and not "the Government's position," but the objection is

22   to two things.

23        Number one, the statement that Mr. Cardenas was

24   "unresponsive" following the attack.  And then later that

25   he possibly had a left orbital fracture and jaw fracture,

1   as well as some other things that may also include a

2   possible skull fracture.

3          Now, again, I am going to overrule the objection.

4   The reason is, all that this section of the report is

5   doing is reporting to me the position that the BOP had and

6   what their understanding was as they entered his cell and

7   removed Mr. Cardenas from it.

8          In terms of his being "unresponsive," I think that

9   is just absolutely accurate as a matter of fact.  I don't

10  think unresponsive is the same as unconscious.  I could be

11  sitting here with a dull look on my face and drool coming

12  down from the corner of my cheek and be conscious, but I

13  could also be unresponsive if I was not responding

14  appropriately to stimuli that was around me.  And that

15  clearly is what was occurring with Mr. Cardenas.

16         So, in terms of the unresponsiveness, I just think

17  that that is flat wrong; that he was, in fact,

18  unresponsive.  In terms of the other matters, again, I am

19  accepting it in the context of the entire presentence

20  report.  This is what the BOP believed upon their original

21  early examination.

22         I am aware of the fact that Mr. Cardenas was

23  thereafter sent to Penrose Hospital and that Penrose

24  Hospital gave a more detailed examination, treatment,

25  diagnoses, and that it was, I believe -- there was serious

1    bruising, cuts, things of that nature.  There was, for

2    lack of better term, mental damage, confusion, memory

3    issues.  I believe there was a broken nose.

4         But the skull fracture and some of the more serious

5    other matters were not what happened.  It was still

6    serious bodily injury, no one is denying that.  So, I

7    suppose what I am saying is two things.  I think it is an

8    accurate portrayal of what the BOP's position was

9    initially and, therefore, I overrule the objection.

10        But I am also, at the same time, fully cognizant of

11   the fact that I have the advantage of having the

12   subsequent records from the hospital which, again, were

13   not only given to me by the Defendant but were also, I

14   think, part of the trial exhibits, as well, and so I am

15   aware that these early visual observations about what

16   might have occurred, did not occur, in fact.

17        So, if there is anything you want beyond that,

18   Mr. O'Hara, please let me know, but that is sort of how I

19   cut to the chase.

20        MR. O'HARA:  I have no other record to make, Your

21   Honor.

22        THE COURT:  All right.  We're going to, again, come

23   back to something that is very similar.  No. 19 is that --

24   excuse me, the objection to paragraph 19 is, again, with

25   respect to a report from Lieutenant Anthony.  The

1    objection is that some of the things that he says are not

2    true.

3           The three things that are the subject of objection

4    is that Mr. Cardenas was "rocked to sleep;" in other

5    words, had his guard -- well, had his guard taken away or

6    let down by virtue of being distracted by presumably Perez

7    and Santiago outside the door.

8           With regard to that, I overrule the objection,

9    because I do believe that that is exactly what happened.

10   And, again, we will get to my ultimate beliefs later, a

11   more full explanation of what I believe later.

12          With regard to whether or not he was being extorted

13   by the Mexican Mafia, the position is, as I said before, I

14   understand that this is the position that is the

15   Government's, and I understand it is not the position that

16   is the Defendant's.  I am not going to resolve it in the

17   context of this objection, I will deal with it more

18   broadly when I am through with the individual objections.

19          And then, finally, the third thing is that

20   Mr. Garcia was up for his black hand, and that is what he

21   had to do by way of earning his black hand.  I will say

22   unequivocally, I don't have enough information before me

23   that would enable me to adopt that statement as true.  I

24   acknowledge it as simply what the BOP believes, and I will

25   leave it at that.

1         But I am not going to accept that statement as one

2    which is fact and sentence Mr. Garcia on the basis of that

3    being true, because I don't think I have anything other

4    than the statement of the SIS or BOP to back that up, and

5    no facts other than the opinion.

6         So I guess at the end of the day, what I am doing

7    with regard to paragraph 19 is denying it in part and

8    accepting it in part, or overruling it in part and

9    sustaining it in part, as I have just indicated.

10         Mr. O'Hara, anything more?

11         MR. O'HARA:  Nothing further, Your Honor.

12         THE COURT:  Ms. Surratt, up to now I have not gone

13    to you because I have been ruling against.  This is, I

14    suppose, the first instance of a mixed ruling, if you have

15    anything you want to add to it.

16         MS. SURRATT:  No, Your Honor.

17         THE COURT:  Okay.  Paragraph 21 is the same matter

18    that I have been dealing with, which is what is the

19    motivation?  This is, again, a statement that Mr. Garcia's

20    position is that this had nothing to do with an extortion.

21    As I have indicated, I am not going to resolve that in the

22    context of the particular individual objection.  I will

23    resolve it or let it be known to the parties how I view

24    things, but I will do so in a more comprehensive manner

25    than kind of picking at individual bits and pieces.  This

1    is the Government's position, and I understand and accept

2    and acknowledge that Mr. Garcia has a contrary position.

3           Anything more?

4           MR. O'HARA:  Nope.  That is fair, Your Honor.

5           THE COURT:  Paragraph 49, I think, is resolved.

6    When the original presentence report came out, paragraph

7    49 referred to something that was called -- and I should

8    mention that these are BOP events that occurred while

9    Mr. Garcia was serving his sentence, that there was an

10   internal disciplinary proceeding that was styled "killing

11   and possessing a dangerous weapon."  And, of course, it

12   was a concern that caught my eye and, yeah, it did.  And I

13   want to say that my reaction was, I'm going to need more

14   than a one-line label to understand what is going on.

15          The final presentence report indicates a good deal

16   more information with respect to this disciplinary

17   proceeding, as well as another subsequent disciplinary

18   proceeding.  This has been changed to "attempted killing,"

19   as there was no dead body that came -- well, there was no

20   death that came about as a result of this assault.

21   Additionally, there is additional information provided by

22   the defendant as to the circumstances of that.

23          I don't see there being any real disagreement

24   between the circumstances as Mr. O'Hara is explaining them

25   to me and the circumstances as the final presentence

1    report fleshes things out.  So I think this is now moot,

2    but I will hear from you.

3          MR. O'HARA:  Yes, Your Honor.  Yes.

4          THE COURT:  Okay.  And I think that covers all of

5    the objections.

6          I now want to circle back to the issue of whether

7    or not a downward departure or variance would be

8    appropriate based on overstatement of criminal history.

9          Well, no, I am going to park that again.  I think

10   the best course is to now move to that matter which is

11   really not reflected in these objections because of the

12   way that the timing of these things developed.  All right.

13   So, what am I talking about?  Well, what I am talking

14   about is a couple of things happened.

15         Number one, the presentence report reclassified

16   from the first draft two of -- well, one of Mr. Garcia's

17   convictions, moving it from a juvenile conviction to an

18   adult conviction.  There were two "adult convictions" that

19   he has that were committed prior to the age of 18, one at

20   age 14, which was, in fact, in the original PSR, said to

21   be a juvenile conviction and said to score no points

22   because it was more than 5 years removed, which is the

23   standard you use for juvenile adjudications.  When it

24   moves to an adult conviction, it then becomes one where

25   the appropriate time frame for counting and non-counting

1      is 15 years, not 5 years.

2              At the end of the day, probation has, as I said,

3      taken that conviction that I'm discussing, which is the

4      one that appears in paragraph 45, moved it forward in

5      time -- excuse me, moved it from a juvenile conviction to

6      an adult conviction, and concluded that it scores 3

7      points.

8              The reason that it scores 3 points is that one has

9      to understand Minnesota State law.  The way I understand

10     it, in shorthand, is this:  Minnesota does this thing with

11     regard to its sentences where in general what it does is

12     it divides its sentences into two-thirds one-third.  You

13     do two-thirds of the time as incarceration, one-third of

14     the time as supervision.  That supervision piece is some

15     kind of a weird, from my perspective, melding of what I

16     would call supervised release and parole.

17             What I mean is it appears to be handled by the

18     Department of Correction in Minnesota, it is not a matter

19     of where the supervision or violations come back to the

20     Court.  It is also not a matter which is tolled.  It runs

21     from the time that it begins running regardless of whether

22     you are in prison or not.

23             And so what ended up happening is that Mr. Garcia

24     ends up originally, on paragraph 45, getting a juvenile

25     adjudication of probation, but there is also this thing

1    called, I think an extended juvenile disposition or

2    something along those lines, where the Minnesota courts

3    can give you both a juvenile and an adult sentence, the

4    adult sentence hanging over you to make sure that you, in

5    essence, follow through with the supervision that has been

6    handed to you as part of the juvenile sentence.  And if

7    you mess up, then it goes back to court, they impose the

8    adult sentence, and it goes forward.

9         That is what happened.  And the reason that the

10   adult sentence was imposed is that the conviction that is

11   paragraph 46 occurred, and both of those ended up being

12   served at the same time -- well, in the same incarcerative

13   term.

14        With regard to the age 14 conviction, 58 months, is

15   what I believe it was, then there was a consecutive 21

16   months on the age 17 conviction.  That means that the age

17   14 conviction, he did two-thirds and then his supervision

18   began running even while he was serving the age 17

19   conviction.  And when he got out of both, there remained

20   supervision time on both the age 14 and the age 17

21   conviction, and there was a revocation which occurred in

22   roughly May of 2005, with a 10-day jail sentence being

23   imposed.

24        If that 10-day jail sentence applies to the age 14

25   conviction, that conviction is within 15 years of the

1    commencement of the instant offense and, therefore,

2    scores.  If the 10-day violation does not apply to the age

3    14 conviction, then the 15-year period ran out shortly

4    before the instant offense of conviction or the conduct

5    occurred.  So even with the 15-year clock being in place,

6    there remains this issue.

7          Probation says it is both the age 14 and age 17

8    that the 10-day revocation was served on because he was,

9    at the time of the revocation, still serving the

10   supervision portion of each of the two sentences.  And

11   that is absolutely correct; that the supervision portion

12   was still live.

13         And that is where we are.  So, to make it simple,

14   the Government says, yep, we agree with that, and the

15   Defendant says, nope, the 15-year clock ran.  I think I

16   have fairly recounted it.

17         MS. SURRATT:  You have, Your Honor.  Do you want

18   further?

19         THE COURT:  I will listen to you.

20         MS. SURRATT:  Very briefly.  The Government agrees

21   with that recitation.  For what it is worth, the

22   Government doesn't disagree with what Mr. O'Hara pointed

23   out in his filing.  The paperwork here is messy.  The

24   Government does share the probation's office view that as

25   a matter of logic, and also given the probation office's

1    consultation with a colleague in Minnesota, it seems clear

2    the revocation was to apply to both convictions for which

3    supervision was running.

4         But, again, the paperwork is messy, and Mr. O'Hara

5    has accurately pointed out a deficiency in the paperwork

6    from that time period.

7         THE COURT:  To be clear, no one -- as I said, I

8    wasn't trying to tell probation what to do or not do, but

9    one of the things that I did say to probation was whatever

10   paperwork we have, give it to both of them.  Give them

11   everything.  And my understanding is that each of you has

12   received all of this, and that each of you has received

13   the North Dakota presentence report, which Mr. O'Hara had

14   obtained independently of this probation office providing

15   it.

16        And I don't mean inappropriately, the Court in

17   North Dakota, pursuant to a motion, permitted that public

18   defender's office to send the North Dakota presentence

19   report to Mr. O'Hara in this federal public defender's

20   office.

21        Let me hear from you, Mr. O'Hara.  We all have the

22   same paperwork.  What Ms. Surratt is referring to is that

23   to the extent there is paperwork with regard to the

24   revocation, we have that paperwork, and what that

25   paperwork is, is from the, I want to say Department of

1    Corrections, but whether that's the accurate description

2    or not, what it does is it says, hey, here is the case

3    number and here is the charge, and it refers only to the

4    age 17 conviction.

5             MR. O'HARA:  Your Honor --

6             THE COURT:  I will hear from you.

7             MR. O'HARA:  What I would say, Your Honor, is I

8    agree with the Court's recitation of this situation, all

9    of the way up until the point that the Court stated that

10   the 10-days should apply to the age 14 conviction,

11   meaning, the extended juvenile jurisdiction program

12   classifying it as an adult conviction, I don't have an

13   objection with that.  I researched the issue out of the

14   Eighth Circuit -- and Tenth Circuit, obviously hasn't

15   addressed that issue, but we are using Eighth Circuit, and

16   they clearly allow that to be classified as an adult

17   conviction, so I don't have an objection to that.

18            I also don't have an objection to the Court -- the

19   probation department's classification that Mr. Garcia's

20   imprisonment term was satisfied as relates to the age 14

21   conviction in November of 2003.

22            Where I do object, and I think based on the

23   evidence we have, we have two competing notions; that --

24   well, we have a very clear piece of evidence, which is

25   this restructure report, and I am referring to document

1    142-1 --

2            THE COURT:  That is what I was trying to get to.

3            MR. O'HARA:  -- and that is the evidence that we

4    have on this issue.  And that evidence clearly includes

5    the assault second degree, which would be the age 17

6    conviction and excludes the age 14 conviction.  If such a

7    restructure -- I would imagine if it applied to both

8    cases, there would be a restructure report as it relates

9    to the age 14 conviction.  We don't have that.  So then we

10   are left to assume, based on this formula of two-thirds

11   one-third, which if you do the math and on the one-third

12   of a 58-month sentence, it potentially could include that

13   date, but that's hypothetical and that's a possibility.

14           What we have is much more certain with this

15   restructure report, and so I am asking the 3 points not be

16   included, and that is my objection.  Thank you.

17           THE COURT:  At this juncture, I find myself more

18   than a little unknowing.  What I mean is this,

19   intellectually, I don't have any doubt about what I think

20   happened.  And what I mean by that is, he is on

21   supervision in two cases, we all agree with that.  It

22   makes no sense that they would be revoking one but not the

23   other.

24           But, as I said, the only thing we have is the

25   restructure report, which is included in the docket at --

1    I am showing it -- I don't know if this is different than

2    what you said, I have multiple places where in my files I

3    have it, but it is at 142-1.  And that restructure report

4    says that the 10 days was assessed in connection with the

5    assault in the second degree, which is what I have been

6    referring to as the age 17 conviction.

7         Probation says -- and I don't dispute what they

8    say, nobody does -- that they were asking about the age 14

9    conviction and got all of this information in response to

10   that request and, therefore, understand that they were

11   being told, both by the federal specialist in Minnesota,

12   as well as by the Minnesota Department of Corrections,

13   where additional information was provided, that this

14   applied to both.

15        The thing that has me feeling annoyed is that I

16   don't like to embrace stupidity.  I know what happened

17   deep in my gut, I know what happened, but the record

18   doesn't support it, and I don't make rulings on the basis

19   of being, you know, the great and powerful wizard of

20   Arraj, where I know what happened and therefore let my

21   knowledge override the documents that are before me.

22        In court it is evidence that counts, not my gut.

23   And the evidence is that it does not apply.  The thing

24   that really annoys me is that if I wanted to play I know

25   what happened to its full measure, I would look at ECF No.

1   142-1, the Register of Action in Case 14K2-03-000436,

2   which is the age 14 conviction, and I would say, okay,

3   well, paper counts, let's see what it says in terms of the

4   disposition, and there you will see that it says 48 and

5   two-thirds months in custody, 19 and one-third months on

6   supervised release.

7       And if I do 48 and two-thirds month in custody,

8   this is within the 15 years.  And I know it is wrong

9   because somebody just can't do math, because two-thirds of

10  58 is not 48 and two-thirds, it is 38 and two-thirds.  So

11  at the same time that I am sitting here saying, well, I am

12  not going to go along with what I know to be true, when I

13  know it is stupid, I am going to go -- I am just going to

14  declare what it is.

15      Well, I won't do that, and yet I am doing it here

16  because this has got equally as stupid a conclusion stated

17  in it, and you can see it right there in front of you,

18  Mr. O'Hara.  Everything I know is that Minnesota divides

19  it two-thirds one thirds.  Everything I know is that

20  two-thirds -- well, it is not everything I know, it is

21  everything everybody knows, except who prepared this

22  document, is two-thirds of 58 is not 48, it is 38.

23      So, one the hand this is benefitting Mr. Garcia as

24  I am saying that I am not scoring it on the basis of the

25  revocation.  On the other hand, I am ignoring the face of

1   the document, which admittedly contains what I acknowledge

2   to be a math error.

3          It is what it is.  I am not going to try and

4   rectify one feeling of displeasure by siding with

5   something silly.  And I can tell from a distance that

6   Ms. Surratt is now looking at the chart that came from the

7   Minnesota DOC to see whether or not she can tell from that

8   whether he actually served 38 and two-thirds or 48 and

9   two-thirds.  I already did that.  It is actually 38 and

10  two-thirds.

11         So I am just lamenting the fact that there are

12  mistakes here.  I can see them all, but I resolve them all

13  in favor of Mr. Garcia.  Even though I don't think that

14  that is the right outcome, I think, in fact, I think on

15  the basis of the evidence before me, and relying on that

16  evidence and, as I said, not taking some position of being

17  all knowing, I am going to sustain the objection.

18         There is one more piece, and that is career

19  offender.  Now, he was a career offender in North Dakota

20  based on these two convictions.  One of them doesn't

21  score, and because it doesn't score, I can't use it as a

22  career offender basis.  But the age 17 one does score, and

23  the North Dakota conviction is also an appropriate

24  predicate.

25         Again, we get into the silliness of documents.  If

1    you look at the Judgment, you will see a reference to 846.

2    He did not plead to 846, he pled to 841, possession with

3    intent to distribute.  That is what the record shows, and

4    even the documents, the plea documents submitted to me by

5    Mr. O'Hara, which I had already seen, unmistakably make

6    that clear.

7          That is two predicates.  One, a crime of violence,

8    the other a federal drug distribution offense.  Now we

9    have the instant offense, and I am just not going to ask

10   the parties where they come out on this, I am just going

11   to make my record on it.

12         I am aware of the fact that, I think it was

13   post-*Borden*, the Tenth Circuit was encountered in a case

14   that dealt with a drunk driver on a reservation, and

15   whether or not restitution could be awarded to the person,

16   the innocent driver that was hit by the intoxicated one,

17   and whether or not that restitution could be ordered

18   depended upon whether or not the crime before the Court

19   was a "crime of violence."

20         And noting that a reckless battery would support

21   the conviction, the Circuit, for purposes of the matter

22   before it, said, yep, no, it is not a crime of violence.

23   And from that, since then, the probation department has

24   taken the position and the government has taken the

25   position and the defendant has taken the position that the

1    consequence of that case is that a number of other

2    statutes are affected, the reason being that the Tenth

3    Circuit's explanation of events was that the statute at

4    issue there referred to an assault and it did not define

5    the term and, therefore, it was the common law definition

6    that was used and, therefore, it could include this

7    reckless component.

8          Now, subsequent to that, I had a case that involved

9    the government and the public defender's office, I believe

10   it is *Devereaux*, and I believe it is now up on appeal, I

11   don't know whether it is pigheadedly or what, but I took

12   the position, or at least raised the question of, all

13   right, if, in fact, this is the case, then there is a lot

14   of statutes that are going to be impacted, and I

15   identified this as one of them, and noted that what was

16   going to end up happening was that you would have inmates

17   beating the hell out of each other, and you couldn't call

18   it a crime of violence or ever get to career offender or

19   anything else couldn't.

20         And the inquiry that I made and the ruling that I

21   made is that just as in a statutory definition or

22   statutory elemental situation, I can apply both the

23   categorical approach and the modified categorical

24   approach.  It seemed to me that absent the Circuit saying

25   no, I could apply the modified categorical approach to

1    federal statutes that rely on a common law definition of

2    assault, and then look to see whether or not we were

3    dealing with this common law notion of knowing assault or

4    this common law notion of reckless battery.

5         Again, as I said, it is up on appeal.  I haven't

6    changed my view of it.  And, of course, as I look through

7    this, there is no question as to what Mr. Garcia pled to,

8    was charged with.  Reckless has nothing to do with this

9    case, nothing.  But, again, I also understand that that is

10   not how the categorical approach works.

11        So the question is, do I persist in saying this is

12   a career offender case?  I would, but for one thing, it

13   will take a special juvenile -- it will take a special

14   conviction for me to believe that an offense committed

15   prior to age 18 should really have this significant an

16   effect on somebody's life.  And so even though I believe

17   he has the qualifiers and even though I believe that this,

18   at least until the Circuit tells me otherwise, can be

19   considered to be a qualifying offense, as well, I would,

20   in most situations, and in this one, choose not to apply

21   the career offender guidelines because one of the

22   predicates was committed prior to the age of -- the age of

23   18.

24        I am not criticizing the North Dakota court for not

25   doing the same thing; clearly they used an age 14 and an

1    age 17 and did go forward.  I think legally that is

2    correct.  I just think that it is not something that I

3    would do, and I wouldn't apply it and I would vary/depart

4    from it, so I am not going to find it in this case, noting

5    that the Government has not taken, in this case or in

6    other cases, express agreement with my view or question as

7    to whether a modified categorical approach can be applied

8    to a common law definition of assault.

9         And, to be honest with you, I don't monitor my

10   appeals to the point where I care what anybody is arguing

11   upstairs.  I care what the Circuit says at the end of the

12   day.  I don't even know what position anybody is taking in

13   the Tenth Circuit, and I am not asking you to report it.

14   I am just saying that is how I am dealing with this career

15   offender issue, which also was, at least in my mind, part

16   and parcel of this whole Minnesota/North Dakota Gordian

17   knot.

18        So I assume you don't have a problem with what I

19   just said.

20        MR. O'HARA:  I don't.  To the extent the Court said

21   he could or does qualify for career offender, I would

22   object to that.  I would add the basis of the controlled

23   substance offense at the time of 2005 was a different

24   statute, broader than the current version of 846 or 841,

25   whatever one it is.  This is moot because the Court has

1      not found necessarily that he is career offender.

2          THE COURT:  Yeah, we don't need to debate that.

3      You have your record, so I understand.

4          MR. O'HARA:  Other than that, nothing else.

5          MS. SURRATT:  Nothing further, Your Honor.

6          THE COURT:  All right.  Then I adopt the

7      un-objected to factual statements in the presentence

8      report as my findings of fact concerning sentencing.  With

9      regard to those matters in the presentence report that

10     have been the subject of objection, I will adopt the

11     position that I have explained to the parties with regard

12     to that, which is that I acknowledge the various

13     statements that have been made, and in some instances I

14     have overruled the objections and in some instances I have

15     acknowledged the disagreement but not adopted either the

16     Government's view or the defendant's view.

17          In terms of guideline calculations, it ends up

18     being, notwithstanding the movement of the age 14 offense

19     from one section of the report to another, that the total

20     offense level is 17, the Criminal History Category is IV,

21     the guideline imprisonment range is 37 to 46 months, the

22     fine range, for whatever it is worth, and it is worth

23     nothing, is $10,000 to $95,000.  The supervised release

24     range is 1 to 3 years.  The fine range I say "is worth

25     nothing" because I am not intending to impose a fine.

1          The supervised release range is equally unimportant

2     because I believe that probation has not requested that

3     supervised release be imposed.  He is subject to a longer

4     term of federal supervision out of the District of North

5     Dakota and I, frankly, have looked at that judgment and

6     don't see any particular benefit to adding a concurrent

7     term of supervised release to that, so it is not my

8     intention to impose a term of supervised release in this

9     case.  If that is viewed as a variance, so be it.  So --

10     and there is also no restitution that I intend to order in

11     this case because none has been sought.

12          Mr. Cardenas has provided his opinion as to what

13     has occurred, but it is also clear that his economic

14     losses were treated, were covered by the actions of the

15     BOP.  So what this case comes down to then is ultimately

16     sentencing.

17          And in terms of the amount of time that I am going

18     to impose, I am not going to make a great mystery here.

19     What I would do by way of whatever sentence is imposed,

20     order it to be consecutive to the sentence that is now

21     being served.  I don't think that that is unexpected, and

22     no one has asked me for the unrealistic outcome of making

23     it concurrent.  So, even if it crossed the mind of

24     Mr. O'Hara, he brushed it to the side.

25          All right.  So I will now hear from each of you as

1    to what it is you think is the appropriate sentence.  I

2    will also tell you before you begin what my view is, and

3    then you can address it or ignore it as you see fit.

4           As to what is going on in terms of this assault, I

5    think prison cases are always tricky, and they are always

6    tricky because there is prison stuff that is always

7    implicated in prison cases.  And prison stuff is not

8    necessarily logical or apparent to persons who are on the

9    outside.  By that, all that I mean is it is very tricky

10   and dangerous to stand on the outside and apply a logical

11   explanation to things that you see occurring on the

12   inside, prison stuff.

13          On the outside there are particular references that

14   one can make by way of insult or curses or descriptions of

15   a person that they are what they are, and I am not saying

16   they are not vulgar, I am not saying they are not graphic,

17   but they are also not uncommon.

18          On the inside, those very same descriptions can

19   have ten times the weight and cause all kinds of different

20   responses that don't seem proportional to the insult to

21   persons on the outside.  I am not here to try to profess

22   an understanding of all aspects of prison stuff, but I

23   believe there is such a thing -- and that I need to be

24   always careful when trying to interpret prison behavior,

25   because it may be the consequence of prison stuff -- and I

1    desperately want to use another word, but I won't -- that

2    may not be obvious to me.

3          Do I believe this was an extortion attempt?  I

4    believe that there is good evidence to support it, but I

5    don't believe that it is necessary that I come to that

6    fine a conclusion.  Maybe it is extortion.  Maybe it is a

7    fake extortion as an excuse to, I don't know, as it said,

8    get a black hand.  Maybe it is to test Garcia.  Maybe it

9    is to come to court to find out whether or not the

10   discovery process would get information about Cardenas.

11   It could be any number of things, and extortion is

12   certainly one of the things it could be, but I don't think

13   I need to decide precisely what it is.

14         The Defendant's version is that it is mutual combat

15   and it just simply went too far.  I don't believe that at

16   all.  In terms of how I look at this, this is what I see.

17   Number one, I have, on the one hand, the Government taking

18   a position and Mr. Cardenas taking a position that is

19   logically supportive of, at the very least, Santiago and

20   Perez being involved in this.  I have nothing from

21   Mr. Garcia by way of a statement.  I don't mean to ignore

22   the input of Mr. O'Hara.  What I mean to say is, as part

23   of the plea, there was no explanation of motivation.

24         As part of the presentence interview, there was no

25   statement made.  And even now, there is nothing by way of

1    written statement or other statement as to his view.  So

2    in some respects, I am weighing things that are said by

3    Cardenas against arguments that counsel is making without

4    the benefit of any statement of Mr. Garcia.

5         Put that to the side.  As I said, what Mr. Cardenas

6    is saying is rational.  It is more than that.  Why would

7    he accuse Santiago and Perez if it weren't true?  These

8    are not ordinary men.  I don't mean they are supermen in

9    any respect, but they are both head or high up in the

10   Mexican Mafia.  They are both, by virtue of their

11   convictions, dangerous.  There are deaths associated with

12   at least Mr. Santiago, I can't remember Mr. Perez'

13   conviction, but I believe one of them, Mr. Perez, is doing

14   life, and I think Santiago is doing double life.

15        Why would you involve those persons in an

16   accusation in a prison setting needlessly?  If you wanted

17   to say, as Mr. Cardenas did, that Mr. Garcia was just a

18   violent aggressive person, I can say that without bringing

19   Santiago and Perez into the mix.  If I want to say that,

20   you know, there was some -- if I want to make something

21   up, I could say that Perez -- that Mr. Garcia was

22   extorting me.  There is any number of things I could say

23   without putting my safety at risk by implicating two

24   persons that are known to be and are, in fact, dangerous.

25        Frankly, the story told by Santiago and Perez does

1    not convince me at all.  First, let's be clear, the

2    possibility of them being subjected to some claim of, I

3    don't know, false statement to a law enforcement officer,

4    or even if we had gone to trial, the pains and penalties

5    of perjury, is meaningless to somebody doing double life

6    unless he has some, I don't know, moral line that he would

7    not cross on that topic, and I see no reason to believe

8    that either of them have such a moral line.

9            Number two, I find the explanation as given by them

10   to be absurd on its face.  There is some tension in the

11   cell, and I'm also told that matters between cellies are,

12   as a matter of prison etiquette, to be resolved by

13   cellies.  You don't get other people involved.  That is

14   not what you do.  But, for some reason, there is tension

15   within the cell, and two higher ups in the Mexican Mafia

16   come up to the cell and say, what's going on?  And

17   Cardenas' response is, hi, I would like to masturbate in

18   front of my cellmate and pee without covering myself.

19   Huh?  It just does not make sense given what I am told

20   about how cellies deal with things that this would happen

21   in that way.

22           It also doesn't make sense that all of this

23   violation of self conduct or self etiquette goes on for

24   months with nobody being concerned or expressing any

25   concern about it.  And then when I look at, most

1    particularly, Perez' statement, which is I am now

2    referring to ECF-140, at 15, that statement is just

3    ridiculous.

4         For starters, I find it interesting that one of the

5    very first things he says at the time of his interview,

6    is, and I am stalling as I am scrolling down through

7    documents to get to it to make sure I do not misstate what

8    it says.  Very early on in the context of talking about

9    Mr. Cardenas, Mr. Perez references the fact that he knows

10   that he has a lot of money.

11        It is interesting that that is one of his earliest

12   comments with regard to that.  He believes that Cardenas

13   paid the Government $50 million in order to receive a

14   less-than-life sentence, and he knows that he has a lot of

15   money.

16        All right.  So what happened in terms of the cell?

17   This is the second interview that he gave to the defense

18   counsel's people.  But what he says is, again, there was

19   tension in the cell and, interestingly, people heed

20   warning from Chuco, which is Santiago, because they know

21   there are consequences if they don't.  Those consequences

22   may be life or death consequences given that he has at

23   least one conviction in this district for a homicide that

24   occurred at the USP, I believe.  It was a Judge Blackburn

25   case, and I did not look up the specifics beyond what I

1    just said.

2         But, anyway, again, that raises the question of why

3    would you bring this person into it if he had nothing to

4    do with it.  But, forget that.  So there is this tension,

5    and Santiago and Perez eventually return to the cell and

6    they say, what's going on?  And the answer -- and what

7    happens is that Perez comes to the door, and what does he

8    see?  He sees Cardenas "pulling it out and peeing

9    everywhere."  So, you know, there is now this discussion

10   at the door about what is going on.  And the answer is

11   not, "hi, I like to masturbate," it is, let me show you my

12   Johnson, and so he yanks it out and starts peeing all over

13   the place like a firehose out of control.  It is

14   ridiculous.  It is absolutely ridiculous.

15        And then it is not these things that are the most

16   compelling to me, it is what I see.  It is what I see.

17   And if somebody is going to tell me that I see something

18   incorrectly, I am going to expect to hear that now.  Let's

19   bring it up.  What we are now looking at on the screen is

20   the video of that event.  And I am looking at the video

21   that is marked as 006.MP4.  I am going to go forward to a

22   point in time because it goes on for some length.  I am

23   going to go forward to, using its timestamp, 8:54,

24   assuming I can drag this.  I am now at 8:54:14.

25        Santiago and Perez are talking to Cardenas through

1   the cell door.  And when you get to there, right there,

2   you can see the assault starting.  Right there is 8:54:23,

3   and a couple of things happen.  Number one, you can see

4   movement across the cell from the visual left from our

5   perspective, left to right.  It appears to be the start of

6   the assault.  It does not happen when Santiago and Perez

7   have left, as they both have said, it starts then.

8          You can also see that the conduct of Santiago and

9   Perez is very different at that precise moment than it is

10  at earlier points.  I keep trying to figure out whether it

11  is more like little kids trying to watch a fight, pushing

12  through the crowd, or whether like the teenager who walks

13  past the adult establishment, who happens to have left

14  their door open, and they are straining their neck to see

15  if they can have a peek.

16         But it is that kind of conduct, where all of a

17  sudden something exciting is going on, and they are moving

18  back and forth to see what is happening in that cell.

19  That is where the assault happens.  That is where the

20  assault begins.

21         Then there are some other matters that are

22  suspicious, but confusing, and one has to do with an

23  object that appears to be passed under cell door 121, then

24  eventually sent back.  But I put that to the side because

25  nobody can establish that anything went into the cell of

1   Cardenas and Garcia.

2        And there is another moment that I find to be

3   interesting and that I will bring us up to and tell you

4   how I see it.  It is around 8:57:22, and what is going on

5   is that this assault has been going on for some period of

6   time.  I will just let it play.  We are now at 8:56:09.  I

7   am trying to get to 8:57:22.  And what you are going to

8   see is a figure comes back to the door.  I believe that

9   figure to be Garcia.  And he has a conversation briefly

10  with Santiago and Perez, and then you will again see

11  motion as if someone is being slammed into the wall on the

12  right.

13        And, of course, if you look at the exhibits at the

14  trial, there is substantial blood on the wall to the right

15  in the corner where the door is.  We are now 20 seconds

16  away, and I am sorry, my tablet is not as responsive to my

17  finger touch as I want it to be.  Santiago is now saying

18  something, and someone comes to the door.  Santiago

19  continues to say -- to talk to him.  That someone then

20  backs up.  Wait.  Now at 8:58:01, again a violent action

21  to the right that is observable.  And again the erstwhile

22  teenagers are staring into the window in excitement.

23        The notion that this occurred -- and you can break

24  the connection.  The notion that this occurred after

25  Santiago and Perez left is nonsense.  I am aware of the

1    fact that Cardenas gave many statements, and one of those

2    is that it occurred afterwards, as well, one of those, I

3    think the very last statement.  And my reaction to that

4    is, the fact that he's got difficulty with the sequence, a

5    couple years after the event, when I know his head was

6    scrambled, is more understandable to me than anything

7    else.

8          So that is how I see it all.  And what am I saying?

9    Am I saying that it was the product of an extortion

10   attempt?  No.  What I am saying is that Santiago and Perez

11   were involved, absolutely involved.  And what it was was

12   some species of prison stuff.  Maybe it was an extortion,

13   maybe it was something else.  I don't need to decide that.

14         What I can say is that it was not mutual combat, it

15   was not self-defense, and it was not some scenario that

16   has to do with peeing in the cell or the other things that

17   have been described as Santiago and Perez as matters of

18   prison etiquette and areas that gave them concern as to

19   whether or not Mr. Garcia was going to be raped.  I don't

20   buy it for a second.

21         That is my view of it, and that view is based on

22   this video, my assessment of the various statements that

23   have been made, my assessment of the roles of the various

24   persons in the prison system, what is known about them,

25   and the trial exhibits, as well.

1        So what do you want from me, Ms. Surratt?  Well let

2    me just stop.  I am going to give my reporter 10 minutes,

3    then I will come back out and hear from Ms. Surratt as to

4    what it is that -- the Government's position is in terms

5    of sentencing.  I will hear the defendant's position, then

6    we will see where we are.

7        Recess.

8        (A break is taken from 10:27 a.m. to 10:38 a.m.)

9        THE COURT:  Please be seated.

10       Two things before we begin, Ms. Surratt.  Number

11   one, every time I call you Surratt, please recall I had a

12   conversation at some point with Judge Varholak, who prior

13   to his current position was with the public defender's

14   office, and a particular judge who is still in the

15   district, would refer to him as Mr. Verbalic over and over

16   again and just could not get his arms around the word

17   Varholak.  So, I suppose I'm hiding behind that and saying

18   I am not as bad as that.

19       The second thing I want to say before I forget is

20   earlier I said I would not go to -- I would not go to

21   career offender in this case, and I explained myself.  I

22   didn't put it into number terms.  If he were a career

23   offender it would be a 24 minus 2 for acceptance, a 22 VI,

24   and the guideline range would be 84 to 105.  I suppose

25   what I am saying is that 84 is a line I will not meet nor

1   will I cross.

2         Now, I am not sure that that means anything because

3   I think each side has been fairly consistent in their ask,

4   so to speak.  And I am anticipating hearing, although you

5   can say whatever you want to, 60 from the Government, 24

6   from the defendant, and probation has stayed, even as the

7   guideline has moved, with the 47.

8         Let me hear from you.

9         MS. SURRATT:  Thank you, Your Honor.  I do believe

10  a 60-month sentence of imprisonment is still appropriate

11  here regardless of how the guideline range has come out

12  after this discussion.

13        I will mention a few things that I think are

14  important and, again, I will be fairly brief because we

15  have litigated this case and briefed it adequately before

16  coming here today.  The Government agrees that the

17  Defendant's explanation through Perez and Santiago is

18  absolutely ridiculous.

19        The Government speculated quite extensively before

20  trial about what Perez and Santiago would say if they were

21  going to take the witness stand, as we were led to believe

22  they would.  We didn't know this was going to be the

23  story, so it makes perfect sense now that the defendant

24  pled guilty because that story is absolutely ridiculous.

25  It doesn't make any sense on its face, and it doesn't make

1    sense given the video, as the Court pointed out.

2         And I will say also, Your Honor, the video -- and

3    we realized this prepping for trial -- has a lot more

4    information in it than at first glance.  You know, the

5    standard line for these cases is, well, you can't see what

6    happened inside the cell because the cameras are outside

7    the cell.

8         In this case, you can see pretty remarkably clear

9    what happened inside the cell, as long as you assume that

10   there wasn't a brawl going on in the cell, which there

11   wasn't, because Mr. Garcia took Mr. Cardenas down in the

12   first blow, at least that is what we think happened.  And

13   then what happened after that was Mr. Garcia pummelling

14   Mr. Cardenas while he was semi-conscious, in what I

15   believe was an attempt to kill Mr. Cardenas.  I don't

16   believe he attempted to maim him within an inch of his

17   life, I believe that he attempted to kill Mr. Cardenas.

18        I think the most difficult part of this case is not

19   knowing exactly what was --

20        THE COURT:  Let me stop you.  Despite the fact that

21   it may be your belief, it is also the case that the

22   Government did not believe that it could prove that beyond

23   a reasonable doubt, I assume, because the charge that was

24   filed was the assault charge and not an attempted murder

25   charge.

1          MS. SURRATT:  Once we began prepping for trial,

2    Ms. Cramer-Babycz and I discussed that there came a point

3    where we believed we could prove it beyond a reasonable

4    doubt, but we did not elect to supersede the Indictment.

5          THE COURT:  All right.  Fine.

6          MS. SURRATT:  I do think we could have proved it

7    beyond a reasonable doubt given the severity of the

8    injuries and the inability for a non-medical professional

9    like Mr. Garcia to have stopped at precisely the right

10   point where he knew his victim wasn't going to die.  This

11   was an attempted murder.

12         I think the most difficult part of this, and I

13   alluded to this in my motion for an upward variance, is we

14   don't know what was in Mr. Garcia's head and we don't know

15   what was in Santiago's and Perez's head.  I do know that

16   Mr. Cardenas believed that, at least on the surface, this

17   was an extortion attempt.  He reports confidently and, I

18   believe, truthfully the words that were said to him

19   leading up to the attack, as far as he remembers those

20   words.

21         In terms of Mr. Cardenas' shifting statement, as I

22   think Mr. O'Hara has put it, in terms of the assault,

23   itself, he hasn't -- his statement has remained remarkably

24   consistent.  As the Court noted, there are sequence of

25   events issues that he doesn't remember precisely, and

```
 1    perhaps never remembered precisely.

 2          For instance, I think this entire time he believes

 3    that he met with his wife that morning.  He didn't.  He

 4    couldn't have, but he believed -- up until the final trial

 5    prep we did with him, he believed he did, and we never

 6    dissuaded him of that, obviously, but that is irrelevant.

 7          What Mr. Cardenas never did was said there was some

 8    alternate motive for the attack.  When one of the SIS

 9    techs asked him to speculate, what could it have possibly

10    been, he gave some other possible explanations that he

11    never really believed, but he was asked to speculate so

12    SIS could do their job to the best of their ability.  He

13    believed this was an extortion attempt.

14          As I say in my motion for upward variance --

15          THE COURT:  Do you disagree with me saying I don't

16    have to understand or come to a factual determination of

17    precisely what it is in order to conclude that it was not

18    what Mr. O'Hara tells me it is, and to conclude that

19    whatever it was, Santiago and Perez were involved?

20          MS. SURRATT:  I agree with that, and I say as much

21    in my motion for upward variance.  And I think I say

22    something like, whether it was an extortion attempt or

23    whether Mr. Garcia, for some other reason, decided this

24    was the day he was going to give Mr. Cardenas a thrashing,

25    doesn't matter for the purpose of sentencing.
```

1          I think it would be hard to dispute that Santiago

2     and Perez are involved in this.  The part of the video

3     that sticks out most to me, and has throughout this case,

4     is at the very beginning, where the Court first started

5     playing the video, where it appears that the assault

6     starts, you can see one of the men outside the cell door

7     sort of like back up, you can almost hear him go "oh

8     shoot."

9          THE COURT:  I don't think the word was "shoot,"

10    but, yeah.

11         MS. SURRATT:  It wasn't, I assume, but you can see

12    him do that.

13         THE COURT:  You are referring to the same thing

14    that I was, where it is sort of like two kids looking in

15    either an adult establishment or at fight, as something

16    exciting and watch-worthy going on on the inside.

17         MS. SURRATT:  It is something exciting, and they

18    are also not concerned for their friend, that much is

19    clear.  The Court raised the term "speculation" about who

20    was in these other cells.  The Government did track down

21    who they were.  In Cell 121, where something appears to be

22    slipped under the door, was a Sureño named Mario Magana.

23    In Cell 118, which you can see on the wider view, that

24    Perez and Santiago visit a couple of times, was Mexican

25    Mafia member named Phillip Segura.

1          They were both interviewed.  They essentially told

2     the BOP to "pound sand", although Magana did say Santiago

3     and Perez were his "homies."  So we didn't get any

4     information from them whether they were involved.

5          THE COURT:  Okay.  Again, nothing I said here on

6     the record today explains quite why those two cells are

7     worthy of inquiry, but if you watch the video, it is

8     obvious what is going on.

9          MS. SURRATT:  And other than the fact that they are

10    Sureños or Mexican Mafia members, we also don't know how

11    they were involved.

12         THE COURT:  Right.  Okay.

13         MS. SURRATT:  To go back to some of the other

14    issues that the Court briefly raised, in terms of whether

15    the defendant was trying to earn his black hand or any of

16    the other things that we could speculate about, the truth

17    is, Your Honor, we just don't know.  I think it was well

18    known within that unit, in particular, that the defendant

19    was up for his black hand, but by "well known," I don't

20    mean admissible evidence that we would have been able to

21    put into the record at trial.  That was simply something

22    we heard over and over again from BOP employees who, as

23    the Court knows, become quite familiar with what is going

24    on in the inmates' lives.  But that is why we haven't

25    relied on that, and it is also why we weren't going to try

1    to assert that as a motive at trial.

2         In terms of an appropriate sentence, whatever the

3    motive was here for this horrific assault, it was

4    horrific.  I think it was an attempted murder.  I think

5    that we are all lucky that Mr. Cardenas escaped with his

6    life, although his life will never be the same.  He is

7    going to be released from prison soon, and who knows what

8    is going to happen to him.  But he is not the same person

9    that he was before this assault, and never will be.

10        In terms of whether some sort of downward variance

11   or departure is warranted here, there is absolutely no

12   conception of the world in which it is.  Mr. O'Hara

13   largely relies on the fact that this defendant, perhaps

14   more than others, had a horrific childhood, and that is

15   true.  We see a lot of defendants before this Court that

16   had a terrible situation growing up, and this appears to

17   be on the very bad end of that spectrum.

18        But the idea that the defendant's deficiencies, in

19   terms of early drug use and potential fetal alcohol

20   syndrome and all of the other things that are mentioned,

21   caused him to lack impulse control so he beats the tar out

22   of Cardenas, does not counsel in favor of letting him out

23   of prison.  What if he gets out and somebody flips him off

24   or says something bad to him and a fight gets out of

25   control?  Does that mean he is just going to beat the tar

1    out of someone outside of prison?  This, to me, is not an

2    argument for releasing him with leniency, it is an

3    argument for warehousing him indefinitely.

4        THE COURT:  I will let Mr. O'Hara speak for

5    himself, but I will tell you my perception of what he is

6    trying to do here.  It is not -- I don't think it is a

7    mystery to anybody that my view of sentencing is that it

8    takes more than bad upbringing to warrant a variance in

9    many circumstances.

10        Obviously if you are 21 or 22, there is a temporal

11    proximity to where it is easy to understand how these

12    things come together, and it is what it is.  As you get

13    older -- and I have seen cases where defendants are, you

14    know, 30s, as he is, or 40s or 50s or even 60s, where

15    people are telling me, you know, daddy beat me with a

16    belt.  And my reaction is that at some point in time you

17    are formed and the one has nothing to do with the other.

18        I recognize that there are other judges who feel

19    differently about this, and I am not trying to decide who

20    is right and who is wrong.  But to the extent that there

21    is, quote, a bridge to be built that I'd like to see, that

22    is what I understand him to be doing.  In other words,

23    here is his early childhood difficulties, they directly

24    relate to his involvement in this offense, therefore,

25    Judge, it is more than proper to consider all of these

1    biological conditions and sociological conditions in

2    sentencing him.

3           I am not saying it is right or wrong, I am just

4    saying that is where I think this is coming from.

5           MS. SURRATT:  So I completely agree, Your Honor.  I

6    think, in terms of explaining this offense conduct,

7    though, that in the Government's view, cuts both ways, at

8    least, because if he is saying all these things led this

9    defendant to have such poor impulse control that in this

10   fantastical mutual combat situation, he simply kept

11   pummelling Garcia until guards arrived --

12          THE COURT:  Cardenas.

13          MS. SURRATT:  Mr. Cardenas until guards arrived and

14   had to incapacitate him.  If that is because of whatever

15   deficiencies exist with him in because of childhood

16   trauma, then he is so dangerous that we shouldn't be

17   turning him lose on society.  So I am saying that that

18   argument, in the context of applying it to the offense

19   conduct, cuts both ways.

20          But, relatedly, in terms of Mr. Garcia's early

21   convictions, what we have been calling the 14-year old and

22   19-year -- or 17-year old convictions, I think Mr. O'Hara,

23   if he has not explicitly made a downward departure motion,

24   is at least going to argue that those two things cut in

25   favor of leniency here.

1        In part -- he said this in one of his filings, that

2    no one was injured, essentially characterizing this as

3    some sort of, you know childhood, misadventure.  These

4    were robbery attempts.  The defendant and his buddies

5    attacked people with pipes and a bat, and the fact that

6    nobody was injured speaks either to luck or the

7    persistence of their intended victim in escaping.  These

8    are not childhood misadventures, these are violent robbery

9    attempts.

10        I would still, nevertheless, agree with Mr. O'Hara

11   that these old convictions perhaps weighed in favor of

12   some sort of leniency if we were here today, many decades

13   later, because Mr. Garcia was, for instance, caught with

14   44 grams of methamphetamine and in the interim had no

15   history of violence.  But that is not what we see here.

16   We have two violent robbery attempts.  We have a whole

17   bunch of violence in prison.  We have got drugs and guns,

18   and here we are today.

19        So we have an unbroken chain of violence and

20   criminal activity.  So this isn't a case where we have old

21   juvenile convictions that are creeping back into his

22   criminal history and elevating his guideline range.  That

23   is not what we have here.  In fact, one of them doesn't

24   even count.

25        So I don't think that a downward departure or

1    variance is warranted based on that old criminal conduct,

2    because based on what we know of the adult Mr. Garcia, we

3    know this wasn't out of character at all.  And so I don't

4    think there is any argument that some sort of credit

5    should be given because those were childhood misadventures

6    of some sort.

7            So based on all of that, Your Honor, and based on

8    all of the filings in this case and the pretrial

9    litigation, I do think a sentence of 60 months is

10   appropriate.

11           THE COURT:  I am not trying to talk you up in terms

12   of sentence, but let me just say something and get

13   whatever reaction from you I get.  If you stand here now

14   and say to me, I firmly believe that this was an attempted

15   murder, then let's just theoretically peek into the book

16   at what that would mean.  It would mean level 38 minus 2,

17   level 36, Criminal History Category III, is 235 to 239

18   months.

19           Obviously that is not a sentence I could impose,

20   but given that I have up to 120 months statutorily, and up

21   to 84 months where I drew a line in the sand and said to

22   be consistent with what I have said to you I will not

23   cross that line, why are you 2 years short of that line?

24           MS. SURRATT:  Your Honor, it is a perfectly

25   reasonable question.  I think I am trying to be, myself,

1    reasonable within the framework of how the case is

2    charged, what the guidelines range is --

3          THE COURT:  As I said, I am not trying to talk you

4    up, I just wanted to ask a question.

5          MS. SURRATT:  You know, when I say I think this was

6    an attempted murder, that is a pretty circumstantial

7    inference that I'm drawing based on what I know from the

8    trial prep and what we were prepared to prove.  I also

9    think, given the severity of the injuries -- and

10   Mr. Cardenas was not unconscious when the officers

11   responded, but he was unresponsive.  He was sort of

12   moaning and drooling and he couldn't breath.  His oxygen

13   levels dropped to a level where he would have died on the

14   spot absent medical intervention in the form of

15   supplemental oxygen and an EMT who had to suck the gunk

16   out of his nose that was starting to accumulate because

17   his face was so bashed in.

18        So had they been left alone and there was no

19   response from the officers, he would have died.  And

20   Mr. Garcia is not precise enough to have said, okay, well,

21   I know they are going to respond in about 8 months and

22   they are going to suck the gunk out of his nose, and I

23   know they have a mask and they can give him oxygen.  That

24   is not what he was thinking, he was pummelling this guy to

25   death.

1          And I think, again, within the framework of where
2      we are now and where we were leading up to trial, I am
3      trying to be reasonable in my request for a sentence of 60
4      months.
5          THE COURT:  All right.  Mr. O'Hara?
6          MR. O'HARA:  Your Honor, I will start with the
7      offense.  Our objective, without looking into the parties
8      or the witnesses, our objective evidence of this assault
9      is looking through what is probably about a 6-inch by
10     12-inch rectangular window.  I say "window," but it has a
11     grate in it, and we are not looking at it right from the
12     front of the window, we are looking at it from probably
13     about 100 yards behind, in what is probably best described
14     as a grainy video.
15         THE COURT:  No doubt.
16         MR. O'HARA:  And I would dispute the Court's
17     conclusion and the Government's argument as to how to
18     interpret what is occurring on the other side of that
19     window.
20         THE COURT:  And I appreciate that.  Part of the
21     reason that I bothered to play it was so that there could
22     be a frame of reference if I were to say to you, hey, I
23     think it shows.  What good is that?  I want to be able to
24     be precise in front of you and say, this is the exact
25     moment that I believe it began and here is why, rather

1   than each of us relying upon our recollection of this

2   video.

3           So everything that you say about the quality of it

4   is correct.  In terms of identifying who is in the cell,

5   it is a shadow, and I am not going to pretend it is

6   anything else.  And I understand you disagree.  So why

7   don't you tell me what the heck I was looking at.

8           MR. O'HARA:  Sure.  I think what occurred behind

9   that door was likely some form of a verbal argument.  And

10  a body moving across that brief piece of light does not

11  necessarily mean, and does not mean in this case, that

12  that is when the fight began.

13          THE COURT:  How would you describe Santiago's and

14  Perez' reaction?

15          MR. O'HARA:  Unremarkable, is how I would describe

16  it.  It is important to look at this in context, in that

17  Santiago and Perez are visiting that cell door to have

18  conversation with Mr. Garcia.  This is a situation where

19  one level of the tier is out of custody, the other is in.

20  Mr. Perez is locked in.  It is a very normal incident.

21          THE COURT:  Just to paint the picture correctly,

22  upper tier, single cells, lower tier you have a cellmate.

23  You have to graduate from the upper tier -- this is the

24  step-down unit.  So you have to graduate from the upper

25  tier to the lower tier, and then graduate from lower tier

1    before you can be returned into gen pop at whatever USP or

2    FCI you would ultimately be transferred out to.

3           MR. O'HARA:  Fair.  That is exactly right, Your

4    Honor.

5           THE COURT:  Right.

6           MR. O'HARA:  So the visitation by Perez and

7    Santiago to that window is unremarkable on the objective

8    scale of a daily occurrence most likely.  And vice versa,

9    that Perez -- Mr. Garcia probably visits Perez and

10   Santiago when he is free and they are not to see if they

11   need anything that he can give to them.

12          So I don't think the moment of the -- that the

13   assault can be determined from that video.  I don't think

14   it can.

15          THE COURT:  And I have heard this a couple of

16   times, you know, that people go by their cell to see if

17   they need anything.  How would you give somebody

18   something?

19          MR. O'HARA:  Somehow hot water can be passed

20   between -- from the people -- there is a hot water spigot

21   outside, and somehow that can be passed -- it is through

22   the passthrough, the meal -- where the meals --

23          THE COURT:  Is the lid on the tray open?

24          MR. O'HARA:  That's right.  There is a portion of

25   the door that has a pull down.

1          THE COURT:  I understand what you are talking about

2     because I have the paragraphs from the trial.  And that is

3     what I was, frankly, wondering, is whether or not that is

4     typically unlocked or locked.

5          MR. O'HARA:  Right.  And so the --

6          THE COURT:  Just unrelated to anything, in terms of

7     security, it is a pretty dumb idea to leave that unlocked,

8     but that is just my view.  Whatever.  Go ahead.

9          MR. O'HARA:  So these two individuals visiting,

10    unremarkable.  Their conversation, unremarkable.  I think

11    throughout it was unremarkable.  From their body language

12    and from what we can see through the window where, at

13    times, a body moves across, other times a part of a body

14    moves across, it is too much to interpret from that when,

15    at any moment, the assault began.

16          And then we look at Mr. Cardenas' version, and

17    under no version of events did Mr. Cardenas say that while

18    they were still at the door, that the assault began.  He

19    has been consistent in the fact that the assault began

20    after these individuals left.  And specifically, in the

21    most recent version of events, he has said that there was

22    this period of time after they left in which he was

23    pacing, he was just laying down on the couch, he was

24    having a --

25          THE COURT:  I don't know that I agree with your

1    entirety of his timing and sequence.  But certainly his

2    most recent statement, I agree with you, it is

3    inconsistent with what I have said.  I acknowledge that,

4    and I have said, basically he got his head scrambled and

5    he is just wrong.

6         MR. O'HARA:  Yet the Government has put stock in a

7    lot -- in what he is saying about how this happened.  And

8    so what is good for the goose is good for the gander.

9         THE COURT:  Absolutely.

10        MR. O'HARA:  We cannot accept certain versions of

11   his story as true and then just refuse to accept other

12   versions of his story.

13        THE COURT:  And I have not.  I have looked at

14   everything that I am being told.  I don't understand why

15   someone on the inside would voluntarily choose to involve

16   and make enemies of the Mexican Mafia when the Mexican

17   Mafia wasn't doing anything.  Help me understand that.

18        MR. O'HARA:  Sure, Your Honor, it is a great point.

19   And I think it is a part of this case that is important to

20   understand, the individuals involved.  So what we have is

21   we have Mr. Garcia, who is inside of the cell.  He is a

22   member of the Sureños.  He is a lowly, as the Government

23   calls it, a foot soldier in the Sureños, but he is a poor

24   man from North Dakota.  And we will get into his

25   upbringing and his situation.

```
 1            And then you have a very unique cellmate, who is
 2    Mr. Cardenas-Guillen.  I met him.  I went to see him in
 3    Terre Haute, and I sat down with him.  I have seen him on
 4    November Geographic about "narcoraficantes," drug
 5    traffickers.  He is famous.  This is an individual who
 6    walks around even the USP Florence, because he sure walked
 7    around the streets with his chest out.  He's better than
 8    everyone around him.  That is the individual we are
 9    talking about.  He is boastful.  He is cocky.  He is an
10    individual that, when he celled with Mr. Garcia, he
11    believes he owns that cell.  He is the one who gets to say
12    what happens.  He's the equivalent of El Chapo.  He
13    started a whole drug cartel, the Gulf Cartel.  He started
14    it.  He is the one who began using military tactics in
15    order to get his drug dealing accomplished.  He started
16    the Zetas.  The Zetas' idea was we are going to take the
17    military and we are going to apply it to the illegal drug
18    trade.
19            So do you think he hesitates for one second to use
20    force when he needs to?  He was known El Mata Amigos, he
21    kills friends.  The individuals he was known to associate
22    with on the outside, his co-conspirators, he killed them.
23    This is the individual we are talking about who is celling
24    with Mr. Garcia.
25            And now we will talk about their bodies, their
```

```
 1    physical distinct bodies.  Mr. Garcia 5'4", 140 pounds.
 2    Mr. Cardenas-Guillen is 5'10', 220 pounds.  He is 6 inches
 3    taller and approximately 80 pounds heavier.  Size
 4    difference matters in this situation.
 5         THE COURT:  Floyd Mayweather could whip my butt
 6    from here until Tuesday --
 7         MR. O'HARA:  True.
 8         THE COURT: -- and then take a deep breath and whip
 9    it again through the rest of the month, and I outweigh him
10    and I am taller than him.  Size isn't everything.
11         MR. O'HARA:  It isn't everything, but it matters.
12         THE COURT:  It does matter.  It is not irrelevant.
13         MR. O'HARA:  In cases involving self-defense,
14    parties argue about size all of the time.  It is, in fact,
15    the bread and butter of a self-defense case is the size of
16    the combatant.  It is in the guidelines as far as the
17    departure provision on the actions of the victim.  The
18    size of the parties is one of the factors that the Court
19    can use.
20         So when we are talking personalities, we are
21    talking about whether this conduct is -- and I don't
22    remember the Court's phrase about whether it was somehow
23    -- the Court said I don't believe that at all, that this
24    was a mutual combat situation or that Mr. Cardenas would
25    pull out his penis while two members of the Mexican Mafia
```

1    are at the door.  This is the individual we are talking

2    about, this head of a drug cartel.  Does he think he owns

3    the cell?  Does he think he can do what he wants inside

4    that cell?  Absolutely.

5         The Court mentioned, well, this went on for months

6    and nothing was said.  Mr. Garcia is a member of the

7    Sureños, and what happened after this incident was not

8    only was he transferred back to the ADX, all of the

9    members of the Sureños go back to the ADX, because in this

10   step-down unit, they are so suspicious of individuals who

11   are acting in concert that they would rather error on the

12   side of assuming it is a whole Sureños thing than just a

13   one-on-one violence, so everybody goes back.

14        So do you think that lowly Mr. Garcia is going to

15   commit an act of violence against someone knowing that

16   this is going to send all of the people in his -- his

17   friends back to the ADX?  They are going to say, what the

18   hell are you doing, Garcia, you are sending us all back to

19   ADX based on some stupid stuff.  And in the end it has to

20   be something that means -- it is only the big things that

21   you do something like this, and that is what this ended up

22   being.

23        Now, I can see the Court is --

24        THE COURT:  Well, what I was moving around for is I

25   hear everything that you are saying.  It was purportedly

1    in answer to the inquiry, why would you make enemies of

2    the Mexican Mafia and someone who has -- Cayo, if that is

3    the nickname for Perez, said if Santiago told you to do

4    something, you would do it because if you don't, you know

5    there are going to be consequences.

6         Why would he -- the question was, why would

7    Cardenas involve them if they had nothing to do with

8    anything?  There is no reason to.  Why bother inventing

9    the story about -- if you are the big man on campus, so to

10   speak, you are proud, you puff out, why bother?  What the

11   heck is the point of putting yourself and others at risk

12   of pissing off, so to speak, not only the Mexican Mafia,

13   not only people who are doing life, not only people who

14   have killed in prison, but all of the Sureños, as well?

15        What prize or other explanation makes that make

16   sense, because I have tried to come up with one and I

17   can't do it.  Now, that does not mean that I am saying

18   that it is an extortion attempt.  As I said, there is

19   prison stuff.  But in terms of the story that I am being

20   asked to believe; that somebody is just involving people

21   falsely, falsely accusing those people, you know, it is

22   sort of like -- and I mean this facetiously, why would you

23   put salt on your arm in front of Hannibal Lecter if you

24   didn't need to do it?

25        MR. O'HARA:  My answer, more directly, I guess,

1    Your Honor, I wanted to present a factual background to

2    this.  But a more direct answer to the question is this

3    argument was ongoing when Santiago and Perez came up.  As

4    the Court mentioned at the outset, there is really no

5    evidence that anything started before September 19, if

6    that is the date -- September 9 -- September 2nd of 2019.

7    There is no evidence that this began earlier than that.

8         And I will come back to the fact of whether this is

9    an extortion attempt, because I do think it matters.  But

10   Santiago and Perez walk up on September the 2nd, and there

11   is an argument ongoing between the cellmates.  That is

12   what they describe.  They could sense something was going

13   on inside the cell.  That in this environment, as the

14   Court mentioned, there are things very unique to cell

15   dynamics, to things going on inside the prison.

16        One of those things are if cellies are "beefing"

17   among one another, you can see it a million miles away.

18   And so they walked up and they saw what was an argument.

19   They asked about it because they care about Mr. Garcia.

20   They asked about what was going on.  And that is when

21   Cardenas, I would imagine, boast -- started basically

22   bragging about what he is doing in the cell and how he has

23   every right to do that in the cell and they are not going

24   to tell him no.

25        Now, was that a smart move to say that to Santiago

1    and Perez?  Absolutely not -- was not.  Because if

2    something didn't happen on that day, then probably

3    something was going to happen later on from them, just

4    that they were going to take care of this.

5           Now, you heard Mr. Santiago's statements about how

6    he regrets getting involved.  From a guy who has been

7    convicted of murder twice, that is very unique for him to

8    express this regret:  I shouldn't have got involved.

9    Should have left it to the cellmates to figure out because

10   they would have figured it out however that was going to

11   happen.  And if they didn't, he was going to do something,

12   but -- or maybe he was going to leave it alone, we don't

13   know.

14          But the point is, he is not going to use Mr. Garcia

15   to do some sort of damage to him based on the internal

16   dynamics.  He got involved, said it had to stop, and from

17   his perspective, it was over.

18          This idea of an extortion attempt, which once again

19   we can't just piecemeal ignore, believe, ignore, believe

20   as it comes to Cardenas, because putting aside the

21   extortion attempt is basically not addressing head on

22   whether it is true.  When you address it head on, you see

23   it is a lie.  It is a total and complete fabrication,

24   because it is so unlikely that an individual would be

25   extorted in the manner in which he says he was extorted,

1    it cannot be believed.

2         And that plays -- that then carries like a wave

3    over onto the remainder of what he is saying happened.

4    And he is saying that these people come up in the cell on

5    September 2nd for the first time.  Mr. Garcia and him have

6    been friends for months, but the first time they walk up

7    and say, hey, we need $30,000.  He is looked in his cell.

8    How is he supposed to get $30,000?  But when he says no, I

9    am not going to do that, they give some sort of a nod to

10   Mr. Garcia, yeah, you know what, take care of that.  Yeah,

11   take care of that.

12        The way that would work out, if it would ever

13   happen -- in a universe it is also unlikely it would ever

14   happen because their funds are monitored.  They wouldn't

15   be able -- if there was $10,000 donation from Cardenas or

16   his lawyer or his wife, where do you think that is going

17   to go from the BOP?

18        But assuming that that is true, they would probably

19   say, hey, we need to talk to you about something, you are

20   going to need to pay us some money, and we will give you a

21   night to think about it, but the next time you are out, we

22   need you to make a call, we will give you 7 days, then you

23   get to do it.  That is probably how an extortion attempt

24   would probably work if it were to occur.

25        The fact in which he is saying this occurred is so

1    unlikely, to make him a liar.  And, therefore, as a liar,

2    how can we believe anything he says about this?  And if we

3    are not going to believe anything he says about this, then

4    what we have is a fight between two cellmates in which one

5    got the better of the other and went way too far with the

6    fight.

7         THE COURT:  And this is why I don't step in to bear

8    traps.  I don't need to decide if the Government's version

9    is -- and recognizing the Government's version is what

10   Cardenas has told him, that the Government's version is

11   absolutely right and your version is absolutely wrong, or

12   your version is absolutely right and their version is

13   absolutely wrong.

14        I can come up with explanations for everything that

15   you have just said.  It doesn't have to be a scenario as

16   you just said where they were looking for immediate

17   payment.  Obviously they couldn't get immediate payment.

18   How is the money going to come?  Who knows.  It goes to a

19   wife, a girlfriend, someone on the outside who can send it

20   in over a period of time.  Yeah, it is possible, if we are

21   just sitting here making up what is possible or not.

22        Well, he couldn't do it right away.  Well, I never

23   said that I believed that it was a true extortion attempt.

24   It could be simply, let's see if he'll say yes.  If he

25   does, hey, guess what, we got us a boatload of money.  And

1   if he says no, then one of our guys gets to prove himself

2   and earns his black hand.  I am not saying that is what

3   happened, either.  Or, you know, if he says no, we are

4   just going to show him and his haughty stuck up self that

5   he doesn't get to say no to the Mexican Mafia.  We are

6   going to whip his ass.

7        I mean, there are a bunch of different

8   explanations.  You paint one end of the spectrum,

9   Ms. Surratt paints the other end of the spectrum, and what

10  I have said is I am inherently suspicious enough of my

11  ability to discern the true ins and outs of prison stuff

12  to say that it would be foolhardy of me to try and

13  determine with precision exactly what is going on.

14       I can say with precision, that faced between the

15  two choices of Santiago and Perez are involved in this,

16  and it's just simply Marquess of Queensbury rules that got

17  out of hand, that Perez and Garcia -- excuse me, Perez and

18  Santiago were involved in this in some way.

19       Whether it was for extortion or to exert dominance

20  or to put someone to a test or to have him earn his black

21  hand or something else that has to do with "prison stuff,"

22  I can't say.  But the notion that this is just sort of,

23  sir, you have offended me, let us do battle, and that gets

24  out of hand, I don't believe it.

25       It doesn't make sense.  It is not consistent with

1    what I see.  And above and beyond anything else, it would

2    be the most self-destructive thing that someone on the

3    inside could do.  And you, yourself, say Santiago wanted

4    to take care of it.  Santiago would take care of it.  I

5    believe that, too.  I believe everybody on that unit

6    believed that, as well, and certainly Perez did, because

7    he said, hey, Santiago tells you to do something, you

8    better do it, because everybody knows there are going to

9    be consequences.

10          So out of all of the people to involve, I am going

11   to go out of my way to involve that guy.  That is just

12   nuts.  It doesn't make sense.  Out of all of the

13   scenarios, that is the piece that makes sense in none of

14   them.

15          MR. O'HARA:  And my only, I think, one-line

16   response to that, Your Honor, is he was angry -- I am

17   talking about Cardenas.  He was angry inside the cell, he

18   wasn't thinking, he was in the middle of an argument,

19   already a verbal fight with Mr. Garcia, and that is why he

20   chose to speak about this to Chuco and Cayo, Santiago and

21   Perez.

22          THE COURT:  Fine.  But why does he blame them

23   afterwards, when he doesn't have to?

24          MR. O'HARA:  Why does he invent a story about this

25   extortion?

1         THE COURT:  Why involve them if he doesn't have to?

2         MR. O'HARA:  Well, Your Honor, it is very clear --

3    they were clearly at the door.  You can't say it was an

4    inmate up in 103 who never visited the door.

5         THE COURT:  What you are telling me is nothing

6    happens when they are at the door.  Why involve them?

7    Nothing happened when they were there.  Nothing happened

8    when they were at the door, it was when you were alone

9    with your cellmate.  Why involve killers from the Mexican

10   Mafia when you don't have to, when you can just say, hey,

11   they stuck me with this guy, I don't like him, he don't

12   like me, and that weasel jumped me when I wasn't looking?

13        MR. O'HARA:  And I think a more -- my more direct,

14   I think, answer to your inquiry, which is a supposition, I

15   admit, but we are back in the mind of Cardenas-Guillen

16   right now --

17        THE COURT:  Right, I asked you.

18        MR. O'HARA:  -- he has to find a way he can come

19   out clean, because in the BOP politics, you are either a

20   snitch, you are a victim.  He sure can't admit to the

21   people who are investigating that this whole dispute began

22   because he was the one who was showing himself inside the

23   cell.  He sure can't admit that because that makes

24   him some kind of a --

25        THE COURT:  So if you have to lie about something,

1   hey, I have got something Garcia, he is the guy.  He was

2   doing that homo pervert stuff in the cell.  You know what,

3   they had a movie on and Scarlett Johansson was on the

4   screen and he pulled it out, I am not going to take that.

5        I mean, it is so easy to come up with any number of

6   explanations, any number of fictional lies that don't

7   involve the Mexican Mafia.  Why do it?

8        MR. O'HARA:  Here is one that does, because as soon

9   as he puts Chuco and Cayo, Santiago and Perez, as involved

10  in this incident, they no longer can be around him in the

11  BOP politic world.  He is then automatically going to be

12  separated from Chuco and Cayo, and probably all members of

13  the Mexican Mafia.

14       And what happened?  What do we know happened to

15  Cardenas-Guillen, he instead maybe went to the ADX for a

16  brief stint, but he got sent to Terre Haute.  So his plan,

17  if it was to separate himself from Santiago and Perez, it

18  worked, because he got away from them.  He is no longer

19  under their control.

20       THE COURT:  Occam's razor, that is my answer.

21       MR. O'HARA:  When you are dealing with your life

22  and the danger of the Mexican Mafia on your back, you

23  can't implicate them and/or --

24       THE COURT:  But there is no reason to implicate

25  them.  He has got no beef with them.  He has no reason to

1    separate from them.  Oh, I got it, they knew that he was

2    the "whip it out" guy and, therefore, I'm going to put my

3    life in danger by involving them when I don't need to.

4         MR. O'HARA:  The danger began by his conduct with

5    Mr. Garcia in the cell, that is when the danger began.

6         THE COURT:  The guy who is so bold as to basically,

7    when asked, hey, what is going on in here, says I run this

8    place, blah, blah, blah, blah, blah, blah, all of a sudden

9    -- and he doesn't care whether he whips it out, who knows,

10   he doesn't care.  All of a sudden he is going to start to

11   care, oh, God, they may tell somebody that I pulled out my

12   pee pee.  I mean, come on.

13        MR. O'HARA:  Your Honor, you mentioned at the

14   outset understanding BOP politics --

15        THE COURT:  I give you that.

16        MR. O'HARA:  -- and there are certain things in the

17   BOP that you cannot do and they carry across institutions

18   because --

19        THE COURT:  One of them might be telling Santiago

20   to go pound sand.

21        MR. O'HARA:  The Court is asking why would

22   Cardenas-Guillen implicate these guys in order to --

23   because it causes more danger.  In his mind, my answer,

24   the danger already existed.  He had to get away from them.

25   He had to separate from these two, and he got what he

1    wanted.  He got his wish.  There is nothing stronger --

2    there is no stronger evidence than where he actually

3    landed, which is Terre Haute, and that is a facility where

4    there is probably not a ton of Mexican Mafia members in

5    Terre Haute.  There is a lot of Mexican Mafia at ADX and

6    at the USP Florence in the step-down unit.

7         Anyway, we have, I think, discussed that issue

8    thoroughly, Your Honor.  I do want to speak about

9    Mr. Garcia, and normally I start with who I am

10   representing, this dynamic, but I think it is was

11   important to discuss the offense, because it is really one

12   of the main issues here.

13        But Mr. Garcia's life was uniquely tragic.  And I

14   have been before this Court enough to know that when an

15   individual is -- he is 38 years now, that typically the

16   Court says why are we talking about this now -- not in

17   those words, I am putting words in the Court's mouth.

18        THE COURT:  No, that's fair.  I understand what you

19   mean.

20        MR. O'HARA:  He is not 21, why are we asking about

21   what happened to him as a baby and a child?  And

22   Ms. Surratt suggested that while not irrelevant, it is on

23   the lesser of the important points as it relates to his

24   sentence.  And my response to this is, it is not like his

25   mom dying at an early age in front of him is necessarily

1    what caused him to commit the assault.  It is not like

2    being abandoned and left in the care of others and all of

3    the neglect and the abuse that were around him, it is not

4    like that led him to commit this assault, that would be

5    way too direct of a situation.

6         However, to ignore the impact of those events on

7    the trajectory of his life, which is early childhood

8    trauma leads to early childhood imprisonment which leads

9    to adult imprisonment, and these are based on his own

10   conduct, I am not blaming others for this.

11        THE COURT:  Right.

12        MR. O'HARA:  And then spending massive amounts of

13   time in prison as a result of decisions made by an

14   individual who was 14, 17, and 20, and ignoring the impact

15   of that on this case, which is a case -- of prison cases,

16   this is a prison case because it happened inside the cell

17   between two inmates who were serving very long sentences.

18        So to ignore the impact of that trajectory is to

19   ignore, in my opinion, one of the key elements in this

20   case, which is when you imprison someone for a long period

21   of time, you cannot control the mentality that they tend

22   to adopt.  And in prison, when you are in a situation

23   where there is even a perceived threat of violence, you

24   must act upon that in order to preserve yourself.  That is

25   a prison dynamic that is not the same on the outside, it

1    just isn't.

2         Maybe in certain heavy gang neighborhoods in which

3    there are drive-by shootings going on and perceived

4    threats must be acted on in order to "defend one's self,"

5    even though it is not self-defense, it is a very similar

6    -- that idea, that ambiance inside of the prison is very

7    unique.  So to understand why Mr. Garcia went way too far

8    with this assault is to understand why he spent so much

9    time in prison and the mentality that is automatically

10   adopted by individuals who spend decades in prison.

11        And if you spend a decade in prison at the FCI

12   Englewood or the work camp or attached to FCI Englewood,

13   that is not what I am talking about.  I am talking about

14   spending decades in the ADX and in the USP.  These are

15   facilities which you are constantly under threat,

16   constantly.

17        So actions are -- do beatings go on longer in the

18   USP?  Absolutely, they do, because if an individual is

19   able to get up, there is probably a shank somewhere in

20   that cell that could be used against you or there is

21   something that could be fashioned into a weapon that could

22   be used against you.  And so do beatings go on longer?

23   Absolutely.  Is that right?  No.  But is it understandable

24   in this context?  Yes.  Yes, because he was still getting

25   up.

1          He was -- Lieutenant Anthony says that

2     Mr. Cardenas-Guillen was sill getting up even at the end

3     of this assault.  So it is not like he is unconscious and

4     still being beaten.  This is an individual still with it

5     enough -- and this is why I thought it was important

6     enough to object to that one word, which is

7     "non-responsive."  And the Court is right, alert and

8     oriented X3 is very different than someone who is

9     unconscious.  So you can be responsive while still

10    conscious.  Or you can be unresponsive while still

11    conscious.

12         But the point is, this attack went too far,

13    clearly, and he suffered serious injuries, clearly.  But

14    we have an individual who was outside and, to be honest,

15    was intimidated by -- Mr. Garcia being intimidated by

16    Mr. Guillen, in the end he got the better of him in this

17    fight.

18         And this Court, just once recently with me, but

19    many times, has been sentencing individuals for fights

20    that have occurred inside of the USP Florence, and they

21    are none the more brutal than this one.  This is not

22    unique in its brutality.  This is pretty much similar to

23    the brutality that exists in the USP.  Not to downgrade

24    it, it is also to put it in context, because this is

25    how -- and maybe it is just the ones brought by the United

1    States Attorney's Office, those are the ones we are

2    seeing, but this was not unique in its brutality.  And I

3    think that -- I guess it comes off as minimizing it, but

4    it is also saying that the normal severity of offenses in

5    USP Florence are serious.

6         So, as far as his criminal history, because that is

7    an important part of why we are even at this guideline

8    range, the Court expressed its hesitance in using a

9    conviction when an individual was a juvenile.  And just

10   note --

11        THE COURT:  Using them for career offender.

12        MR. O'HARA:  Career offender, that's right.  We are

13   speaking about the 2002 conviction, he was 17 years old,

14   there were no injuries in that incident, and he got a

15   21-month sentence in that case.  Without that, it would be

16   30 to 37 months, if we don't consider that conviction,

17   that would be the guideline range.

18        THE COURT:  Let's not lose sight of how I see it,

19   okay, and I will paint it for you.  In his early juvenile

20   days, he is into thefts, and I think he has a couple

21   convictions for stealing motor vehicles or attempting to

22   do so.  There is more than two, there are three of them.

23   So there is a consistency or repetitiveness to that

24   behavior.

25        What also begins during his juvenile years is

1    violence.  And the age 14 case, which does not score as I

2    have set it out, involves he and his companion robbing a

3    pizza person, each has a fireplace poker, the companion

4    has a baseball bat.  Then we get to the second degree

5    assault at age 17.  Again, it is robbing a businessman and

6    assaulting him with a baseball bat, a hammer, and a knife.

7    Then in adulthood, at age 20 or 21, we have graduated to

8    now having in our possession adult weapons, the firearm.

9        What is fascinating about it is that after that,

10   there is a consistency to things.  He pleads guilty in, I

11   want to say, February of -- I am trying to find it.  There

12   we go.  He pleads guilty in North Dakota on February 2nd

13   of 2006.  And I am now looking at something not in the

14   record, but as we all confirmed, I have it, you have it,

15   and Ms. Surratt has it, and that is the PSR from North

16   Dakota.

17       One week later, while pending sentencing, one week

18   later, there is an assault in a jail room where he is

19   involved.  And I don't know, other than what is reported

20   in paragraph 60, what occurs, beyond the fact that he is

21   the only one deemed worthy of disciplining in that

22   assault, and it is of sufficient significance that they

23   referred it to the county attorney for possible

24   prosecution.  But of course he gets a 270-month sentence

25   and nothing ever happens about it.  But one week after a

1    plea of guilty there is an assault in prison.

2         Now, we know that he was sentenced to a very

3    substantial sentence by the North Dakota court in

4    connection with the drugs and the 924(c).  And then what

5    happens?  Less than a year after that sentencing, there is

6    the attempted killing and possession of a dangerous weapon

7    in the BOP.  And he is on video.  He is assaulting

8    somebody with a weapon.  He is stabbing them with a shank.

9    There were others involved, I give you that.  He gets

10   disciplined but not prosecuted.

11        Three years later, assault with serious injury;

12   kicking somebody in the head over 15 times.  I should take

13   that back.  The defendant was identified on video

14   surveillance stabbing the victim in the head and torso

15   area over 30 times.  He was also observed kicking him in

16   the head and torso over 15 times.  Again, no prosecution,

17   but that is likely what gets him into ADX.  And then we

18   have got this one.

19        If I am looking at him, it is violence, violence,

20   violence, violence.  I don't know how else to characterize

21   it.  Maybe it is violence that stems from his upbringing.

22   Certainly somebody does not outgrow fetal alcohol

23   syndrome, I am not going to try to suggest anything to the

24   contrary.  But what I am looking at is violence, violence,

25   violence on top of violence, with the victims of the

1    violence being sufficiently injured that they're needing

2    to be sent offsite to be treated for serious injuries, not

3    once, not twice, three times in the federal system,

4    arguably once in the state system, and that is on top of

5    two robberies and a possession of a gun.

6          I don't deny anything that you say.  But when I

7    look at this -- and, to be clear, this convinces me of two

8    things.  Number one, that a departure for

9    overrepresentation of criminal history is inappropriate

10   because it does not -- the conviction, the scorable

11   convictions, which doesn't include the robbery at age

12   13 -- excuse me, at age 14, and don't include any of these

13   acts which are felonious, although not prosecuted that

14   occurred in the BOP, that when I look at his record, it

15   does not significantly, or even at all, overstate the

16   seriousness of his record, nor does it overstate the

17   likelihood of recidivism, because I'm staring at

18   recidivistic conduct over and over and over again.

19         So to the extent I have not yet addressed the

20   motion for downward departure based on overrepresentation

21   of criminal history, it is denied for these reasons.

22         All right.  You are right, I do look at criminal

23   history, and I include the conduct inside the institution

24   in this case as being relevant in a case where the crime

25   is inside an institution.  What am I to do with it?

1          MR. O'HARA:  Sure, Your Honor.  I actively concede

2     that the conduct in these two assaults inside of the

3     prison not being compensated in the criminal history and

4     their consideration by the Court is, by all means, fair,

5     and it is on the bad fact side of my situation.

6          THE COURT:  Right.

7          MR. O'HARA:  I concede that, and I understand where

8     the Court is coming from.  What I think that causes is a

9     very interesting discussion, the length of imprisonment

10    and its impact on deterrence, because this idea that

11    keeping someone in prison longer is going to stop this

12    behavior from happening, is actually played out in the

13    negative by Mr. Garcia.

14         We look at his 2005 conviction, and while it wasn't

15    for a violent offense, it was for a drug conviction, he

16    got a 270-month sentence.  I can tell you in my 8-plus

17    years in this district, I haven't seen -- and we are

18    dealing with now mandatory guidelines, but I haven't seen

19    a 270-month conviction for 44 grams of any drug and a gun,

20    unless maybe the gun was shot at somebody, which there is

21    no indication that that one was.

22         But, when -- the idea partly, I guess, behind the

23    guideline was maybe this conduct, this criminal conduct

24    will stop if I give him a longer sentence.

25         THE COURT:  Or maybe it was we need to remove him

1    from the public.

2         MR. O'HARA:  Maybe.  In the end, though, when you

3    keep individuals in these higher security prisons for long

4    periods of time, often -- and these two prior offenses

5    were reactionary type offenses.  He was not engaged in

6    starting either of those offenses.

7         THE COURT:  But let's be clear.  It isn't the

8    length of time that causes this behavior.  The first one,

9    the attempted killing, was less than a year after he was

10   beginning to serve his federal sentence.  There was an

11   assault of some sort before he got to a federal

12   institution.  There was an assault that was classified as

13   an attempted killing, and you and Ms. Surratt debated

14   about whether it is attempted murder or attempted killing.

15   Who cares what the label is.  I will use the label that

16   the BOP used, an attempted killing within the first year.

17        So, you know, if you are going to cook up the meal

18   that says, well, this is all the product of him being kept

19   for excessive periods of time, he would have gotten at

20   least a year on 44 grams and a gun in a 924(c).  At a bare

21   minimum, he would have gotten 5, and he didn't even get

22   through a misdemeanor sentence without attempting to kill

23   somebody.

24        MR. O'HARA:  Fair point.  Fair point.  And I think,

25   Your Honor, my response to that is that many of

1    these crimes -- many of these incidences, as we will call

2    them, in the BOP are the response to being in the BOP.  If

3    this were a situation where he was beating every cellmate

4    that he was given, that would be one thing.  What it is is

5    when you got into federal prison, as the Court knows, you

6    have to align with somebody.

7         I guess there are people -- there are dropout yards

8    where you can go and try to disaffiliate yourself, but you

9    don't get to choose where you travel in the BOP.  So you

10   don't know if you drop out if you are going to spend 10

11   years in the SHU or you are going to spend it all on the

12   same yard in the public and they are not going to believe

13   you as a dropout, and you just get tormented.

14        THE COURT:  He was a Sureños before he went into

15   federal custody.

16        MR. O'HARA:  Exactly.  So when he went into federal

17   custody he is a Sureño.  And when the Sureños are on the

18   prowl, he is on the prowl.  That is the way that prison

19   works.  I don't like that, Ms. Surratt doesn't like that,

20   and this Court doesn't like that.  But let's be honest,

21   there is nothing that this sentence will do that will stop

22   that practice from occurring.

23        THE COURT:  It might do one thing, because one of

24   the things that strikes me is that Santiago and Perez both

25   said, why is he even being prosecuted for this?  You don't

1    get prosecuted for this.  This is two guys, the heat of

2    passion.  I can't believe -- they are not going to

3    prosecute.  They are not going to go to trial.  This guy

4    is not going to show up for trial, this is not

5    prosecutable stuff.

6         And in his experience, it isn't, because you

7    attempted to kill somebody and it wasn't prosecutable

8    stuff.  And you assaulted someone with serious injury and

9    it wasn't prosecutable stuff.  And before you even got to

10   the BOP, it was an assault that was referred, but nothing

11   ever came of it, so it is not prosecutable stuff.  Maybe

12   it stops that fiction from taking root; that in essence

13   those in a cage, it is, I don't know, a fight game or

14   something, and you can wail the crap out of each other and

15   nobody cares, you are not going to get any more time, it

16   is okay.  Just macho up, do your time, and if you beat the

17   crap out of somebody, well, no more time because this

18   isn't prosecutable stuff.  They are not going to bother.

19        And I honestly don't understand why some of these

20   other ones weren't prosecuted, but I don't know what the

21   guidelines are, and I am not asking Ms. Surratt to give me

22   an answer, because I doubt that she knows the answer.  And

23   she is telling me she does not.

24        MR. O'HARA:  And, yes, Your Honor, that -- at some

25   point these do become prosecutable, but do you think that

1    Mr. Garcia, in the heat of the moment, is acting and

2    thinking, they will never prosecute this?  It is the heat

3    of passion at its very, very -- at its very basic, it is a

4    heat of passion situation.  And this was not a planned

5    assault, this occurred in the moment and, therefore,

6    deterrence in a crime like that is difficult to impose the

7    terms.

8          And while, yes, it is important to send a message

9    to other inmates in the USP Florence, he has already --

10   that message has already been sent.  He is here in a

11   courtroom.  He has been prosecuted.  He will get time.  I

12   am not asking for concurrent time.  He will get time in

13   addition to his sentence.

14         So that fact that the Court has just mentioned has

15   been accomplished by the fact he has been prosecuted.

16   Should he then, though, bear the burden of all of the

17   prior prosecutions that haven't occurred or that any

18   future prosecution that occurred, just because he is

19   before the Court?  No, he shouldn't.

20         And in many situations that we find, it is much

21   more of a defenseless victim attack by multiple people.

22   That is also unique about this offense.  The case we were

23   just here on was two individuals, one who came up from

24   behind and bashed him or tackled an individual from behind

25   while he wasn't looking and that started the assault.

1          This is an inside-of-a-locked-cell battle.

2          THE COURT:  Those guys walked away.

3          MR. O'HARA:  Eventually, yes.  Yes.  And so it also

4    -- it starts an interesting conversation about are we

5    talking about safety of the community in prison?  Is that

6    the factor of 3553(a), or safety of the community on the

7    outside?  And the statute doesn't really -- I guess it

8    would include both --

9          THE COURT:  I think that is fair.

10         MR. O'HARA:  -- that it would include the other

11   inmates at the facility he is at, as well as potentially

12   whether imprisonment is going to make the community

13   outside of the prison more safe.

14         Starting with the first, he is in the ADX.  He has

15   no physical contact with anyone else.  And I think it is

16   actually thanks to potentially Mr. Santiago that now the

17   ADX does not allow any contact between inmates.  So even

18   when he is on rec, he is in a cage.  He lives by himself,

19   and he probably will remain, because my experience is when

20   you are in ADX, you probably stay there until the end of

21   your term, or at least for a very, very long portion.

22         He is supposed to get released in 2025.  By my

23   request, he will be there until 2027.  He will be there.

24   He is probably not going anywhere, so he is not going to

25   be a danger to anyone else inside of the prison.

1          Then we talk about outside of the prison.  How do

2     we protect people in the community?  He isn't going to be

3     imprisoned indefinitely.  He isn't.  He can't be.  By the

4     very nature of his crime, there is a statutory maximum.

5     And so then the question is, is he being imprisoned -- and

6     the difference between our request is, what, 36 months, I

7     guess.  Well I am asking 24.

8          THE COURT:  Two versus 5.

9          MR. O'HARA:  Two versus 5.  So is heaping 3 years

10    on going to make anyone in the community more safe?  It is

11    probably going to make them less safe, because the more

12    time he spends in prison, the harder it is going to be to

13    acclimate to the outside.

14         THE COURT:  Why don't I just give him 60 days?

15         MR. O'HARA:  There has to be punishment, Your

16    Honor.  This is a balancing act.  It is the inclusion of

17    all sorts of factors.  I am not asking for 60 days.  There

18    has to be punishment for this offense.  So I am asking for

19    that 24-month number.  I think that is a fair number

20    considering all of the facts of this case.

21         And just to tie up the loop on the mitigation,

22    because it is hard to tell whether this mitigation was

23    used before.  The one case I really dug into was a federal

24    case, and there was no sentencing statement, it was just

25    this doctor's evaluation, which I have included for the

1    Court to see.  So to that extent it has been reviewed

2    before.

3          But a real exploration into who he is, the real

4    difficulties he suffered, the challenges, I don't know how

5    much judges in the past have considered that.  So he

6    deserves that whole --

7          THE COURT:  Minimally, if at all.

8          MR. O'HARA:  That's right.  That's right.  So he

9    deserves consideration of that in this case, and then

10   future cases, we know, now there is pretty clear evidence

11   that this has been considered by this Court.

12         So, thank you, Your Honor, for your time and

13   consideration.

14         THE COURT:  Now I will hear from Mr. Garcia, but I

15   understand he is also restrained.  And so I am not going

16   to have him shuffle up to the lectern, we can do what we

17   can do from the seat.

18         Mr. Garcia, let me say a couple of things.  Number

19   one, you have the right to make a statement at this time

20   if you wish to do so.  You are not required to make any

21   statement at all, but you do have the right, and I will

22   consider whatever it is you have to say in deciding what

23   is the appropriate sentence.

24         If you choose to speak, you are not taking on the

25   obligation to somehow be the answer man.  In other words,

1    to answer anything in particular or everything or any

2    portion of anything that you have heard discussed today or

3    read in the report.  You get to decide what you want to

4    talk about.  You can talk about whatever you want to talk

5    about.  You cannot talk about whatever you don't want to

6    talk about.  And I do not intend to interrupt or debate or

7    look to you to answer particular questions.  It is not

8    that kind of a circumstance.

9         Finally, what I would say to you is I am not a

10   delicate flower, and so I wouldn't spend any time worrying

11   about slips of the tongue or things like that, they means

12   nothing to me.  I listen to the content of what you have

13   to say.  If there is a slip of the tongue, so be it.  The

14   floor is yours.

15        THE DEFENDANT:  I got nothing to say, Your Honor.

16        THE COURT:  All right.  I respect that.

17        So, ultimately what it comes down to is to decide

18   what is the appropriate sentence here.  It is my custom to

19   say what I am about to say, and that is in fashioning a

20   sentence here today, I have considered the presentence

21   report, all matters relating to that report that have been

22   filed by the parties.  I have also considered, as I have

23   said, all of the other information I have had, meaning the

24   trial exhibits, the videos.  I have looked at this case

25   carefully and extensively.

1          I am mindful I am required to impose a sentence

2     that is sufficient, but not greater than necessary, to

3     achieve the purposes of sentencing.  In fashioning a

4     sentence, I have considered both individually and as a

5     whole all of the 3553 factors, regardless of whether or

6     not I have noted each of them in an individualized manner

7     here today.

8          So, what I do is I tell you what it is I am going

9     to do by way of a sentence.  Much of it I have already

10    told you.  There will not be a fine.  There is no

11    restitution.  There is not going to be a term of

12    supervised release.  What it comes down to is very simply,

13    what is the term of imprisonment that will be imposed in

14    this case?

15         I've set an artificial limit and I said what that

16    limit was.  I would not consider and will not consider

17    this to be a career offender case, and I will not cross

18    that line, artificial though it may be.  And then I have

19    looked at what the various parties have given me.  My

20    sentencing is based on the following:

21         Number one, obviously a prison assault is a violent

22    act, and so there is inherent violence that is involved

23    here.  There is also a degree of brutality that is

24    involved here.  It is hands on, if you would, as opposed

25    to a weapon.  And in order to understand both the violence

1    and the brutality, you are not going to get it from

2    looking at words on a page.  There are videos.  There are

3    pictures.  And when you look at those, I suppose the

4    nonlegal saying is, a picture is worth a thousands words,

5    and in this case, it is.

6         I don't know that I will go so far as to say it is

7    attempted murder, but it certainly is in that direction,

8    because there was the second factor, which is the absolute

9    refusal to stop.  The man is a pulp on the ground, and

10   there is an absolute refusal to stop.  The guards order

11   him to stop.  The answer is "fuck you."  He is OC sprayed,

12   and he still does not stop.  They order him again, a

13   second guard, to stop.  The answer is again, "fuck you,"

14   and the assault continues.  The second OC spray

15   incapacitates him, and that is the only thing that

16   indicates that this assault -- well, the only thing that

17   caused this assault to stop.

18        Let me be clear, this is not an assault that had

19   been going on for seconds, this is something that had been

20   going on for minutes and minutes and minutes.  And, again,

21   you have got a timer on the video and you know when I saw

22   it beginning.  And even if you don't, there are videos

23   pictures of the insides of the cells which were included

24   in the trial exhibits.  You could not bloody yourself to

25   that degree without this being protracted.

1          And then there is the repetitive nature.  And I

2     have already commented on this.  Assaultive conduct at 14.

3     Assaultive conduct at 17.  A gun at 20 or 21, while

4     waiting for sentencing, waiting for sentencing in that

5     case, an apparent assault.  You get sentenced, and less

6     than a year later you attempt to kill somebody.  Then

7     there is another assault resulting in serious bodily

8     injury, and then there is this one.

9          And in terms of the need to impose a substantial

10    punishment, this is not just on the yard, no, we are not

11    just going to wait until we get on the yard, it is at the

12    ADX step-down unit.  If that is where the assaults happen

13    and there is no consequence, then I don't know what the

14    message is.

15         Finally, let me be clear, I am not sitting here

16    going to sit down and put my pin in the explanation of it

17    was extortion or it was the usual combat.  I have said how

18    I view it.  It was something going on that may have a

19    number of different explanations.  Santiago and Perez were

20    part of it, but they are not the actors, the ones who

21    committed the violence in this case.

22         I do not believe for any reason that this was

23    prison etiquette and mutual combat.  It's absurd.  I view

24    this as, whatever the explanation, one which defies

25    reason, and whatever the explanation, the violence was

1    massively out of proportion to whatever the reasoning was

2    for the assault.

3          To be honest with you, my view of the right number

4    is 72 months.  But the Government has sought 60.  And

5    although I do not give them what they want, even -- I

6    wouldn't put a percentage on it, I would say I make up my

7    own mind considering them, what they say.  In this case I

8    am going to lean in their direction and against my own.  I

9    think more than 60 could be given.

10          I also think that there is some degree of truth to

11   some of the things that Mr. O'Hara has to say by way of

12   history, by way of what goes on in prisons, and I will

13   step back from the number that was my number and impose

14   the lesser, but still significant, number that the

15   Government has requested.

16          I am going to impose 60 months, no supervised

17   release, end of discussion.

18          MS. SURRATT:  Nothing further from the Government,

19   Your Honor.

20          THE COURT:  Mr. O'Hara?

21          MR. O'HARA:  Your Honor, may I have just one

22   moment?

23          THE COURT:  Yes.

24          MR. O'HARA:  Your Honor, there was one question I

25   have, which was the Court's mention of an assault in the

1    jail before he got to the BOP.

2         THE COURT:  Uh-huh.

3         MR. O'HARA:  Where is that in the PSR, if I may?

4         THE COURT:  It is not.  It is in the North Dakota

5    PSR.

6         MR. O'HARA:  Ah, okay.

7         THE COURT:  And it is in the North Dakota PSR at

8    paragraph -- I gave it before, I want to say 40.  I will

9    -- it is not 40.  Hold on, 60.  I will read it to you.

10   "On February 17, 2006, the defendant was involved in an

11   incident at the Cass County Jail in Fargo where he was

12   involved in a fight with other inmate.  The defendant was

13   placed in 60 days lockdown, until April 16, 2006.  He was

14   the only individual disciplined in this matter.  The case

15   was referred to the Cass County State's Attorney Office

16   for possible prosecution to resolve.  No decision has been

17   made at this point."

18        MR. O'HARA:  If I may, Your Honor.

19        THE COURT:  Yes.

20        MR. O'HARA:  Your Honor, I think I would object to

21   the Court's consideration of that fact or that allegation

22   in paragraph 60 of the prior presentence investigation

23   report as not being true, for what it is worth.

24        THE COURT:  Okay.

25        MR. O'HARA:  I have no other objection.

1          THE COURT:  As I said, I refer to it as "possible"

2     assault.  Certainly the fact that a matter is referred for

3     prosecution ought to send some signal to an individual

4     that there could be consequences for this and, of course,

5     particularly when one is awaiting sentencing in front of a

6     federal judge.

7          But I know no more about it than what I said, and I

8     don't think that anything I have said up to now hinges on

9     that particular matter.  So, ultimately, I have decided to

10    -- well, I have decided there is reason to vary from the

11    guidelines in this case.  Oddly, I am varying in two

12    directions at once.  In terms of the amount of time,

13    obviously I am varying upward from the top of the

14    guideline range, which is 47 months, I believe, to 60

15    months.  In terms of supervised release, I am varying

16    downward from the range of 1 to 3 years to simply not

17    impose supervised release, all for the reasons that I have

18    stated.

19         Pursuant to the Sentencing Reform Act of 1984, it

20    is the Judgment of the Court that the defendant, Francisco

21    Garcia, is hereby committed to the custody of the Bureau

22    of Prisons to be imprisoned for a term of 60 months.  The

23    term of imprisonment imposed by this judgment is

24    consecutive to the defendant's current imprisonment

25    sentence out of the United States District Court for the

1    District of North Dakota in Case No. 05-cr-00133.  No term

2    of supervised release is imposed.  The defendant shall pay

3    a special assessment of $100, which is due and payable

4    immediately.  He does not have the ability to pay a fine.

5    There is no fine that is being imposed in this case.

6    Although restitution would be appropriate, no request for

7    restitution has been made and no restitution is ordered in

8    this case.

9         The defendant is advised of his right to appeal the

10   sentence.  If he desires to appeal, a Notice of Appeal

11   must be filed with the Clerk of the Court within 14 days

12   after entry of Judgment or the right to appeal will be

13   lost.

14        If the defendant is unable to afford an attorney

15   for an appeal, the Court will appoint one to represent

16   him.  If he is so requests, the Clerk of the Court must

17   immediately prepare and file a Notice of Appeal on his

18   behalf.

19        The defendant is in BOP custody.  He is remanded to

20   the custody of the Marshals for return to BOP.

21        Anything further?

22        MS. SURRATT:  No, Your Honor.  Thank you.

23        THE COURT:  Anything further?

24        MR. O'HARA:  May I just have one moment, Your

25   Honor?

1           THE COURT:  Yes.

2           MR. O'HARA:  Your Honor, if I may just ask that

3     Mr. Garcia remain here in lockup or here in the courtroom

4     for just 10 minutes so I can speak to him before he is

5     taken back to ADX.

6           THE COURT:  I understand.  Take him to the room on

7     the second floor and put him in the visiting room so that

8     Mr. O'Hara can talk to him, because once he gets moved to

9     ADX, the communication is extraordinarily difficult.  So I

10    need to give Mr. O'Hara a fair opportunity to discuss

11    appeal, as well as other matters with Mr. Garcia, and I

12    request that he be placed in the lockup room on the second

13    floor.

14          You can keep him shackled, I don't care about that,

15    but put him in the lockup room for 15 minutes.

16          MR. O'HARA:  That would be fine, Your Honor.  Thank

17    you very much.  That is all I have.

18          THE COURT:  Recess.

19          (Proceedings conclude at 12:03 p.m.)

20

21

22

23

24

25

# R E P O R T E R ' S   C E R T I F I C A T E

I, Darlene M. Martinez, Official Certified Shorthand Reporter for the United States District Court, District of Colorado, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had as taken stenographically by me at the time and place aforementioned.


Dated this <u>9th</u> day of <u>January</u>, 2023.


_____
s/Darlene M. Martinez
RMR, CRR