APPEAL,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: <u>1:21–cr–00143–RM</u>–1

Case title: USA v. Garcia

Date Filed: 04/22/2021

Date Terminated: 11/28/2022

---

Assigned to: Judge Raymond P. Moore

Appeals court case number: 22–1415 U.S. Court of Appeals for the Tenth Circuit

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **Francisco Garcia**<br>*TERMINATED: 11/28/2022* | represented by | **Matthew Kyle Belcher**<br>Office of the Federal Public Defender<br>633 Seventeenth Street<br>Suite 1000<br>Denver, CO 80202<br>303–294–7002<br>Fax: 303–294–1192<br>Email: Matthew_Belcher@fd.org<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community Defender Appointment* |
| | | **Timothy Patrick O'Hara**<br>Office of the Federal Public Defender<br>633 Seventeenth Street<br>Suite 1000<br>Denver, CO 80202<br>303–294–7002<br>Fax: 303–294–1192<br>Email: timothy_ohara@fd.org<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community Defender Appointment* |

| **<u>Pending Counts</u>** | **<u>Disposition</u>** |
|---|---|
| 18 U.S.C. § 113(a)(6) – Assault Resulting in Serious Bodily Injury (1) | Committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of sixty (60) months, consecutive to United States District Court, District of North Dakota, Docket No. 05–cr–00133–RRE–1. Special Assessment of $100.00. |

**Highest Offense Level
(Opening)**

Felony

| **Terminated Counts** | | **Disposition** |
|---|---|---|
| None | | |

**Highest Offense Level
(Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| **USA** | represented by | **Laura Cramer–Babycz** |
|---|---|---|
| | | U.S. Attorney's Office |
| | | District of Colorado |
| | | 1801 California Street |
| | | Suite 1600 |
| | | Denver, CO 80202 |
| | | 303–454–0100 |
| | | Email: Laura.Cramer–Babycz@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Federal Agency Attorney* |
| | | |
| | | **Andrea Lee Surratt** |
| | | U.S. Attorney's Office |
| | | District of Colorado |
| | | 1801 California Street |
| | | Suite 1600 |
| | | Denver, CO 80202 |
| | | 303–454–0124 |
| | | Email: andrea.surratt@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Federal Agency Attorney* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 04/22/2021 | 1 | | INDICTMENT as to Francisco Garcia (1) count(s) 1. (Attachments: # 1 Criminal Information Sheet) (rvill, ) (Entered: 04/23/2021) |
| 03/17/2022 | 32 | | MOTION for Order *to Address the Topic of Implicit Bias During Voir Dire* by Francisco Garcia. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(O'Hara, Timothy) (Entered: 03/17/2022) |

2

| 03/17/2022 | 33 | | MOTION for Order *to Conduct Additional Attorney−Led Voir Dire Beyond Fifteen Minutes* by Francisco Garcia. (O'Hara, Timothy) (Entered: 03/17/2022) |
|---|---|---|---|
| 03/18/2022 | 34 | | MOTION to Produce *Giglio Material* by Francisco Garcia. (O'Hara, Timothy) (Entered: 03/18/2022) |
| 03/28/2022 | 47 | | RESPONSE by USA as to Francisco Garcia *TO DEFENDANTS MOTION TO PRODUCE GIGLIO MATERIAL [ECF NO. 34]* (Cramer−Babycz, Laura) (Entered: 03/28/2022) |
| 03/28/2022 | 48 | | RESPONSE by USA as to Francisco Garcia *TO DEFENDANTS MOTION TO ADDRESS THE TOPIC OF IMPLICIT BIAS DURING VOIR DIRE [ECF NO. 32]* (Cramer−Babycz, Laura) (Entered: 03/28/2022) |
| 03/28/2022 | 49 | | RESPONSE by USA as to Francisco Garcia *TO DEFENDANTS MOTION TO CONDUCT ADDITIONAL ATTORNEY−LED VOIR DIRE BEYOND FIFTEEN MINUTES [ECF NO. 33]* (Cramer−Babycz, Laura) (Entered: 03/28/2022) |
| 04/06/2022 | 51 | | COURTROOM MINUTES for proceedings held before Judge Raymond P. Moore: Motion Hearing as to Francisco Garcia held on 4/6/2022, denying 32 Motion for Order *to Address the Topic of Implicit Bias During Voir Dire*, denying 33 Motion for Order *to Conduct Additional Attorney−Led Voir Dire Beyond Fifteen Minutes*, and granting 34 Motion to Produce *Giglio Material*. Court Reporter: Tammy Hoffschildt. (cpear) (Entered: 04/06/2022) |
| 05/02/2022 | 110 | | RESPONSE by USA as to Francisco Garcia re: 82 Restricted Document − Level 2 (Surratt, Andrea) (Entered: 05/02/2022) |
| 05/02/2022 | 112 | | RESPONSE by USA as to Francisco Garcia re: 84 Restricted Document − Level 2 (Attachments: # 1 Exhibit 1)(Cramer−Babycz, Laura) (Entered: 05/02/2022) |
| 05/03/2022 | 121 | | COURTROOM MINUTES for proceedings held before Judge Raymond P. Moore: Trial Preparation Conference as to Francisco Garcia held on 5/3/2022. The following motions are granted in part and denied in part: 61 Government's motion and 84 Defendant's motion. The following motions are denied: 75 and 80 Defendant's motions. 76 Government's supplemental motion is granted. 82 Defendant's motion is taken under advisement. Court Reporter: Tammy Hoffschildt. (cpear) (Entered: 05/03/2022) |
| 05/05/2022 | 123 | | COURTROOM MINUTES for proceedings held before Judge Raymond P. Moore: In−Court Hearing as to Francisco Garcia held on 5/5/2022. Court Reporter: Tammy Hoffschildt. (cpear) (Entered: 05/05/2022) |
| 05/06/2022 | 124 | | NOTICE of Disposition by Francisco Garcia (O'Hara, Timothy) (Entered: 05/06/2022) |
| 05/06/2022 | 125 | | COURTROOM MINUTES for proceedings held before Judge Raymond P. Moore: Status Conference as to Francisco Garcia held on 5/6/2022. Oral Notice of Disposition accepted. Written Notice of Disposition to be filed. Four−day Jury Trial set for 5/9/2022 is VACATED. Change of Plea Hearing set for 5/9/2022 at 10:00 AM in Courtroom A 601 before Judge Raymond P. Moore. Court Reporter: Tammy Hoffschildt. (cpear) (Entered: 05/06/2022) |
| 05/09/2022 | 126 | | |

| | | | |
|---|---|---|---|
| | | | COURTROOM MINUTES for proceedings held before Judge Raymond P. Moore: Change of Plea Hearing as to Francisco Garcia held on 5/9/2022. Guilty plea entered by Francisco Garcia to Count 1 of the Indictment. Sentencing set for 8/19/2022 01:00 PM in Courtroom A 601 before Judge Raymond P. Moore. Court Reporter: Tammy Hoffschildt. (cpear) (Entered: 05/09/2022) |
| 05/09/2022 | 127 | | DEFENDANT'S PLEA OF GUILTY AND STATEMENT OF FACTS RELEVANT TO SENTENCING {WITHOUT PLEA AGREEMENT) as to Francisco Garcia. (cpear) (Entered: 05/09/2022) |
| 05/09/2022 | 128 | | STATEMENT IN ADVANCE OF PLEA OF GUILTY by Francisco Garcia. (cpear) (Entered: 05/09/2022) |
| 11/22/2022 | 147 | | COURTROOM MINUTES for Sentencing Hearing as to Francisco Garcia held before Judge Raymond P. Moore on 11/22/2022. ORDERED: 139 Restricted Document is granted. 140 Restricted Document id denied. Defendant sentenced as reflected on the record. Court Reporter: Darlene Martinez. (lrobe) (Entered: 11/23/2022) |
| 11/28/2022 | 148 | | JUDGMENT as to defendant Francisco Garcia (1), Count 1 – Committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of sixty (60) months, consecutive to United States District Court, District of North Dakota, Docket No. 05–cr–00133–RRE–1. Special Assessment of $100.00. SO ORDERED by Judge Raymond P. Moore on 11/28/2022. (rmsec) (Entered: 11/28/2022) |
| 11/28/2022 | 150 | | NOTICE OF APPEAL as to 148 Judgment, by Francisco Garcia. (O'Hara, Timothy) (Entered: 11/28/2022) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.  21-cr-00143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  FRANCISCO GARCIA,

      Defendant.

---

### INDICTMENT

---

      The Grand Jury charges:

### COUNT 1

      On or about September 2, 2019, in the State and District of Colorado, the defendant, FRANCISCO GARCIA, at a place within the special maritime and territorial jurisdiction of the United States, namely the United States Penitentiary, Florence, Colorado, did knowingly assault another person resulting in serious bodily injury.

      All in violation of Title 18, United States Code, Section 113(a)(6).


                               A TRUE BILL:


                               Ink signature on file in Clerk's Office
                               FOREPERSON


MATTHEW T. KIRSCH
Acting United States Attorney

By: /s/ Laura Cramer-Babycz
Laura Cramer-Babycz
Assistant United States Attorney
United States Attorney's Office
1801 California St., Suite 1600
Denver, Colorado   80202
Telephone:   (303) 454-0100
Fax:   (303) 454-0406
E-mail:   laura.cramer-babycz@usdoj.gov

DEFENDANT:      FRANCISCO GARCIA

AGE or YOB:     1984

COMPLAINT      \_\_\_\_\_ Yes    \_\_X\_\_ No
FILED?

If Yes, MAGISTRATE CASE NUMBER:

HAS DEFENDANT BEEN ARRESTED ON COMPLAINT?   \_\_ Yes  \_X\_ No
   If No, a new warrant is required

OFFENSE(S):     Count 1: Assault Resulting in Serious Bodily Injury, 18 U.S.C.
                    § 113(a)(6)

LOCATION OF
OFFENSE:       Fremont County, Colorado

PENALTY:       Count 1: NMT 10 years' imprisonment, $250,000 fine, or both; NMT
               3 years supervised release; $100 special assessment fee.

AGENT:         Amber Cronan
             Special Agent, FBI

AUTHORIZED
BY:           Laura Cramer-Babycz
           Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:

 X  five days or less; \_\_\_ over five days

THE GOVERNMENT

 X  will seek detention in this case based on 18 U.S.C. § 3142(f)(1)

The statutory presumption of detention **is not** applicable to this defendant.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.    21-cr-00143-RM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**FRANCISCO GARCIA,**

        **Defendant.**

---

### MR. FRANCISCO GARCIA'S MOTION TO ADDRESS THE TOPIC OF IMPLICIT BIAS DURING VOIR DIRE

---

Mr. Francisco Garcia, by and through undersigned counsel, hereby moves the Court for permission to address the topic of implicit bias during jury selection. Specifically, Mr. Garcia requests that the Court use the following procedures during *voir dire*: (1) administer a case-specific jury questionnaire that includes questions related to implicit bias; (2) show two brief videos explaining implicit bias to the venire; and (3) give a preliminary instruction on implicit bias. As set forth more fully below, the requested relief is necessary in order to minimize the impact of implicit bias and ensure that Mr. Garcia receives a fair trial.  The government objects to the issuance of the questionnaire, does not oppose the preliminary instruction to the jury, and does not take a position on the use of the requested videos at this time.

**I.    There Is A Significant Risk That Implicit Bias Will Have A Negative Impact On The Fairness Of Mr. Garcia's Trial**

Implicit bias, also known as stereotyping, refers to "the unconscious assumptions that humans make about individuals." *United States v. Mateo-Medina*, 845 F.3d 546, 553 (3d Cir.

1

2017). While implicit bias may play a particularly large role in situations requiring "rapid decision-making, such as police encounters," *id.*, it can also affect longer term decision-making, like the decisions made by jurors. In one study of mock jurors, a defendant's skin color "altered how jurors evaluated the evidence presented and also how they answered the crucial question 'How guilty is the defendant?'" In particular, darker-skinned defendants were judged to be more guilty than lighter-skinned defendants. *See Implicit Bias in the Courtroom*, Kang, Jerry, et. al; 59 UCLA L. Rev. 1124, 1144-45 (2012). Implicit bias also "causes judges and jurors to unknowingly misremember case facts in racially biased ways." The Hon. Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, The Failed Promise of* Batson*, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 157 (2010).

The main danger with implicit bias is that individuals are unaware of its presence: people "unconsciously act on such biases even though [they] may consciously abhor them." Bennett, 4 Harv. L. & Pol'y Rev. at 149. These stereotypes lie "deep within our subconscious." *Id.* For example, in the aforementioned study many of the same mock jurors who found the darker-skinned defendants to be guiltier than the lighter-skinned defendants could not even recall the defendant's race. *See* Kang, 59 UCLA L. Rev. at 1145. Moreover, there was no correlation between the mock jurors' levels of explicit racial bias and their weighing of the evidence or assessment of guilt. *See id.*; *see also* Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 Duke L.J. 345, 398 (2007) (finding that test subjects "misremembered certain legally relevant facts in a racially biased manner," and in particular tended to make memory errors "in a manner harmful to Blacks").

The risk that these implicit biases will have a negative impact on the fairness of this trial is heightened by three factors. First, Mr. Garcia is a Latino man and may testify at the trial.

2

Second, Mr. Garcia anticipates calling witnesses in his defense who are also Latino. The credibility of Mr. Garcia and the defense witnesses will be an important issue for the jurors to evaluate. Third, the risk that implicit bias will play a role in Mr. Garcia's trial is actually *increased* by the fact that his case is not explicitly racially charged. Research suggests that, "[w]hen the case is racially charged, jurors—who want to be fair—respond by being more careful and thoughtful about race and their own assumptions," whereas "when the case is not racially charged, even though there is a Black defendant and a White victim, jurors are not especially vigilant about the possibility of racial bias influencing their decision-making." Kang, 59 UCLA L. Rev. at 1143. Unless measures are taken to combat implicit bias, there is a significant risk that the trial will be driven, at least in part, by these unconscious, and unfair, thought-processes.

## II.     This Court Can and Should Take Steps To Limit The Impact Of Implicit Bias

Importantly, there are strategies for limiting the negative impact of implicit bias and promoting impartial decision-making. Individuals with inflated senses of their own objectivity, for example, seem to be at particular risk for behaving in biased ways. *See* Kang, 59 UCLA L. Rev. at 1172-73. Learning about the possible influence of unconscious thought processes on decision-making, on the other hand, may actually lead people to be *more* objective. *See id.* at 1173. Similarly, research suggests that individuals who are consciously motivated to counteract their implicit biases make more objective decisions. *See id.* at 1174-75. In combination, these factors may explain why, for instance, judges seem to be able to engage in more objective decision-making than laypeople, even when they harbor the same kinds of implicit bias as the general population. *See* Bennett, 4 Harv. L. & Pol'y Rev. at 156-57 ("given significant motivation, judges can compensate for the influence of these biases.") (citation omitted).

3

"A probing *voir dire* examination is the best way to ensure that jurors do not harbor biases for or against the parties." *Sampson v. United States*, 724 F.3d 150, 163-64 (1st Cir. 2013) (citation omitted). And increasingly, state and federal courts across the country have adopted *voir dire* procedures intended to counteract the negative impacts of implicit bias by educating jurors and increasing their motivation to evaluate the evidence objectively, free from implicit bias. *See, e.g.*, *Unconscious Bias*, United States District Court for the Western District of Washington, http://www.wawd.uscourts.gov/jury/unconscious-bias (last visited March 17, 2022) (video and jury instructions created by a committee of judges and attorneys to be presented to jurors "highlighting and combating the problems presented by unconscious bias"). Accordingly, Mr. Garcia requests that the Court exercise its broad discretion over matters related to jury selection in order to limit the impact of implicit bias on the trial by instituting the following procedures at trial:

### A. Case-Specific Jury Questionnaire

Mr. Garcia requests that the Court order the use of a case-specific jury questionnaire. *See* Exhibit A (Proposed Jury Questionnaire). This is a prison case in which the defendant, Mr. Garcia, is Latino and witnesses expected to testify on his behalf are Latino. And as previously discussed, the risk that implicit bias will have an impact on jurors' assessment of the evidence in this case is actually exacerbated by the fact that it is not otherwise racially charged.

Under these circumstances, a case-specific jury questionnaire is an appropriate tool to enable the selection of a fair and impartial jury. The case-specific jury questionnaire is particularly valuable in this case because it may be completed in private. Racial prejudice and implicit bias are sensitive subjects, and prospective jurors are likely to be more forthcoming in

4

writing. The completed jury questionnaires will enable counsel to use their time with the jury to question the jurors more efficiently.

Accordingly, Mr. Garcia requests that this Court grant his request to use a case-specific jury questionnaire.

### B.    Orientation Video Explaining Implicit Bias

Mr. Garcia also requests that the Court play two videos: 1) "Unconscious Bias," a video produced by the United States District Court for the Western District of Washington on the subject of unconscious or implicit bias and shown to all potential jurors during orientation and 2) a clip from the hidden camera show "What Would You Do?", which aired on ABC in 2010. *See Unconscious Bias*, United States District Court for the Western District of Washington ("Washington Video") (Exhibit B); *see also* video of "What Would You Do?*" (*found at https://www.youtube.com/watch?v=ge7i60GuNRg (Exhibit C).[1]  The first video, which is 10:53 minutes long, was "created by a committee of judges and attorneys" in the Western District of Washington, and "presented to jurors in every case with the intent of highlighting and combating problems presented by unconscious bias." *Id.*  The second video contains an example of implicit bias that was uncovered as part of a hidden camera show.

Together, these videos provide viewers with a brief but thorough education on the subject of implicit bias—and strategies for combating it. As previously discussed, research suggests that educating individuals about implicit bias can help reduce its impact, both by encouraging them to question their own objectivity, and by increasing their motivation to make fair decisions. *See* Kang, 59 UCLA L. Rev. at 1172-77. The Washington Video works on both of these fronts,

---

[1] Both exhibits are contained on a single compact disk. The disk is filed conventionally with the Clerk's Office and a copy will be delivered to chambers.

5

simultaneously raising juror awareness of the potential pitfalls of unconscious bias and encouraging jurors to combat any such bias within themselves by carefully reflecting on their decisions. The video is measured in tone, rather than accusatory, and grounded in evidence-based, scientific terms - both factors that are likely to increase its efficacy in reducing implicit bias and increasing juror fairness. *See id.* at 1183. The second video demonstrates implicit bias in a real world setting and demonstrates how shocking of a phenomena it can be when implicit biases infect the decision-making process of average citizens.

Accordingly, Mr. Garcia requests that this Court play both videos to potential jurors during orientation.

### C.    Preliminary Instruction on Implicit Bias

Mr. Garcia further requests that this Court issue the following preliminary instruction to the entire panel of potential jurors, prior to *voir dire*, which is based upon the model instruction used in the Western District of Washington:

> It is important that you discharge your duties without discrimination,
> meaning that bias regarding the race, color, religious beliefs,
> national origin, sexual orientation, gender identity, or gender of the
> defendant, any witnesses, and the lawyers should play no part in
> the exercise of your judgment throughout the trial.
>
> Accordingly, during this voir dire and selection process, you may be
> asked questions related to the issues of bias and unconscious bias.

*Cf.* Preliminary Instruction To Be Given To The Entire Panel Before Jury Selection, Western District of Washington,

http://www.wawd.uscourts.gov/sites/wawd/files/CriminalJuryInstructions-ImplicitBias.pdf.

In addition to setting the stage for *voir dire*, the proposed preliminary instruction "alert[s] the jury to the concept of unconscious bias" and instructs them "in a straightforward way not to use bias, including unconscious bias, in its evaluation of information and credibility and in its

decision-making." *Id.* In these ways, the proposed preliminary instruction helps to ensure that jurors are educated about implicit bias. As previously discussed, education helps to ensure that potential jurors are both "skeptical about their own objectivity" and "motivated to check against implicit bias," and thus more likely to make objective decisions. 59 UCLA L. Rev. at 1181.

Accordingly, Mr. Garcia requests that this Court read the proposed preliminary instruction to the entire panel prior to *voir dire*.

### D. Consultation

Undersigned counsel consulted with government counsel about the present motion. The government objects to the issuance of a questionnaire, does not object to the proposed preliminary instruction, and does not take a position on the use of the aforementioned videos at this time.

## III.  Conclusion

For the foregoing reasons, Mr. Garcia respectfully requests that this motion be granted and that this Court order the requested relief.

<div style="margin-left: 40%;">

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/*Timothy P. O'Hara*
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
timothy.ohara@fd.org

</div>

<div style="text-align: center;">7</div>

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2022, I electronically filed the foregoing **Mr. Garcia's Motion to Address the Topic of Implicit Bias During Voir Dire** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

Laura Cramer-Babycz – Laura.Cramer-Babycz@usdoj.gov
Assistant United States Attorney

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Mr. Francisco Garcia (via Mail)

s/Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Timothy_OHara@fd.org
Attorney for Defendant

8



**Defendant's Proposed Voir Dire Questions Relating to Implicit Bias**

1. Does racial prejudice still exist in America?  If yes, how serious of a problem is it (1 being not a problem and 10 being a very serious problem)?

2. Can someone be unintentionally biased against Latino people?  Please explain your answer.

3. If you believe unconscious bias or implicit bias exists, how can someone prevent that bias from affecting important decisions that individual has to make?

4. What steps will you personally take to guard against implicit bias affecting the way you look at the evidence and deliberate about a verdict?

5. Some people believe that Latino people commit more crimes than white people – do you agree or disagree with that statement?

6. Is it possible that you are biased against Latino people even though you do not intend to be?  Does the fact that Mr. Garcia is Latino make it more likely to you that he committed the crime in this case?

7. If you hear testimony from a Latino witness, would you consider the person's race in determining whether to believe that witness?  If yes, why?  If no, why not?

8. Is there anything about the fact that Mr. Garcia is Latino that makes it less likely that you could be a fair and impartial juror in this type of case?  Circle one: yes or no.  If you circled yes, please explain why.

9. Have you ever heard individuals making negative remarks about Latino people?  If so, how did that make you feel?

10. What would you do if you were selected as a juror and during deliberations another juror made comments about Latino people and/or race in general?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.     21-cr-00143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**FRANCISCO GARCIA,**

      **Defendant.**

---

## EXHIBIT B (CONVENTIONALLY FILED)
*Unconscious Bias video*
United States District Court for the Western District of Washington

---

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.     21-cr-00143-RM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**FRANCISCO GARCIA,**

       **Defendant.**

---

**EXHIBIT C (CONVENTIONALLY FILED)**
"What Would You Do?" video

---

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.    21-cr-00143-RM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**FRANCISCO GARCIA,**

       **Defendant.**

---

## MR. FRANCISCO GARCIA'S MOTION TO CONDUCT ADDITIONAL ATTORNEY-LED *VOIR DIRE* BEYOND FIFTEEN MINUTES

---

Mr. Francisco Garcia, by and through his attorney, Timothy P. O'Hara, hereby moves the Court for 60 minutes of attorney-led *voir dire* examination by each party following the *voir dire* examination by the court.[1] As set forth below, the requested relief is necessary in order to guarantee that Mr. Garcia's Sixth Amendment right to an impartial jury is fulfilled.  The government opposes the present request.

**Introduction**

A defendant's right to an impartial jury stems from the Sixth Amendment to the United States Constitution: "[i]n criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . ." This fundamental constitutional right "includes the right

---

[1] This Court's Practice Standard indicates that "[u]nless ordered otherwise, each side shall be permitted *voir dire* examination of 15 minutes after *voir dire* examination by the Court."  *See* Part IV (Trials) (B)(3).

to adequate *voir dire* to identify unqualified jurors." *See United States v. Beckner*, 69 F.3d 1290, 1291 (5th Cir. 1995) (citing *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992)).

In the federal system, the gatekeepers for this fundamental right are district court judges. *See* Federal Rule of Criminal Procedure 24(a)(1). The federal rules do not specify how jury selection is to occur in federal courtrooms, leaving significant discretion to the trial court. The operative rule does not even specify who should conduct the questioning: the district court judge may examine prospective jurors or the court "may permit the attorneys for the parties to do so." *See id.*

However, the federal rules note that the attorneys representing the parties cannot be left out of the jury selection process. If the court chooses to conduct the *voir dire* process, then the court *must* permit the attorneys to either ask questions themselves or to submit further questions to the court. *See* F.R.Cr.P. 24(a)(2). The function of *voir dire* is to provide information to both the court *and counsel*; it is important to "lay predicate for both the judge's and counsel's judgment about the qualifications and impartiality of potential jurors." *United States v. Shelton*, 736 F.2d 1397, 1408 (10th Cir. 1984).

The majority of jury selection in federal cases is conducted by the court rather than the attorneys. *See* Hon. Mark Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: the Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*; 4 Harv. L. & Pol'y Rev. 149, 159 (2010). This is likely out of a "perceived efficiency" or "local legal tradition" that favors the court conducting the majority of *voir dire*. *See id.*

Unfortunately, however, predominately judicial-led *voir dire* is less likely to identify and correct important concepts like implicit bias during jury selection. *See* Bennett, 4

Harv. L. & Pol'y Rev. at 150.  The attorneys involved in the case are in a better position to anticipate implicit biases in jurors and determine how those biases might affect their respective client's case.  *See id.*

Other jurisdictions allow the attorneys to play a larger role in the *voir dire* process, especially in state courts. In Vermont, for example, *voir dire* examination is to be conducted by the attorneys under the supervision of the court, with the court conducting any supplemental questioning it sees fit.  *See State v. Calloway,* 157 Vt. 217, 220 (Vt. 1991); V.R.Cr.P. 24(a).  In Louisiana, the court must afford a "wide latitude to counsel in the conduct of *voir dire* examination" to comply with the mandates of the Louisiana Constitution.[2]  *See State v. Sexton*, 477 So.2d 124 (La. 4th Cir. Ct. Appl. 1985).  In Mississippi, counsel are allowed to question the jury directly "on matters not inquired to by the court."  *See Simon v. State*, 688 So. 2d 791, 799 (Miss. 1997).  And in California, after the court conducts an initial examination of the venire, the parties are entitled to subsequent examination "by oral and direct questioning, [of] any of the prospective jurors."  *See* Ca. Code Civ. Pro. §223.[3]

The better practice is to allow a generous amount of attorney-led questioning. Empirical research suggests that "potential jurors respond more candidly and are less likely to give socially desirable answers to questions from lawyers than from judges."  *See* Bennett at p. 160.  In Judge Bennett's extensive judicial experience, jurors were "all too likely to give me the answer that they think I want, and they almost uniformly answer that

---

[2] The Louisiana Constitution requires that the defendant "have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily."  *See* LSA – Const. Art. 1 §17.

[3] In California, juries in criminal actions are formed in the same manner as juries in civil actions.  *See* Ca. Penal §1046.

3

they can 'be fair.'"  *Id.*  Limiting the role of the attorneys in the *voir dire* process "allows jurors with undetected and undeterred implicit biases to decide cases" and prevents attorneys "from using preemptory or for cause strikes to eliminate such jurors."  Bennett, at 160.

Attorney-conducted *voir dire* presents numerous advantages:

> 1) jurors may be more forthright in signaling potential bias while answering questions posed by attorneys rather than by judges;
>
> 2) the lawyers involved in the case always know the case better than the trial judge at the onset of the case;
>
> 3) they have an incentive to identify juror tendencies that may be of concern to the client; and
>
> 4) jurors would be less likely to form snap judgments about criminal defense attorneys if they had more meaningful interaction with them.

*See Wu v. Lauriat*, 2012 WL 5208552 *3 (Superior Court of Mass. 2012).

**Argument**

In the present case, there are two principal issues that justify an expanded attorney-led *voir dire*.  First, as explained in a separate filing, undersigned counsel intends to question the jurors about their potential implicit bias.  This topic is new to many individuals and there may be some resistance from the panel to this idea.  The topic also is inherently controversial and will require an extended discussion, with follow-up questioning, beyond just surface conversation.  Undersigned counsel would like to discuss this topic with every, or nearly every, juror.

Second, since the present case is alleged to have occurred inside a federal prison, defense counsel intends to question the venire about their experiences with correctional officers, as well as their impression of individuals that have been convicted of crimes and

are serving time in prison. Defense counsel expects there to be significant factual disputes between the government witnesses (at least one BOP inmate and various correctional officers) and the defense witnesses (at least one BOP inmate and perhaps Mr. Garcia) in the upcoming trial. Because it is a realistic danger for a juror to inherently consider a correctional officer more credible than a prisoner, significant time will need to be spent to determine whether any bias exists toward Mr. Garcia or potential witnesses that will be called by the prosecution and/or defense.

Additionally, undersigned counsel will need to question the prospective jurors about their answers to the court's initial questions. These follow-up questions alone will require more than 15 minutes. If the Court were to select an initial venire of 31 potential jurors, in order to talk to each juror in 15 minutes, undersigned counsel would have to spend approximately 29 seconds with each individual juror. Even doubling the amount of time for attorney-led questioning to 30 minutes would allow less than a minute with each potential juror. This is insufficient.

This Court does not have to worry about a rambling, uncontrolled, improper series of questions by defense counsel. Undersigned counsel has not only conducted numerous *voir dire* examinations in his legal career, in both criminal and civil cases, but for years, undersigned counsel co-taught the portion relating to *voir dire* at the Illinois State Appellate Defender's Trial Advocacy Seminar.

**Consultation**

Undersigned counsel advised the government of the present motion, and it opposes the allotment of 60 minutes for attorney-led *voir dire*.

WHEREFORE, undersigned counsel requests that the Court allow each party to conduct 60 minutes of attorney-led examination during *voir dire*.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/*Timothy P. O'Hara*
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
timothy.ohara@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2022, I electronically filed the foregoing

### MR. FRANCISCO GARCIA'S MOTION TO CONDUCT ADDITIONAL ATTORNEY-LED *VOIR DIRE* BEYOND FIFTEEN MINUTES

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

      Laura Cramer-Babycz – Laura.Cramer-Babycz@usdoj.gov
      Assistant United States Attorney

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

      Mr. Francisco Garcia (via Mail)

               s/*Timothy P. O'Hara*
               TIMOTHY P. O'HARA
               Assistant Federal Public Defender
               633 17th Street, Suite 1000
               Denver, CO 80202
               Telephone: (303) 294-7002
               FAX: (303) 294-1192
               Timothy_OHara@fd.org
               Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-CR-00143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**FRANCISCO GARCIA,**

      **Defendant.**

_____

## MOTION TO PRODUCE *GIGLIO* MATERIAL
_____

      MR. FRANCISCO GARCIA, through attorney Timothy P. O'Hara, moves this Court to compel the government to disclose material under *Giglio v. United States*, 405 U.S. 150 (1972), **by April 8, 2022**. The government opposes the present motion.

      **Relevant Factual Background**

      1) On April 22, 2021, the government filed a one-count Indictment against Mr. Garcia, alleging a violation of 18 U.S.C. §113(a)(6), assault resulting in serious bodily injury, on September 2, 2019. *See* Doc. 1. The alleged crime occurred at the United States Penitentiary (USP) in Florence, Colorado. Mr. Garcia and the alleged victim were inmates at the facility at the time of offense.

      2) On June 1, 2021, Mr. Garcia was arrested and appeared before the Honorable Magistrate Judge S. Kato Crews for an Initial Appearance. *See* Docs. 4 & 5.

      3) On June 3, 2021, the parties completed the Discovery Conference Memorandum and Order and submitted it to the Court. *See* Doc. 10. Magistrate Judge Crews entered the Memorandum as an Order. *See id.* In the Order, the parties noted:

> The defendant requests disclosure of evidence favorable to the defendant on the issue of guilt and/or sentencing. The government states it will disclose material evidence which is favorable to the defendant as required by *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and *United States v. Bagley*, 473 U.S. 667 (1985). **The government acknowledges its continuing duty to make these disclosures.** This request does not foreclose the defendant from filing a more specific motion requesting exculpatory evidence.

*See id.* at p. 4 (emphasis added).

4) To date, no information pertaining to potential impeachment[1] has been disclosed by the government as part of the discovery obligations regarding the witnesses that the government intends to call at Mr. Garcia's trial.

### The Importance of this *Giglio* Evidence

The Due Process Clause requires the government to disclose information favorable to the accused that is material to either guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Giglio v. United States*, the Supreme Court extended the rule expressed in *Brady* to include evidence useful to the defendant to impeach the government's witnesses. *See* 405 U.S. 150, 153-155 (1972). In this analysis, "no distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'" *Douglas v. Workman*, 560 F.3d 1156, 1172-73 (10th Cir. 2009) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). This type of evidence must be disclosed by the prosecution to the defense. The question becomes *when* such a disclosure should be required.

Even though no date or time period is specified in the Discovery Conference

---

[1] The government has disclosed witness statements of multiple, potential witnesses, including the alleged victim.

2

Memorandum nor in the Rules of Criminal Procedure, last minute *Brady* and *Giglio* disclosures contradict the concept of due process and therefore discouraged. Specifically, it would "eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." *See United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009) (citation omitted). The Tenth Circuit's disfavor of disclosures during trial can be extended to include disclosures shortly before trial:

> [i]t is not hard to imagine the many circumstances in which the belated revelation of *Brady* material might meaningfully alter a defendant's choices before and during trial: how to apportion time and resources to various theories when investigating the case, whether the defendant should testify, whether to focus the jury's attention on this or that defense, and so on. To force the defendant to bear these costs without recourse would offend the notion of fair trial that underlies the *Brady* principle.

*Id.* And delay to gain a strategic advantage should be discouraged:

> [i]f a defendant could never make out a *Brady* violation on the basis of the effect of delay on his trial preparation and strategy, this would create dangerous incentives for prosecutors to withhold impeachment or exculpatory information until after the defense has committed itself to a particular strategy during opening statements or until it is too late for the defense to effectively use the disclosed information.

*Id.* The district court can impose a wide variety of sanctions if the government was determined to be dilatory in its disclosure obligations, including the exclusion of the witness, limitations on permitted testimony, instructions to the jury, or mistrial. *See id.*

Requiring that the government disclose *Giglio* material one month before trial is reasonable and consistent with due process. This deadline will allow the defense to not only effectively prepare for the examinations of the government's witnesses, but also to conduct any necessary investigation learned from the disclosure. Preparing for trial is a massive undertaking and adding additional investigation and work at the last minute,

when the information could have been disclosed earlier, would be unfair.

At Mr. Garcia's upcoming trial, the government intends to call the alleged victim as a key witness in its case-in-chief. In addition, the government likely will call correctional officers. To truly confront the government's witnesses, impeachment material in the government's possession (*Giglio* material) should be tendered one month in advance so the import of the information may be explored.

### Government's Discovery Obligations Extend Beyond Information in its Actual Possession

Another reason to require disclosure before trial is that crucial *Giglio* information may be held in the hands of a related agency, like the Bureau of Prisons (BOP) or a different division of the U.S. Attorney's Office. Since the government likely will present testimony of former BOP employees as witnesses as well as testimony from an individual formerly prosecuted by their own office whom was serving a sentence at the time of the alleged offense, a *Giglio* response from the BOP and the prosecuting division of the U.S. Attorney's Office will be required. This will require time for the information to be obtained, reviewed, and transmitted to the defense.

As of two weeks ago, in a different criminal case stemming from the same facility at the BOP, undersigned counsel learned that the policy of both the Department of Justice (DOJ) and the U.S. Attorney's Office for the District of Colorado was to request *Giglio* material no sooner than three weeks before a jury trial. *See United States v. Crews* – 19-cr-00222-REB in the District of Colorado (Doc. 129 at p. 1) (government filing noting that the government's request for *Giglio* material three weeks before the onset of trial followed the policy of both the DOJ and the U.S. Attorney's Office in the District of Colorado).

4

Adhering to a policy of this type inevitably will lead to a flurry of last-minute litigation in a large number of trials.[2]

The government's obligations under *Brady* and *Giglio* should be read broadly to encourage prosecutors to carry out their "duty to *learn* of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *United States v. Combs*, 267 F.3d 1167, 1174-75 (10th Cir. 2001) (quoting *United States v. Kyles*, 514 U.S. at 437-38, 115 S.Ct. 1555) (emphasis added by Tenth Circuit). Information possessed "by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case." *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999). The Department of Justice affirmed this duty, calling the burden to gather and review discoverable information a "search duty." *See* the Criminal Resource Manual, *Department of Justice Guidance for Prosecutors Regarding Criminal Discovery*, § 165 (found at https://www.justice.gov/archives/jm/criminal-resource-manual-165-guidance-prosecutors-regarding-criminal-discovery) (last visited March 17, 2022). The manual defines the prosecution team to "include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." Per the manual, prosecutors are encouraged to "err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes." *Id.* According to the government's own best practices, "carefully

---

[2] For more information about the specific *Giglio* issues in *United States v. Crews*, the Court can consult the relevant CM/ECF entries following Doc. 129. Because those filings were filed under restriction, information from those filings is not reproduced here.

5

considered efforts to locate discoverable information are more likely to avoid future litigation over *Brady* and *Giglio* issues and avoid surprises at trial." *Id.*

Several courts have held this duty is elevated when it involves government agencies closely aligned with the prosecution and may include a "duty to search" files maintained by those agencies. *United States v. Brooks,* 966 F.2d 1500 (D.C. 1992); *see also United States ex rel. Fairman,* 769 F.2d 386, 391 (7th Cir. 1985). The Tenth Circuit cited *Brooks* with approval for the proposition that the government should be incentivized to learn of any favorable evidence known to those individuals acting on the government's behalf. *See United States v. Combs,* 267 F.3d at 1175.

**Consultation with the Government**

Undersigned counsel advised government counsel and the government objects to a required disclosure date of April 8, 2022. Government counsel also informed undersigned counsel that she has already submitted a *Giglio* request in the present case.

WHEREFORE, undersigned counsel requests that the Court impose a deadline of April 8, 2022, for the government to disclose *Giglio* material to the defense.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ *Timothy P. O'Hara*
Timothy P. O'Hara
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Timothy_ohara@fd.org
Attorney for Defendant

6

## CERTIFICATE OF SERVICE

I certify that on March 18, 2022, I electronically filed the foregoing:

## MOTION TO PRODUCE *GIGLIO* MATERIAL

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

    Laura Cramer-Babycz
    Assistant U.S. Attorney

and I certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

    Francisco Garcia (U.S. Mail)

                            s/ *Timothy P. O'Hara*
                            Timothy P. O'Hara
                            Assistant Federal Public Defender
                            633 17th Street, Suite 1000
                            Denver, CO  80202
                            Telephone:  (303) 294-7002
                            FAX:  (303) 294-1192
                            Timothy_ohara@fd.org
                            Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FRANCISCO GARCIA,

      Defendant.

---

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO PRODUCE *GIGLIO* MATERIAL [ECF NO. 34]

---

      The defendant, Francisco Garcia, seeks a Court order to compel the U.S. Attorney's Office for the District of Colorado ("the government") to disclose material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), by a specific date—specifically, one month in advance of trial, on April 8, 2022. *See* ECF No. 34 ("Def. Mot."). The government, of course, acknowledges and will comply with its ongoing discovery obligations, including those pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). However, for the reasons set forth below, the government objects to a Court-ordered deadline of April 8, 2022 to make those disclosures.

### I.    Legal Background

      The government has an obligation to disclose "evidence favorable to an accused . . . where the evidence is material." *Brady*, 373 U.S. at 87. "Impeachment evidence as

<center>1</center>

well as exculpatory evidence falls within the *Brady* rule." *United States v. Young*, 45 F.3d 1405, 1408 (10th Cir. 1995) (citing *Giglio*, 405 U.S. at 154). Federal Rule of Criminal Procedure 16 further requires disclosure of, among other things, items "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Pursuant to Rule 16 and the Discovery Conference Memorandum and Order entered in this case, the government has a continuing duty to make such disclosures. *See* Fed. R. Crim. P. 16(c); ECF No. 9.

Nothing in *Brady*, *Giglio*, Rule 16, or the Discovery Conference Memorandum and Order sets a specific deadline for the disclosures that the defendant now seeks. Rather, it is well accepted that *Brady*—and, therefore, *Giglio*—disclosures must be made "soon enough to give the defendant an opportunity to use [the information] at trial effectively." *Browning v. Trammell*, 717 F.3d 1092, 1105 (10th Cir. 2013). Moreover, the necessary timing of *Giglio* disclosures may differ from *Brady* disclosures because (1) *Giglio* requires disclosure of information related to the witnesses the government ultimately decides to call at trial, *see United States v. Green*, 178 F.3d 1099, 1109 (10th Cir. 1999) (rejecting defendant's challenge to government's alleged failure to disclose impeachment material for non-testifying witness because "both the discovery order and *Giglio* apply only to impeachment information relating to a government witness"); and (2) *Giglio* material will often require less time to prepare to effectively use at trial, *see United States v. Lujan*, 530 F. Supp. 2d 1224, 1255 (D.N.M. 2008) (explaining that *Giglio* material "usually does not require substantial time to prepare for its effective use at trial," and, therefore, "[g]enerally, a defendant's right to a fair trial will be fully protected if the government discloses *Giglio* impeachment evidence the day before the witness testifies"). For those

2

reasons, other courts have routinely rejected a defendant's request for early disclosure of *Giglio* material. *See, e.g.*, *United States v. Segovia-Landa*, No. 20-CR-287 (JPO), 2021 WL 1966117, at *5 (S.D.N.Y. May 17, 2021) (rejecting defense request for early *Giglio* disclosures as "premature" because "[t]he Government has yet to identify which witnesses it intends to call at trial, and, in any event, courts generally decline to compel early disclosure of impeachment or *Giglio* material").

## II. Argument

The defendant asks this Court to compel the government to disclose *Giglio* material by April 8, 2022, arguing that the deadline is necessary to allow defense to "effectively prepare for the examinations of the government's witnesses" and "to conduct any necessary investigation learned from the disclosure." Def. Mot. at 3. The government objects to the request for a specific deadline of April 8, 2022 for such disclosures.

As an initial matter, the government acknowledges and will comply with its obligations as outlined above, including its obligation to disclose *Brady* and *Giglio* material soon enough to allow the defendant an opportunity to use that information effectively at trial. To that end, the undersigned Assistant United States Attorney has already disclosed certain potential impeachment material included in the victim's Bureau of Prisons ("BOP") file, and has submitted a formal request to the *Giglio* officer for the U.S. Attorney's Office for the District of Colorado for potential *Giglio* material for witnesses currently or formerly employed by BOP and the Federal Bureau of Investigation ("FBI") who may be called at trial. Consistent with its continuing discovery obligations, the government will review

material on an ongoing basis and make any necessary disclosures as soon as practicable.

The defendant's request for a specific deadline for *Giglio* disclosures, however, goes far beyond any disclosure requirement to which the government is subject. Indeed, the defendant's instant motion would require the government effectively to finalize and disclose its witness list a month in advance, despite the fact that this is a non-capital case in which (1) the defendant does not have a constitutional right to pretrial disclosure of the government's witnesses, *see United States v. Nevels*, 490 F.3d 800, 803 (10th Cir. 2007) (citing *Weatherford v. Bursey*, 429 U.S. 545 (1977)); and (2) the Court requires the government to disclose its witness list two days before the trial preparation conference currently scheduled for April 29, 2022. Again, the government intends to disclose *Giglio* material as soon as it is available and disclosure is practicable, particularly for those witnesses who the government has already determined it will call at trial. Given the nature of trial preparation, however, the government's trial witnesses may change after April 8, 2022, potentially necessitating further *Giglio* disclosures.

Further rendering the defendant's requested deadline impracticable is the fact that—as the defendant highlights in his motion—the government has an obligation to request potential *Giglio* material from other government entities that are not within the direct control of the U.S. Attorney's Office for the District of Colorado. Although the government has and will continue to make such requests as early as possible to satisfy its discovery obligations, the date on which those entities provide potentially responsive information is not entirely within the control of the undersigned Assistant United States

4

Attorney.

At bottom, the defendant's motion is premature in that it assumes there will be significant and material *Giglio* information disclosed before trial that necessitates substantial investigation. Rather than imposing a disclosure deadline that is neither reasonable nor practicable, the government respectfully submits that the better course of action would be to see what—if any—*Giglio* information is disclosed before trial and the timing of any such disclosures. If, at that time, the defendant believes that there has been a discovery violation—*i.e.*, that the government "suppressed evidence" that was "favorable to the accused" and "material," *United States v. Burke*, 571 F.3d 1048, 1053 (10th Cir. 2009)—he can file a further motion with the Court that provides concrete details regarding the subject disclosure and seeks specific remedies, *see id.* at 1054 (describing district court's discretion to select appropriate remedy if government is "dilatory in its compliance with *Brady*, to the prejudice of the defendant," which remedies include a continuance, exclusion of evidence, or any other order that is justified under the circumstances). Importantly, although the Tenth Circuit has not foreclosed the possibility that a belated disclosure may establish a due process violation, it has at the same time emphasized that "not every delay in disclosure of *Brady* material is necessarily prejudicial to the defense." *Id.* at 1056.

## III. Conclusion

For the reasons discussed above, the government respectfully objects to a Court-ordered deadline of April 8, 2022 for *Giglio* disclosures.

5

Dated:  March 28, 2022                    Respectfully submitted,

                                          COLE FINEGAN
                                          United States Attorney
                                          By:  s/ *Laura Cramer-Babycz*
                                          Laura Cramer-Babycz
                                          Assistant U.S. Attorney
                                          U.S. Attorney's Office
                                          1801 California Street, Suite 1600
                                          Denver, CO 80202
                                          Telephone: 303-454-0100
                                          Fax:  303-454-0406
                                          E-mail:  Laura.Cramer-Babycz@usdoj.gov
                                          Attorney for Government

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2022, I electronically filed the foregoing **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO PRODUCE GIGLIO MATERIAL [ECF NO. 34]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

<div style="margin-left:50%">

By: <u>s/ Deana Ambrosen</u>
     Legal Assistant
     United States Attorney's Office

</div>

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 21-cr-143-RM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

FRANCISCO GARCIA,

       Defendant.

---

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO ADDRESS THE
TOPIC OF IMPLICIT BIAS DURING VOIR DIRE [ECF NO. 32]**

---

       The defendant seeks a number of modifications to the Court's standard practice for jury selection, including (1) using a case-specific jury questionnaire; (2) showing two videos about implicit bias to the venire; and (3) giving a preliminary instruction on implicit bias. *See* ECF No. 32 ("Def. Mot."). For the reasons set forth below, the government objects in part to these requests.

       Rule 24(a) of the Federal Rules of Criminal Procedure grants a district court broad discretion in determining what questions the jurors will be asked. *See also Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) ("Federal judges have . . . ample discretion in determining how best to conduct the *voir dire*."). The focus of jury selection is to select twelve members from the community who can be fair and impartial and follow the law as given to the panel by the Court.

       This Court's Practice Standards allow for 15 minutes of attorney-conducted *voir*

*dire*, requiring the parties to file their proposed *voir dire* questions two days before the trial preparation conference. *See* Practice Standards, Section IV(A)(3), (B)(3). Several of the defendant's requests are well beyond the typical *voir dire* questions and, accordingly, should be limited or denied as set forth below.

## I. CASE-SPECIFIC QUESTIONNAIRE

The defendant seeks to provide a written questionnaire containing ten written questions related to the jurors' potential bias. In support of this request, the defendant states (1) he is "Latino and witnesses expected to testify on his behalf are Latino," and (2) the risk of implicit bias in this case "is actually exacerbated by the fact that [the case] is not otherwise racially charged." Def. Mot. at 4.

The government opposes the use of this written questionnaire. The defendant, through counsel, can of course ask any of these questions that he deems appropriate—and that the Court approves—during the attorney-led portion of *voir dire*. But providing a written questionnaire is unnecessary, especially given that only one of the ten proposed questions gets to the heart of part of the inquiry during *voir dire*—whether "there is anything about the fact that Mr. Garcia is Latino that makes it less likely that you could be a fair and impartial juror in this type of case." ECF No. 32-1 (question 8). To the extent that the defendant contends that "prospective jurors are likely to be more forthcoming in writing," Def. Mot. at 4–5, he provides no support for that assertion. Indeed, it is arguably easier to provide a false or partial answer on a written questionnaire, and the attorneys lose the ability to observe the prospective juror's demeanor when providing those answers. *See, e.g.*, *United States v. Jackson*, 863 F. Supp. 1449, 1459 (D. Kan. 1994)

<div align="center">2</div>

(explaining that the "cost" of using a written questionnaire is that "the parties and their attorneys lose the opportunity to observe demeanor").

Accordingly, the government opposes the defendant's request to use a written questionnaire.

## II. ORIENTATION VIDEOS EXPLAINING IMPLICIT BIAS

The defendant also asks to show two videos to potential jurors during orientation: (1) a video produced by the United States District Court for the Western District of Washington titled "Unconscious Bias"; and (2) a video from "the hidden camera show 'What Would You Do?,' which aired on ABC in 2010." Def. Mot. at 5. The defendant argues that these videos, a total of fifteen minutes in length, provide a "brief but thorough education on the subject of implicit bias—and strategies for combating it." *Id.* The government does not object to playing the first video, but does oppose playing the second proposed video.

The second proposed video shows the likelihood of passersby to conclude that a crime is being committed by people of different races. As an initial matter, the defendant fails to explain why showing the first video, providing a preliminary instruction, and discussing bias during attorney-led *voir dire* is insufficient to address this topic. Moreover, there is nothing to suggest that the defendant was investigated or targeted based on his race. Rather, he was found assaulting another inmate—who is also Latino—in their shared cell. Although the defendant insists the jury's implicit biases must be uncovered, given that this is not a case of "whodunit" identification or targeting, playing multiple videos to demonstrate the concept of bias is unnecessary. Indeed, the Tenth Circuit recently

3

concluded that a district court did not abuse its discretion in refusing to play any videos about implicit bias. *See United States v. Mercado-Garcia*, 989 F.3d 829, 839–41 (10th Cir. 2021) (finding district court did not abuse its discretion in refusing to play the "Unconscious Bias" video from the Western District of Washington). The Court, therefore, should decline to play the second proposed video.

## III.    PRELIMINARY INSTRUCTION

Lastly, the defendant requests the Court give a preliminary instruction prior to the commencement of *voir dire*. Mot. at 6–7. The government has no objection to the instruction tendered or to the Court reading it to the panel the morning of jury selection.

Dated:  March 28, 2022

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:  s/ *Laura Cramer-Babycz*
Laura Cramer-Babycz
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0406
E-mail:  Laura.Cramer-
Babycz@usdoj.gov
Attorney for Government

## **CERTIFICATE OF SERVICE**

        I hereby certify that on March 28, 2022, I electronically filed the foregoing **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO ADDRESS THE TOPIC OF IMPLICIT BIAS DURING VOIR DIRE [ECF NO. 32]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

                            By:  s/ Deana Ambrosen
                            Legal Assistant
                            United States Attorney's Office

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 21-cr-143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FRANCISCO GARCIA,

      Defendant.

---

**UNITED STATES' RESPONSE TO
DEFENDANT'S MOTION TO CONDUCT ADDITIONAL ATTORNEY-LED *VOIR DIRE*
BEYOND FIFTEEN MINUTES [ECF NO. 33]**

---

The defendant seeks 60 minutes—45 additional minutes—of attorney-led *voir dire* examination by each party. *See* ECF No. 33 ("Def. Mot."). The defendant claims he needs additional time to (1) discuss the topic of implicit bias with "every, or nearly every, juror"; (2) question the venire about their experiences with, and impressions of, correctional officers and those who are serving time in prison; and (3) follow up on the Court's initial questions. *Id.* at 4–5.

The defendant presents these reasons as a justification to triple the *voir dire* time ordinarily permitted by the Court, but none of these reasons set this case apart from a standard criminal case. Issues of implicit bias are routinely dealt with in this District. Almost every single criminal case involves some form of law enforcement, and, often, a person who has previously been convicted of a crime. And as the defendant points out, having 31 prospective jurors is standard in this district.

This is also a straightforward case. This indictment contains one count. The question for the jury will be whether the defendant assaulted another inmate and caused serious bodily injury. The facts and legal concepts are not complex.

This Court ordinarily only permits 15 minutes of *voir dire* per side. Undoubtedly, this requirement is based on this Court's extensive experience handling trials, including cases like this one. The defendant has cited no case law suggesting this amount of time is insufficient. Nor has the defendant provided a sufficient reason to deviate from this standard. This Court "retains great latitude in conducting *voir dire*, and the Constitution does not require an additional opportunity to make a searching inquiry." *Sallahdin v. Gibson*, 275 F.3d 1211, 1223 (10th Cir. 2002) (citation omitted). Accordingly, the defendant's motion should be denied.

Dated: March 28, 2022

Respectfully submitted,

COLE FINEGAN
United States Attorney

By: s/ *Laura Cramer-Babycz*
Laura Cramer-Babycz
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0406
E-mail: Laura.Cramer-Babycz@usdoj.gov

Attorney for Government

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2022, I electronically filed the foregoing **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO CONDUCT ADDITIONAL ATTORNEY-LED VOIR DIRE BEYOND FIFTEEN MINUTES [ECF NO. 33]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

By:  s/ Deana Ambrosen
Legal Assistant
United States Attorney's Office

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**JUDGE RAYMOND P. MOORE**

| | |
|---|---|
| Courtroom Deputy:   Cathy Pearson | Date:   April 6, 2022 |
| Court Reporter:   Tammy Hoffschildt | Interpreter:   n/a |
| Probation:   n/a | |

**CASE NO.   21-cr-00143-RM**

Parties                                                                Counsel

UNITED STATES OF AMERICA,                        Laura Cramer-Babycz
                                                                       Andrea Surratt

        Plaintiff,

v.

1.   FRANCISCO GARCIA,                                   Timothy O'Hara

        Defendant.

---

**COURTROOM MINUTES**

---

**MOTION HEARING – Video teleconference (VTC)**
**COURT IN SESSION:        1:30 p.m.**

Appearances of counsel.   Defendant is in custody and present by VTC.

Discussion held regarding the defendant appearing by VTC.

Mr. O'Hara states that the defendant agreed to appear by VTC for this hearing.

The Court makes statements regarding his telephone conversation with counsel and what was discussed.

Argument given and discussion held regarding Mr. Francisco Garcia's Motion to Address the Topic of Implicit Bias During *Voir Dire* (Doc. 32) and Mr. Francisco Garcia's Motion to Conduct Additional Attorney-Led *Voir Dire* Beyond Fifteen Minutes (Doc. 33).

The Court states findings.

**ORDERED:**  Mr. Francisco Garcia's Motion to Address the Topic of Implicit Bias During Voir Dire (Doc. 32) and Mr. Francisco Garcia's Motion to Conduct Additional Attorney-Led *Voir Dire* Beyond Fifteen Minutes (Doc. 33) are DENIED as stated on the record.

Argument given and discussion held regarding Motion to Produce *Giglio* Material (Doc. 34).

2:19 p.m.    Sidebar discussion held.

**ORDERED:**  This portion of the transcript shall be filed as restricted for the Court and counsel for the Government.

2:21 p.m.    Back on the record in open court.

**ORDERED:**  This portion of the transcript shall be filed as unrestricted.

Continued argument and discussion regarding Motion to Produce *Giglio* Material (Doc. 34).

The Court states findings.

**ORDERED:**  Motion to Produce *Giglio* Material (Doc. 34) is GRANTED as stated on the record.   The Government shall produce any *Giglio* material related to the victim on or before **April 20, 2022.**   The Government shall produce any *Giglio* material related to other witnesses at the time of, or before, the Trial Preparation Conference set for **April 29, 2022.**   Any other *Giglio* material the Government receives after the above deadlines shall be produced as soon as practicable.

Discussion held regarding sensitive witnesses at trial and security measures that will be in place at the time of trial.

**ORDERED:**  The defendant **shall be present in person** for the Trial Preparation Conference set for **April 29, 2022.**

**COURT IN RECESS:**        **2:49 p.m.**
**Total in court time:**        **1:19**
**Hearing concluded**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FRANCISCO GARCIA,

      Defendant.

---

## GOVERNMENT'S REPONSE TO MOTION TO COMPEL UNREDACTED INFORMATION

---

The United States Attorney's Office for the District of Colorado (the "Government") respectfully files this response to the defendant's April 28, 2022, Motion to Compel Unredacted Information (the "Motion") [ECF #82]. Because the Government understands, and has thus far met, its continuing discovery obligations in this case, the Government respectfully requests that the Court deny the defendant's Motion.

### A. Background

As described in the defendant's Motion, among the discovery produced in this case, the Government has produced some documents with redactions. As to some (but not all) of the redacted documents, the Government has offered to produce unredacted versions under the "attorneys' eyes only" protective order at ECF #69, but counsel for the defendant has rejected that offer.

### B. Discussion

The Supreme Court has recognized that "[t]here is no general constitutional right

to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Moreover, there is no requirement that "the prosecution make a complete accounting to the defense of all evidence in its possession." *United States v. Baxter*, 492 F.2d 150, 173 (9th Cir.1973). "*Brady* does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." *United States v. Wright*, 2012 WL 4049826, at *1 (D. Colo. Sept. 13, 2012) (Blackburn, J.) (citing *Smith v. Secretary of New Mexico Dep't of Corr.*, 50 F.3d 801, 823-824 (10th Cir. 1995)). Further, "the accused has no right to rummage through the government's files," *id.* (citing *United States v. Williams*, 580 F .2d 578, 585 (D.C.Cir. 1978), and "*Brady* does not authorize wholesale discovery or demand an 'open file' policy." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995)).

Importantly here, "[m]ere speculation that a government file may contain *Brady* material [is] not enough to require an in camera examination." *United States v. Little*, 2021 WL 4894626, at *1 (D. Colo. Oct. 20, 2021) (Brimmer, C.J.) (*quoting United States v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992)). *See also United States v. Roybal*, 46 F.Supp.3d 1127, 1155 (D.N.M. 2014) (noting that the "Court does not typically do in camera reviews, given the crush of civil and criminal cases in the district, without some compelling reason").[1]

---

[1] After a Government witness's testimony on direct examination, *in camera* review of potential a Jencks Act statement of that witness is required should the Government refuse production on the grounds that the statement does not relate to the subject matter of that witness's testimony. 18 U.S.C. § 3500(c); *United States v. Smith*, 984 F.2d 1084, 1086 (10th Cir. 1993). After further consideration, the Government now believes it will likely call SIS Tech Roman Manjarrez to testify at trial (currently a "may call" on the Government's witness list) and, accordingly, will produce unredacted versions of Mr. Manjarrez's reports at INV_110-11 and INV_120 to defense counsel.

Courts in this District routinely accept the Government's assertions that it understands its continuing obligations pursuant to Rule 16, *Brady*, and *Giglio*, and is complying with those obligations. *See, e.g.*, *United States v. Little*, 2021 WL 4894626, at *1; *United States v. Garrison*, 147 F.Supp.3d 1173, 1178 (D. Colo. 2015) (Martinez, J.); *United States v. Wright*, 2012 WL 2012 WL 4049826, at *3; *United States v. Weiss*, 2006 WL 1752373, at *6 (D. Colo. June 21, 2006) (Babcock, C.J.). The Government has made such an assertion to counsel for the defendant, and now makes that same assertion to the Court.

It is a fact of discovery in criminal cases that the Government must determine, for all of the materials in its possession, whether such materials are discoverable as Rule 16, *Giglio*, and/or *Brady*. As a result, the Government produces some documents, withholds some documents, and produces others with redactions. Just as the defendant would not be permitted to "rummage through" whatever materials the Government has not produced at all, the defendant should not be permitted to do the same as to documents with redactions. *United States v. Wright*, 2012 WL 4049826, at *1. Nor is *in camera* review of documents required upon demand of the defendant based on generalized references to Rule 16 and *Brady*. It would obviously be a tremendous drain on the Court's resources were every discovery decision of the Government second-guessed and reviewed by the Court, based on the "mere speculation" of the defendant. *United States v. Little*, 2021 WL 4894626, at *1.

---

None of the remaining documents at issue in the defendant's Motion constitute material that must be produced pursuant to 18 U.S.C. § 3500.

3

**C. Conclusion**

For the reasons stated herein, the Government respectfully requests that the

Court deny the defendant's Motion to Compel Unredacted Information.


Dated:  May 2, 2022                                      Respectfully submitted,

                                                        COLE FINEGAN
                                                        United States Attorney

                                                        By:  s/ *Andrea Surratt*
                                                        Andrea Surratt & Laura Cramer-Babycz
                                                        Assistant U.S. Attorneys
                                                        U.S. Attorney's Office
                                                        1801 California Street, Suite 1600
                                                        Denver, CO 80202
                                                        Telephone: 303-454-0100
                                                        E-mail:  andrea.surratt@usdoj.gov

## **CERTIFICATE OF SERVICE**

     I hereby certify that on May 2, 2022, I electronically filed the with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

<div style="margin-left:40%">

By:  *s/ Andrea Surratt*
Assistant United States Attorney
United States Attorney's Office

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 21-cr-143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FRANCISCO GARCIA,

      Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE BOP
GANG EXPERT TESTIMONY [ECF NO. 84]**

---

The United States Attorney's Office for the District of Colorado (the "Government"), by and through Assistant United States Attorneys Laura Cramer-Babycz and Andrea Surratt, respectfully submits this response to defendant's Motion to Exclude BOP Gang Expert Testimony, *see* ECF No. 84 ("Def. Mot.").

## I.  BACKGROUND

### A.  September 2, 2019 Assault

As the Court is aware from previous filings, the charge in this case is the result of an alleged assault that happened at the United States Penitentiary ("USP") in Florence, Colorado, on September 2, 2019.  The Government alleges that defendant Francisco Garcia assaulted his cellmate, Osiel Cardenas-Guillen ("Cardenas"), while they were locked in their cell together.  At trial, the Government anticipates calling Cardenas—the former leader of the Gulf Cartel—as a witness.

Cardenas was first interviewed about the assault on September 6, 2019, while he

1

was still in the hospital for injuries from the September 2, 2019 assault. Since that date, he has provided a largely consistent recitation of the events of September 2, 2019. In particular, Cardenas has consistently stated that, on the day of the assault, a member of the Mexican Mafia, Richard Santiago, approached Cardenas' cell that he shared with Garcia. At the time, Santiago was "on range," *i.e.*, out of his cell, and Cardenas and Garcia were confined in their shared cell. Santiago demanded that Cardenas deposit $10,000 into the accounts of Santiago, Arcadio Perez, and Phillip Segura. Perez and Segura are also members of the Mexican Mafia. According to Cardenas, he informed Santiago that he was not going to pay them. Surveillance video from that date shows both Santiago and Perez going to Cardenas' cell multiple times between approximately 8:50 am and 9:00 am, at times appearing to speak with someone and at other times appearing to peer inside the cell door window to watch what is going on inside the cell.

Shortly after the extortion attempt, Garcia assaulted Cardenas from behind. Cardenas remembers very little from the actual assault, but correctional officers arrived at Cardenas' cell at approximately 9:05 am. By the time correctional officers arrived, Cardenas was on the ground bleeding, and Garcia continued to hit and kick Cardenas despite the correctional officers' repeated commands to stop.

Although Cardenas reported that before the assault he had a good relationship with Garcia, he has explained that Garcia is a Sureño and Santiago, Perez, and Segura are Mexican Mafia. As discussed in more detail below, the Sureños act as foot soldiers, or enforcers, for the Mexican Mafia. As indicated in various pretrial filings, Garcia's defense in this case is that Cardenas was the initial aggressor and that he (Garcia) acted in self defense. *See* ECF No. 72 at 2; ECF No. 80 at 7.

## B. Bureau of Prisons Gang Expert

Against that backdrop, Garcia's gang affiliation and relationship to the Mexican Mafia is crucial in allowing the jury to understand the context of this assault. For that reason, the Government included John Feeney, an Intelligence Officer with the Bureau of Prisons' ("BOP") National Gang Unit, in its expert disclosure. *See* Ex. 1 (Government's Notice of Expert Testimony). As set forth in the Government's Notice of Expert Testimony, Mr. Feeney has extensive experience with the Mexican Mafia and Sureños from working within the BOP for over 25 years. Over the course of his career, he has monitored and interacted with both gangs, and now specifically monitors members of those gangs who are incarcerated in BOP facilities throughout the United States.[1] He also monitors, to a lesser extent, members and associates of Mexican drug cartels within BOP facilities.

Mr. Feeney's proposed expert testimony falls into four general categories: (1) the structure and operation of the Mexican Mafia within the BOP; (2) the structure and operation of the Sureños within BOP and their relationship to the Mexican Mafia; (3) the relationship between the Mexican drug cartels, Mexican Mafia, and Sureños; and (4) the BOP's process of validating gang membership. At this time, the Government anticipates eliciting the following testimony from Mr. Feeney, which is slightly narrowed from the Government's Notice of Expert Testimony (testimony that the Government included in its Notice but no longer seeks to elicit at trial is indicated in strikethrough text):

---

[1] Given that the defendant does not object to Mr. Feeney's expert testimony on the basis that he lacks the requisite experience and specialized knowledge, the Government does not recite Mr. Feeney's extensive experience here but rather relies on Government Exhibit 1.

3

1. Structure and Operation of Mexican Mafia within the BOP

    a. The Mexican Mafia is, first and foremost, a prison gang. It was created in the mid-to-late-1950s in California to provide protection to its members from inmate-on-inmate physical and sexual abuse in prisons. Initially, the Mexican Mafia operated primarily within the California Department of Corrections.

    b. The Mexican Mafia began operating in the BOP by the late 1970s, when the first well-known members of the Mexican Mafia were incarcerated in BOP facilities. The Mexican Mafia orchestrated a number of murders in the BOP in California around that time to assert power and control. The Mexican Mafia continues to exert control within prisons, including BOP facilities, through fear and intimidation.

    c. There are currently approximately 35 active Mexican Mafia members in BOP facilities throughout the United States. There are approximately 10 Mexican Mafia members at the BOP complex in Florence, Colorado, including Richard Santiago and Arcadio Perez.

    d. In order to become a member of the Mexican Mafia, someone must be voted in by the membership. As explained more fully below, individuals must generally be a Sureño before they can become a member of the Mexican Mafia. Once someone becomes a Mexican Mafia member, they are able to get a "black hand," which is the Mexican Mafia tattoo. If someone who was not a Mexican Mafia member got a "black hand" tattoo, they would face significant retaliation from the Mexican Mafia.

    e. Richard Santiago's tattoo, documented at INV_3270–3271, is a Mexican Mafia

tattoo. In particular, Santiago's tattoo includes "the Eternal War," a tattoo that is earned and awarded by the Mexican Mafia for battle. In addition, the button of the helmet in Santiago's tattoo has the letter "M" for "Mafia." The Aztec Pyramid that is depicted has 13 steps, a number that is associated with and used by the Mexican Mafia. Santiago's tattoo also includes a black hand, which only Mexican Mafia members can wear.

2. Structure and Operation of the Sureños within BOP and Relationship to the Mexican Mafia

   a. In the 1990s, the Mexican Mafia created the Sureños to serve as the "foot solders" of the Mexican Mafia. When individuals are initially incarcerated, joining the Sureños gives them the benefit of protection from the Mexican Mafia and other Sureños. It also makes them eligible to, at some point, potentially become a full member of the Mexican Mafia; generally, someone must be a Sureño before they can be a Mexican Mafia member.

   b. Similar to the Mexican Mafia, the Sureños operate within the BOP and have been formally tracked since approximately 1990. There are currently approximately 2,000 Sureños in BOP facilities throughout the United States. There are currently approximately 3 to 4 Sureños at the BOP high level complex in Florence, Colorado, including Francisco Garcia. ~~There are less than 60 Sureños housed at the medium level facility.~~

   c. Sureños often have tattoos to identify themselves as a Sureño member. The most common tattoo utilized is the number 13. The number 13 is used as a mark to identify loyalty to the Mexican Mafia. The 13th the letter "M", and

shows a Sureno to be a loyal solider for the Mexican Mafia. Sureno members will also tattoo the words "SUR" or spell out the whole word "Sureño." Additionally, Sureño members will at times have their specific street gang tattooed or represent their gang by having Aztec numbers or Aztec Gods tattooed on themselves. If a Sureño had a street gang tattooed on him, it is not uncommon to see a directional tattoo such as the letters "N" "S" "E" "W" or the words "North", "South", "East or "West" to represent which side of a town or city the gang member if from.

d. Francisco Garcia's tattoo, depicted at INV_305 and INV_421, reads "SUREÑO" and is a tattoo worn by Sureños.

e. Sureños are taught to be loyal to the Mexican Mafia, and must follow a strict set of rules implemented by the Mexican Mafia. Those rules may be conveyed orally or, sometimes, in writing. Mr. Feeney has seen confiscated copies of these written rules. The most important rule is that Sureños cannot snitch, *i.e.*, cooperate with law enforcement or any other authorities.

f. Sureños are required to carry out any orders they receive from the Mexican Mafia. As foot soldiers, Sureños often carry out illegal activities on behalf of the Mexican Mafia to ensure that, if anyone gets in trouble for those illegal activities, it is a Sureño and not a Mexican Mafia member.

g. Sureños generally cannot carry out any activities that affect the Mexican Mafia—including assaults—without permission. The Mexican Mafia may give advance permission for a Sureño to take some action, such as an assault, or may give a non-verbal signal in the moment.

h. If, however, someone assaults a Sureño, it is understood that the Sureños will protect themselves and retaliate against that individual.

i. Similarly, if someone "snitches" on a member of the Mexican Mafia or Sureños, they put themselves at risk of retaliation.

3. <u>Relationship between Mexican Drug Cartels, Mexican Mafia/Sureños</u>

a. When members of Mexican drug cartels are incarcerated in a BOP facility, they do not wield much influence. They are, however, known for having money.

b. The leadership of the Mexican Mafia and various drug cartels generally get along well because they have separate roles and spheres of influence. In particular, cartels have lots of money and access to drugs, which can benefit the Mexican Mafia. The cartels do not generally have foot soldiers like the Mexican Mafia, which is able to exert control through the Sureños and acts of violence.

c. The relationship between Mexican Mafia and drug cartel leadership does not always trickle down to the lower levels. Accordingly, it would not be unusual for members of the Mexican Mafia to attempt to extort a member of drug cartel.

4. <u>BOP's Process of Validating Gang Membership[2]</u>

a. BOP has a process to validate inmates' gang membership. There are 10 to 12 different broad criteria that BOP considers, including whether the inmate

---

[2] The defendant does not move to exclude category four at this time, but rather states that its relevance depends on the testimony at trial. The Government agrees, and will only seek to admit testimony related to category four in the event that it becomes relevant over the course of trial.

has any gang-related tattoos, whether the inmate admitted to membership, information from the media, information from inmate communications, and information from inmate activities.

   b.  If an inmate satisfies 3 of the listed criteria, he is validated as a member of that particular gang.  If he satisfies 2 of the listed criteria, he is identified as an associate of that particular gang.

   c.  The purpose of validating an inmate's gang membership is to ensure that they are safely housed.

## II.  ARGUMENT

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

(b)    The testimony is based on sufficient facts or data;

(c)    The testimony is the product of reliable principles or methods; and

(d)    The expert has reliably applied the principles and methods to the facts of the case.

The Tenth Circuit has explained that "[t]his rule applies to experts beyond those in the field of science," and, accordingly, courts have "long recognized that police officers can testify as experts based on their experience."  *United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014).  The recognition that law enforcement officers can testify as experts based on experience is based on courts' acknowledgement that "the average juror is often innocent of the ways of the criminal underworld."  *Id.* (internal quotation marks and citation omitted).

For the reasons set forth below, Mr. Feeney's proposed expert testimony set forth

8

in categories one through three, above, is admissible under Rule 702, and should not be excluded on any basis set forth in the defendant's Motion.

### A. Mr. Feeney's Proposed Testimony is Relevant, Reliable, and Helpful to the Jury

As an initial matter, the defendant does not argue that evidence of his gang affiliation, or the gang affiliation of Santiago and Perez, is inadmissible.  Nor could he.  The gang affiliation of Garcia, Santiago, and Perez is an "integral and natural part" of the circumstances of the offense in this case and provides crucial context for the jury.  *United States v. Allen*, 610 F. App'x 773, 781 (10th Cir. 2015) (affirming admission of defendant's "alleged affiliation with a violent gang" because it "provided the jury with relevant context for both [witnesses'] testimonies" and was an "integral and natural part of . . . their accounts of the circumstances surrounding the offense" (internal quotation marks and citations omitted)).  Moreover, given the likelihood that Santiago and Perez will testify at trial on Garcia's behalf, *see* Def. Witness List, ECF No. 95, their affiliation with Garcia bears on their credibility.  *See United States v. Tsosie*, 288 F. App'x 496, 499–500 (10th Cir. 2008) ("Evidence of gang affiliation is admissible for proving a witness's bias if a proper foundation is laid and the evidence is not more prejudicial than probative.").

This is not, however, a situation in which the jury will automatically understand the affiliation and loyalties between the Mexican Mafia and Sureños.  The jury will hear that Garcia is a Sureño, and that the two inmates who approached Cardenas' cell door just before the assault were Mexican Mafia members.  Mr. Feeney's testimony—based on his expertise derived over many years and from many sources, *see Kamahele*, 748 F.3d at 998–99 (finding gang expert's testimony sufficiently reliable when it was based on "expertise, derived over many years and from multiple sources")—will explain the

9

relationship between, and hierarchy of, the two groups, which goes to explain a potential reason why Garcia would engage in this assault. Without that explanation about the relationship and hierarchy, the jury could be left wondering if there is any actual connection between the two separately named groups.[3] Accordingly, the defendant's argument that the jury will have a sufficient understanding of how gangs operate without the proposed expert testimony, *see* Def. Mot. at 9–10, is without merit.

Moreover, contrary to the defendant's assertion, this is not a case where "[t]he jury only needs to find that Mr. Garcia assaulted Mr. Cardenas-Guillen, that the assault caused serious bodily injury, and that the assault occurred in the special maritime jurisdiction of the federal government." Def. Mot. at 9. Rather, the jury will *also* be asked to decide whether Garcia was acting in self defense, and whether the force he used was reasonable. That self-defense claim makes the reason for the assault even more relevant: the jury will have to decide whether Garcia was acting in self defense or whether the assault was in retaliation for Cardenas' refusal to accede to the Mexican Mafia's demands. Mr. Feeney's testimony about the operation of, and relationship between, the Mexican Mafia and Sureños is, therefore, highly relevant and helpful to the jury.

Nor does the fact that Mr. Feeney's expert testimony will corroborate some aspects of Cardenas' testimony render that expert testimony inadmissible. *See* Def. Mot. at 9. "[T]he mere fact that expert testimony tends to corroborate the testimony of another witness is not grounds for exclusion; indeed, it is surely the case that most expert opinion

---

[3] Based on his experience in BOP, Cardenas understands the Mexican Mafia to be "the bosses" of the Sureños. Given that the defendant will likely portray Cardenas as fabricating his testimony, however, it is not sufficient for the Government to rely solely on Cardenas' view of the Mexican Mafia and Sureño relationship.

evidence proffered by litigants is paired with lay evidence that is in some fashion supported by the expert opinion." *United States v. Fuertes*, 805 F.3d 485, 496 (4th Cir. 2015) (affirming admission of expert testimony that corroborated victim's account of how she sustained her injuries); *see also United States v. Archuleta*, 737 F.3d 1287, 1294–95 (10th Cir. 2013) (affirming, on plain-error review, admission of expert testimony regarding structure and operation of Sureños where "[t]he logic behind offering [the expert's] testimony was simple: If the coconspirators' description of the events leading up to and on July 2 is consistent with the typical operation of a Sureño gang, then it is more likely that the coconspirators testified truthfully"). Here, the Government no longer intends to ask whether it would be unusual for Mexican Mafia members to attempt to extort a member of the drug cartel, or to ask whether Sureños need permission to carry out activities, such as assaults, on behalf of the Mexican Mafia. Rather, Mr. Feeney's expert testimony will largely focus on the operation of, and respective relationships between, the Mexican Mafia, Sureños, and drug cartels within the BOP. Not only is that evidence relevant and helpful with respect to the reason for the assault, it will also assist the jury in assessing witness credibility.

## B. Mr. Feeney's Proposed Testimony Does Not Violate the Confrontation Clause

The defendant further argues that Mr. Feeney's proposed expert testimony violates the Confrontation Clause because it is based on intercepted BOP communications and statements made during BOP investigations. *See* Def. Mot. at 10. That argument fails.

Although it is well settled that an expert may not "simply parrot[] another individual's out-of-court statement," an expert may "convey[] an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion." *United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015). "An important

11

consideration in distinguishing proper testimony from parroting is the generality of or specificity of the expert testimony." *Id.* Here, Mr. Feeney will not testify as to any testimonial statements whatsoever. Rather, he will (1) provide the jury with background for his expertise—including intercepting BOP communications and investigating gang-related incidents within BOP—to allow the jury to assess his testimony; and (2) testify—based on synthesizing information learned over the course of over twenty years—regarding categories one through three, discussed above, that relate generally to the Mexican Mafia, Sureños, and drug cartels. Such testimony does not raise Confrontation Clause concerns, and should not be excluded on that basis. *See Kamahele*, 748 F.3d at 1000 (concluding that gang expert testimony did not violate Confrontation Clause where there was no indication that expert "parroted a testimonial fact learned from a particular interview," but expert instead "applied his expertise, formed by years of experience and multiple sources, to provide an independently formed opinion").

### C. Mr. Feeney's Proposed Testimony Does Not Violate Rule 704(b)

Nor does Mr. Feeney's testimony violate Federal Rule of Evidence 704(b). *See* Def. Mot. at 11. Rule 704(b) states, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." The Tenth Circuit has interpreted Rule 704(b) as "preventing experts from expressly stating the final conclusion or inference as to a defendant's mental state, but not preventing the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state." *Archuleta*, 737 F.3d at 1297 (internal quotation marks omitted).

Mr. Feeney's proposed expert testimony falls within the latter category of permissible testimony. He will testify that the Sureños are foot soldiers for the Mexican

Mafia and, as such, are loyal to the Mexican Mafia and carry out orders on their behalf. Again, he will not testify that a Sureño would require Mexican Mafia permission in order to assault another inmate. Although Mr. Feeney's testimony that the Sureños carry out orders on behalf of the Mexican Mafia, that opinion only provides one fact "from which the jury could conclude or infer" that he acted intentionally in assaulting Cardenas. In order to reach that conclusion, however, the jury would also have to find that in this case, Garcia had received such an order from the Mexican Mafia—an issue on which Mr. Feeney will not provide any testimony or insight. Nor does the Government intend to pose any hypotheticals to Mr. Feeney that involve similar facts to this case. *Cf. Archuleta*, 737 F.3d at 1298 (questioning permissibility of hypothetical posed to gang expert that "involved the same facts as in [the defendant's] case, and directly posed the question of whether a person in [the defendant's] position could lack the requisite mens rea," but ultimately concluding admission of testimony was not plain error).

### D. Rule 403 Does Not Preclude Mr. Feeney's Proposed Testimony

Rule 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The defendant argues that Mr. Feeney's proposed expert testimony is outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Def. Mot. at 11–12. His argument is without merit.

Mr. Feeney's testimony, as discussed above, is highly relevant to the issues in this case; indeed, the operation of, and relationship between, the Mexican Mafia and Sureños within BOP is integral to Cardenas' recollection of the assault in this case. That relevance is not "substantially outweighed" by unfair prejudice, confusing the issues, or misleading

13

the jury.  Mr. Feeney will not testify at any length about specific acts of violence committed by the Mexican Mafia or Sureños.   Nor will he testify about the likelihood of the Mexican Mafia attempting to extort other inmates, or the Sureños generally committing assaults on behalf of the Mexican Mafia.  The fact that Mr. Feeney's testimony will provide some indirect corroboration for Cardenas' testimony does not constitute "unfair prejudice."  *See Archuleta*, 737 F.3d at 1293 ("[U]nfair prejudice must do more than simply harm a defendant's case. . . . Evidence becomes *unfairly* prejudicial . . . when it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." (emphasis in original, internal quotation marks and citations omitted)).

To the extent the defendant raises concerns about confusing or misleading the jury, such concerns are unfounded.  There will be no confusion about Mr. Feeney's limited role in this trial.  This is not a situation where he is serving as both an expert and fact witness.  The jury will also receive an instruction regarding expert witnesses, and the Government has proposed an instruction regarding the relevance of Garcia's gang affiliation.  Those instructions mitigate any outstanding concerns about prejudice or confusion.  *See United States v. Lujan*, 603 F.3d 850, 860 (10th Cir. 2010) (explaining that potential for prejudice or confusion resulting from admission of certain evidence could be cured by a jury instruction, which juries are presumed to follow).

### E.  Mr. Feeney's Proposed Testimony is Not Impermissible Character Evidence

In a final attempt to exclude Mr. Feeney's proposed expert testimony, the defendant argues that it constitutes impermissible character testimony under Federal Rule of Evidence 404(a)(1), which prohibits "[e]vidence of a person's character or

14

character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." Mr. Feeney's testimony, however, is not designed to demonstrate the "character" of a Sureño (and, again, he will not testify about Sureños generally engaging in assaults on behalf of the Mexican Mafia). Rather, his testimony provides background about the operation and relationship between the Mexican Mafia and Sureños. Any testimony that Sureños are foot soldiers for the Mexican Mafia does not constitute what is generally considered to be "character" evidence. *See, e.g.*, *United States v. Williams*, 900 F.3d 486, 490 (7th Cir. 2018) ("Although it is difficult to give a comprehensive definition of 'character evidence,' we generally interpret it as evidence that 'refers to elements of one's disposition, such as honesty, temperance, or peacefulness,' which shows a propensity to act a certain way in a certain situation." (internal citations and quotation marks omitted)). Accordingly, Rule 404(a) does not provide a basis to exclude Mr. Feeney's proposed expert testimony.

### III. CONCLUSION

For the reasons set forth herein, the Government respectfully requests that the Court deny the defendant's Motion to Exclude BOP Gang Expert Testimony.

Dated: May 2, 2022

Respectfully submitted,

COLE FINEGAN
United States Attorney

By: s/ *Laura Cramer-Babycz*
Laura Cramer-Babycz & Andrea Surratt
Assistant U.S. Attorneys
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0406
E-mail: laura.cramer-babycz@usdoj.gov
Attorneys for Government

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on May 2, 2022, I electronically filed the with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.


                    By:  <u>s/ Deana Ambrosen</u>
                          Legal Assistant
                          United States Attorney's Office

Case 1:21-cr-00143-RM Document 113 Filed 05/02/22 USDC Colorado Page 1 of 3
GOVERNMENT EXHIBIT 1
Case 1:21-cr-00143-RM Document 65-1 Filed 01/20/22 USDC Colorado Page 71 of 107



**U.S. DEPARTMENT OF JUSTICE**

**Cole Finegan**
*United States Attorney*
*District of Colorado*

---

*Laura Cramer-Babycz and Andrea Surratt*          *1801 California Street, Suite 1600*          *(303) 454-0100*
*Assistant United States Attorneys*          *Denver, CO  80202*          *FAX (303) 454-0405*

April 18, 2022 *(via email)*

Timothy Patrick O'Hara
Matthew Belcher
Office of the Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, CO 80202

Re:  *United States v. Francisco Garcia*, 21-cr-143-RM
       Notice of Expert Testimony Pursuant to Fed. R. Crim. P. 16(a)(1)(G)

Dear Mr. O'Hara and Mr. Belcher:

The government hereby gives notice of its intent to call certain witnesses at trial and to elicit expert opinions.  This letter is tendered pursuant to the Discovery Conference Memorandum and Order [ECF No. 9], Judge Moore's Order Setting Trial Date and Deadlines [ECF No. 12], and Federal Rule of Criminal Procedure 16.  The government identifies the anticipated expert witnesses below and, pursuant to Fed. R. Crim. P. 16(a)(1)(G), provides a description of each witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

## I.    John Feeney, BOP Gang Expert

The United States hereby gives notice, pursuant to Fed. R. Crim. P. 16(a)(1)(G), of its intent to call John Feeney, an employee of the Federal Bureau of Prisons ("BOP"), as an expert witness regarding the operation of the Mexican Mafia, Sureños, and Mexican drug cartels within the BOP.  In particular—and as detailed more fully below—the government anticipates that Mr. Feeney will testify about (1) the structure and operation of the Mexican Mafia within the BOP; (2) the structure and operation of the Sureños within the BOP, and, specifically, the relationship between the Mexican Mafia and the Sureños; (3) how members of Mexican drug cartels interact with the Mexican Mafia/ Sureños; and (4) the process for validating gang members within BOP.  A summary of Mr. Feeney's opinions and expertise has been produced at INV_3193–3196, and is supplemented by the information provided below.  Mr. Feeney's testimony will be elicited in the form of opinions or otherwise, as permitted under Fed. R. Evid. 701, 702, 703, 704 and/or 705.

### A.  Mr. Feeney's Qualifications

Mr. Feeney is currently an Intelligence Officer with BOP's National Gang Unit—a position he has held since April 2020.  Since April 2020, he has also been a Task Force Officer with the

Federal Bureau of Investigation in Phoenix. In those roles, Mr. Feeney specifically monitors members of the Mexican Mafia and Sureño prison gangs who are incarcerated in BOP facilities throughout the United States. The purpose of that monitoring is to ensure that inmates are safely housed and to protect the public. In order to monitor those inmates, Mr. Feeney has access to information about all validated members of the Mexican Mafia and Sureños, including telephone calls, inmate emails, financial data, and mail. In Mr. Feeney's current roles, he also interacts directly with BOP facilities—including the United States Penitentiary that houses the stepdown unit for the Administrative Maximum ("ADX") in Florence, Colorado—regarding the placement and movement of Mexican Mafia and Sureño inmates. Mr. Feeney also conducts and monitors, to a lesser extent, members and associates of Mexican drug cartels housed within BOP facilities.

Mr. Feeney also has 25 years of prior BOP experience. In particular, he has been assigned to the investigative section of various federal prisons across the United States, including in Lompoc, California; Atlanta, Georgia; Safford, Arizona; Springfield, Missouri; New York, New York; Allenwood, Pennsylvania; Pollock, Louisiana; and Phoenix, Arizona. Of particular relevance to his expertise in this case was his role as a BOP Special Investigative Agent from 1998 to 2015. During that time, his duties included monitoring members of specific prison gangs and referring potential criminal actions to law enforcement. Mr. Feeney's *curriculum vitae*, produced in discovery at EXP_003–005, includes detailed information about his professional experience.

In his various roles with the BOP, Mr. Feeney has monitored prison gangs since 1990. His knowledge about prison gangs—and, specifically, the Mexican Mafia and Sureños—is based on his experience monitoring inmate communication and activity within BOP; participating in the process of validating gang members for BOP, which includes interviewing inmates who are self-admitted members of gangs; and investigating allegations of inmate misconduct. Based on working in facilities with members of the Mexican Mafia and Sureños, interacting directly with them, and monitoring their communications and activities, he has learned firsthand about their rules, primary activities, organization, and structure. Based on his experience monitoring prison gangs, he has also gained knowledge about members of Mexican drug cartels within the BOP and their interaction with members of the Mexican Mafia and Sureños.

B. Summary of Anticipated Testimony

At trial, it is anticipated that—based on his training and experience—Mr. Feeney will provide expert testimony about the following topics.

1. Structure and Operation of Mexican Mafia within the BOP

a. The Mexican Mafia is, first and foremost, a prison gang. It was created in the mid-to-late-1950s in California to provide protection to its members from inmate-on-inmate physical and sexual abuse in prisons. Initially, the Mexican Mafia operated primarily within the California Department of Corrections.

b. The Mexican Mafia began operating in the BOP by the late 1970s, when the first well-known members of the Mexican Mafia were incarcerated in BOP facilities. The Mexican Mafia orchestrated a number of murders in the BOP in California around that time to assert power and control. The Mexican Mafia continues to exert control

within prisons, including BOP facilities, through fear and intimidation.

c.  There are currently approximately 35 active Mexican Mafia members in BOP facilities throughout the United States. There are approximately 10 Mexican Mafia members at the BOP complex in Florence, Colorado, including Richard Santiago and Arcadio Perez.

d.  In order to become a member of the Mexican Mafia, someone must be voted in by the membership. As explained more fully below, individuals must generally be a Sureño before they can become a member of the Mexican Mafia. Once someone becomes a Mexican Mafia member, they are able to get a "black hand," which is the Mexican Mafia tattoo. If someone who was not a Mexican Mafia member got a "black hand" tattoo, they would face significant retaliation from the Mexican Mafia.

e.  Richard Santiago's tattoo, documented at INV_3270–3271, is a Mexican Mafia tattoo. In particular, Santiago's tattoo includes "the Eternal War," a tattoo that is earned and awarded by the Mexican Mafia for battle. In addition, the button of the helmet in Santiago's tattoo has the letter "M" for "Mafia." The Aztec Pyramid that is depicted has 13 steps, a number that is associated with and used by the Mexican Mafia. Santiago's tattoo also includes a black hand, which only Mexican Mafia members can wear.

2.  <u>Structure and Operation of the Sureños within BOP and Relationship to the Mexican Mafia</u>

a.  In the 1990s, the Mexican Mafia created the Sureños to serve as the "foot solders" of the Mexican Mafia. When individuals are initially incarcerated, joining the Sureños gives them the benefit of protection from the Mexican Mafia and other Sureños. It also makes them eligible to, at some point, potentially become a full member of the Mexican Mafia; generally, someone must be a Sureño before they can be a Mexican Mafia member.

b.  Similar to the Mexican Mafia, the Sureños operate within the BOP and have been formally tracked since approximately 1990. There are currently approximately 2,000 Sureños in BOP facilities throughout the United States. There are currently approximately 3 to 4 Sureños at the BOP high level complex in Florence, Colorado, including Francisco Garcia. There are less than 60 Sureños housed at the medium level facility.

c.  Sureños often have tattoos to identify themselves as a Sureño member. The most common tattoo utilized is the number 13. The number 13 is used as a mark to identify loyalty to the Mexican Mafia. The 13th letter of the alphabet is "M," and shows the number 13 shows a Sureño to be a loyal solider for the Mexican Mafia. Sureño members will also tattoo the words "SUR" or spell out the whole word "Sureño." Additionally, Sureño members will at times have their specific street gang tattooed or represent their gang by having Aztec numbers or Aztec Gods tattooed on themselves. If a Sureño had a street gang tattooed on him, it is not uncommon to see a directional tattoo such as the letters "N" "S" "E" "W" or the words "North", "South", "East or "West" to represent which side of a town or city the gang member if from.

d.      Francisco Garcia's tattoo, depicted at INV_305 and INV_421, reads "SUREÑO" and is a tattoo worn by Sureños.

e.      Sureños are taught to be loyal to the Mexican Mafia, and must follow a strict set of rules implemented by the Mexican Mafia. Those rules may be conveyed orally or, sometimes, in writing. Mr. Feeney has seen confiscated copies of these written rules. The most important rule is that Sureños cannot snitch, *i.e.*, cooperate with law enforcement or any other authorities.

f.      Sureños are required to carry out any orders they receive from the Mexican Mafia. As foot soldiers, Sureños often carry out illegal activities on behalf of the Mexican Mafia to ensure that, if anyone gets in trouble for those illegal activities, it is a Sureño and not a Mexican Mafia member.

g.      Sureños generally cannot carry out any activities that affect the Mexican Mafia—including assaults—without permission. The Mexican Mafia may give advance permission for a Sureño to take some action, such as an assault, or may give a non-verbal signal in the moment.

h.      If, however, someone assaults a Sureño, it is understood that the Sureños will protect themselves and retaliate against that individual.

i.      Similarly, if someone "snitches" on a member of the Mexican Mafia or Sureños, they put themselves at risk of retaliation.

3.    <u>Relationship between Mexican Drug Cartels, Mexican Mafia/Sureños</u>

a.      When members of Mexican drug cartels are incarcerated in a BOP facility, they do not wield much influence. They are, however, known for having money.

b.      The leadership of the Mexican Mafia and various drug cartels generally get along well because they have separate roles and spheres of influence. In particular, cartels have lots of money and access to drugs, which can benefit the Mexican Mafia. The cartels do not generally have foot soldiers like the Mexican Mafia, which is able to exert control through the Sureños and acts of violence.

c.      The relationship between Mexican Mafia and drug cartel leadership does not always trickle down to the lower levels. Accordingly, it would not be unusual for members of the Mexican Mafia to attempt to extort a member of a drug cartel.

4.    <u>BOP's Process of Validating Gang Membership</u>

a.      BOP has a process to validate inmates' gang membership. There are 10 to 12 different broad criteria that BOP considers, including whether the inmate has any gang-related tattoos, whether the inmate admitted to membership, information from the media, information from inmate communications, and information from inmate activities.

b.      If an inmate satisfies 3 of the listed criteria, he is validated as a member of that particular gang. If he satisfies 2 of the listed criteria, he is identified as an associate

of that particular gang.

      c.    The purpose of validating an inmate's gang membership is to ensure that they are safely housed.

## II.   Dr. Christopher Capua, Oral and Maxillofacial Surgeon

The United States hereby gives notice, pursuant to Fed. R. Crim. P. 16(a)(1)(G), of its intent to call Dr. Christopher Capua as an expert witness regarding his evaluation and treatment of Oziel Cardenas-Guillen ("Cardenas") in September 2019.  A summary of Dr. Capua's testimony and opinions, and the bases and reasons for his opinions, have been provided at INV_421–426, INV_450–451, INV_466–470, the report at INV_3191, and the report at INV_3265, and is supplemented by the information provided below.  A copy of Dr. Capua's *curriculum vitae* is provided at EXP_001–002.  Dr. Capua's testimony will be elicited in the form of opinions or otherwise, as permitted under Fed. R. Evid. 701, 702, 703, 704 and/or 705.

### A.  Dr. Capua's Qualifications

Dr. Capua is an oral and maxillofacial surgeon.  In addition to his private practice at Comfort Dental Oral Surgery in Colorado Springs, Dr. Capua is also an on-call surgeon for facial trauma and oral surgery for the major hospitals in Colorado Springs, including the UC Health Hospital, Penrose Hospital, and St. Francis Hospital.  Dr. Capua has performed approximately 50 nasal bone fracture surgeries similar to the one he performed on Cardenas.  Dr. Capua's qualifications are otherwise outlined in his *curriculum vitae*.

### B.  Summary of Anticipated Testimony

At trial, it is anticipated that Dr. Capua will testify that he was on call for oral surgery consults on September 2, 2019.  On that day, Dr. Capua received a call from the emergency room ("ER") physician at Penrose Hospital that a patient had arrived with facial injuries.  Generally, after receiving such a call, Dr. Capua would first see the patient in an emergency room setting.  Here, however, Dr. Capua recalls evaluating Cardenas in a standalone, closed-off room with armed guards. Dr. Capua, who speaks Spanish, attempted to conduct an initial evaluation of Cardenas, but Cardenas was not particularly verbal, and all Dr. Capua could elicit from Cardenas is that Cardenas's face hurt.  Dr. Capua noted that Cardenas had a lot of blood on his face and a considerable amount of swelling and brusing, which made it difficult for Dr. Capua to conduct a thorough initial evaluation.  Prior to Dr. Capua's evaluation of Cardenas, some of the lacerations of Cardenas's lip had been closed by Dr. Steuer, an ER doctor.

Cardenas was brought to the operating room ("OR") so that Dr. Capua could operate on Cardenas's face.  Once Cardenas was under anesthesia, Dr. Capua cleaned up Cardenas's face, which allowed Dr. Capua to better see Cardenas's facial trauma.  Dr. Capua close the lacerations on Cardenas's face that had not been closed in the ER.  Specifically, Dr. Capua closed a one cm laceration on the bridge of Cardenas's nose and a one cm laceration in one of his nostrils.  Dr.

Capua used deep sutures to close the wounds because of the location of the wounds, their severity, and because Dr. Capua assumed he would not see Cardenas again for post-operative care.

Dr. Capua diagnosed Cardenas with a bilateral comminuted nasal bone fracture. This means that the entire nasal bone was shattered into many small pieces. During surgery, Dr. Capua performed a closed reduction of the nasal bone fractures. A closed reduction means that, during surgery, it was not required that Cardenas's skin be peeled back from his nasal bones in order to repair the break. During the procedure, Dr. Capua first inserted cotton material soaked in Afrin into Cardenas's nose. This restricts the constriction of the mucosa, which reduces the bleeding that occurs when surgery begins. Surgery involves re-fracturing some of the nasal bones as they are set into place, which can cause bleeding. Dr. Capua used a "boies elevator" during surgery, which is a tool used during reconstructive surgery to manipulate and align bone fragments in order to reduce the nasal septum and nasal bones. Next, Dr. Capua placed Doyle splints into both nostrils. These splits help align the nasal tissues and bones as they heal, and also has a hole through the middle to allow the patient to breathe, although they often get plugged with blood and mucus post-surgery. The splits are held together with a stitch that is placed through the splints and through the nose. Finally, a Denver splint was placed across the patient's nose. The Denver splint is held in place with adhesive and gives support to the bones and soft tissue as they heal.

Dr. Capua will refer to INV_298–302 when describing the operation on Cardenas. Cardenas's face in these photos is less bloody than when Cardenas arrived at Penrose, presumably because Cardenas kept bleeding en route to the hospital.

The splints placed during surgery are designed to be removed in about seven days, which is long enough to develop primary fibrosis, or healing of the tissues that hold the bony pieces in place. It takes two to three months for ossification of bones to set, but a patient undergoing this type of procedure is not fully healed for about six months post-surgery. The stiches that Dr. Capua used to suture Cardenas were self-dissolving and did not need to be removed.

Dr. Capua performed Cardenas's surgery at around 5:00 p.m. on September 2, 2019. He did a follow-up with Cardenas on September 4, 2019, while Cardenas was still at Penrose Hospital.

From Cardenas's medical records, Dr. Capua understands that Cardenas was given fentanyl. This is prescribed for pain and is given based on a patient's vital signs and subjective pain assessment.

In terms of the nasal and facial injuries only, Dr. Capua expects that Cardenas would make largely a full recovery in time, though he will likely have some scarring and a missing tooth.

In Dr. Capua's opinion, the injuries sustained by Cardenas would have been very painful. In Dr. Capua's opinion, the injuries to Cardenas's face were not sustained by a single blow or accidental fall in which Cardenas hit his face on something. Rather, Dr. Capua's opinion is that the injuries appear to be from multiple strikes to the face. Dr. Capua's opinion is that the trauma to Cardenas's face was not from a high-velocity impact like a car accident, but rather was from

6

repeated lower-velocity strikes. Based on his training and experience, Dr. Capua was surprised that Cardenas sustained only the nasal fracture given the extent of swelling and bleeding present.

## III.    Jeremy Kammrad, Bureau of Prisons Paramedic

The United States hereby gives notice, pursuant to Fed. R. Crim. P. 16(a)(1)(G), of its intent to call Jeremy Kammrad as an expert witness regarding his evaluation and treatment of Oziel Cardenas-Guillen ("Cardenas") on September 2, 2019. A summary of Mr. Kammrad's testimony and opinions, and the bases and reasons for his opinions, have been provided at INV_274–276 and the reports at INV_761 and INV_3262, and is supplemented by the information provided below. A copy of Mr. Kammrad's *curriculum vitae* is provided at EXP_006–009. Mr. Kammrad's testimony will be elicited in the form of opinions or otherwise, as permitted under Fed. R. Evid. 701, 702, 703, 704 and/or 705.

### A.    Mr. Kammrad's Qualifications

Mr. Kammrad is a paramedic at the U.S. Penitentiary ("USP") in Florence, Colorado. Mr. Kammrad received his associates degree in Emergency Medical Services in 2013 and then passed the National Registry of Emergency Medical Technician ("EMT") test to become a licensed EMT in January 2014. Mr. Kammrad began working for the Bureau of Prisons ("BOP") as a paramedic in 2016. As a paramedic, Mr. Kammrad specializes in emergency medicine. Mr. Kammrad also has certificates in advanced cardiac life support, pediatric advanced life support, CBR, and tactical combat casualty care. Mr. Kammrad estimates that he has treated over 400 inmates after assaults, so he is familiar with what inmates look like after a fight. Mr. Kammrad's qualifications are further outlined in his *curriculum vitae* and EXP_10–22.

### B.    Summary of Anticipated Testimony

At trial, it is anticipated that Mr. Kammrad will testify that, on September 2, 2019, Mr. Kammrad began attending to Cardenas after Cardenas was pulled from his cell. Mr. Kammrad noticed that Cardenas was bleeding from the facial area and his face was so swollen that it was unrecognizable. Cardenas's head was also very swollen. Mr. Kammrad may refer to INV_298–302 when describing the injuries. Given the injuries, and the amount of blood, Mr. Kammrad recognized that Cardenas would need to go to the hospital, so Mr. Kammrad told the lieutenant on the scene to call 911.

Cardenas was semi-conscious. He was grunting in pain and breathing, but did not appear to know what was going on. Cardenas was not responding to stimuli. For instance, Mr. Kammrad yelled at Cardenas, did a chest rub, and pinched his fingernails, but Cardenas did not respond. Mr. Kammrad attempted to check Cardenas's pupils. One eye was normal, but the other could not be checked because the eye had swollen shut.

Cardenas was bleeding from his mouth, head, and nose. Mr. Kammrad observed that Cardenas had a hole in the top of his nose that had blood spilling out of it like a whale spout. Cardenas kept trying to clear his airway with what appeared to be reflexive coughing, which was not effective. Once in medical, Mr. Kammrad tried to scoop and suction blood out of Cardenas's

mouth. Cardenas's oxygen saturation dropped to 83 at one point, which meant he was not getting enough oxygen to his brain, which could cause cellular death or permanent disability. Oxygen saturation should be over 90. Mr. Kammrad cleaned the blood out of Cardenas's mouth and placed a rebreather mask on Cardenas to attempt to increase his oxygen levels. Eventually, Cardenas's oxygen saturation reached 97.

Mr. Kammrad also assessed Cardenas's other injuries. Mr. Kammrad thought Cardenas might have skull fractures, but it was hard to tell because of the swelling. Cardenas had a hematoma on the back of his head that was so big that Mr. Kammrad could stick his whole fingertip into it. Cardenas's injuries were focused on the head.

Mr. Kammrad noticed that Cardenas did not have any defensive injuries consistent with defending himself in a fight, such as abrasions or lacerations to hands or knuckles. Mr. Kammrad's opinion is that Cardenas was knocked unconscious with a first blow and was unable to fight back. It is Mr. Kammrad's opinion that Cardenas was the victim of a beat-down rather than someone involved in a fight. Further, given Cardenas's injuries, it is Mr. Kammrad's opinion that Cardenas's injuries came from multiple blows to the head, not a single blow.

It is Mr. Kammrad's opinion that, absent the medical intervention described above, Cardenas would have choked on his own blood and died. In Mr. Kammrad's experience as a paramedic at the BOP, Cardenas's injuries are some of the worst he has ever seen. On a scale from one to ten, Mr. Kammrad assessed this injury to be a nine.

## IV.  Testimony Regarding Jurisdictional Element

On April 7, 2022, the government inquired as to whether the jurisdictional element of the charge in this case—*i.e.*, that the September 2, 2019 incident charged in the Indictment occurred at the United States Penitentiary in Florence, Colorado, which is within the territorial jurisdiction of the United States—is disputed. You have not yet provided a substantive response to that inquiry. In the event that Mr. Garcia disputes that element, the government intends to call a land surveyor to testify to that element. The government provides this notice in an abundance of caution, but does not concede that such testimony would constitute an expert opinion as opposed to lay opinion.

## V.  Government's Satisfaction of Discovery Obligations

With the provision of this notice pursuant to Fed. R. Crim. P. 16(a)(1)(G), and the discovery materials referenced throughout this letter, it is the government's position that all documents which are appropriate for pre-trial discovery in relation to the above-described testimony have been disclosed. If counsel believes any predicate materials are missing from discovery, then the government will work to provide supplemental materials upon request, if appropriate for disclosure.

Sincerely,

Laura Cramer-Babycz
Andrea Surratt
Assistant United States Attorneys

8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE RAYMOND P. MOORE**

| | |
|---|---|
| Courtroom Deputy:  Cathy Pearson | Date:   May 3, 2022 |
| Court Reporter:   Tammy Hoffschildt | Interpreter:   n/a |
| Probation:  n/a | |

**CASE NO.   21-cr-00143-RM**

Parties                                                    Counsel

UNITED STATES OF AMERICA,                     Laura Cramer-Babycz
                                                            Andrea Surratt

     Plaintiff,

v.

1.  FRANCISCO GARCIA,                            Timothy O'Hara
                                                            Matthew Belcher

     Defendant.

---

**COURTROOM MINUTES**

---

**TRIAL PREPARATION CONFERENCE
COURT IN SESSION:        10:00 a.m.**

Appearances of counsel.   Defendant is present and in custody.

Preliminary remarks made by the Court.

Discussion held regarding first day of trial schedule, jury selection, voir dire, opening statements, scheduling of witnesses, closing arguments, displaying of exhibits, physical exhibits, jury instructions, pending motions and motions *in limine*.

**ORDERED:**   Government's motion (Doc. 61) is GRANTED in part and DENIED in part as stated on the record.

**ORDERED:**   Government's supplemental motion (Doc. 76) is GRANTED as stated on the record.

**ORDERED:**   Defendant's motion (Doc. 80) is DENIED as stated on the record.

**ORDERED:** Defendant's motion (Doc. 82) is **taken under advisement.**  Counsel shall provide the unredacted information at issue for the Court's review by **May 4, 2022**, and a written order will be issued by May 5, 2022.

**ORDERED:** Defendant's motion (Doc. 75) is DENIED as stated on the record.

**ORDERED:** Defendant's motion (Doc. 84) is GRANTED in part and DENIED in part as stated on the record.

**ORDERED:** If counsel wish to file pleadings to preserve their positions on the motions the Court has ruled on today, they may do so by **close of business on May 6, 2022.   Those pleadings shall be filed at the same restriction level as the motions to which they are referred.**

Discussion held regarding clarification on certain rulings the Court has made today and where the defendant will be held prior to the trial.

**ORDERED:** Defendant remanded to the custody of the U.S. Marshals Service.

**COURT IN RECESS:**        **11:21 a.m.**
**Total in court time:**        **1:21**
**Hearing concluded**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE RAYMOND P. MOORE**

| | |
|---|---|
| Courtroom Deputy: Cathy Pearson | Date: May 5, 2022 |
| Court Reporter: Tammy Hoffschildt | Interpreter: n/a |
| Probation: n/a | |

**CASE NO.   21-cr-00143-RM**

Parties                                                            Counsel

UNITED STATES OF AMERICA,                        Laura Cramer-Babycz
                                                                      Andrea Surratt

     Plaintiff,

v.

1.   FRANCISCO GARCIA,                                 Matthew Belcher

     Defendant.

---

**COURTROOM MINUTES**

---

**IN-COURT HEARING**
**COURT IN SESSION:**        **1:08 p.m.**

Defendant is not present; presence waived.

Remarks made by the Court regarding security issues raised by the U.S. Marshals Service.

**COURT IN RECESS:**        **1:16 p.m.**
**Total in court time:**        **00:08**
**Hearing concluded**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00143-RM

UNITED STATES OF AMERICA,

　　　　　Plaintiff,

v.

**FRANCISCO GARCIA,**

　　　　　**Defendant.**

---

## NOTICE OF DISPOSITION

---

　　　　MR. FRANCISCO GARCIA, by and through counsel, Timothy P. O'Hara,

Assistant Federal Public Defender, hereby confirms to this Honorable Court in writing

that Mr. Garcia intends to plead guilty without a plea agreement.  The matter has been

scheduled for a Change of Plea Hearing on Monday, May 9, 2022.

　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　VIRGINIA L. GRADY
　　　　　　　　　　Federal Public Defender


　　　　　　　　　　s/ *Timothy P. O'Hara*
　　　　　　　　　　TIMOTHY P. O'HARA
　　　　　　　　　　Assistant Federal Public Defender
　　　　　　　　　　633 Seventeenth Street, Suite 1000
　　　　　　　　　　Denver, Colorado  80202
　　　　　　　　　　Telephone:  (303) 294-7002
　　　　　　　　　　FAX:  (303) 294-1192
　　　　　　　　　　Email:  timothy_ohara@fd.org
　　　　　　　　　　Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2022, I electronically filed the foregoing **Notice of Disposition** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Laura Cramer-Babycz, Assistant United States Attorney
Email:  Laura.Cramer-Babycz@usdoj.gov

Andrea Surratt, Assistant United States Attorney
Email: Andrea.Surratt@usdoj.gov

. . . and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Francisco Garcia (via U.S. mail)

s/ *Timothy P. O'Hara*
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  timothy_ohara@fd.org
Attorney for Defendant

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**JUDGE RAYMOND P. MOORE**

| | |
|---|---|
| Courtroom Deputy: Cathy Pearson | Date: May 6, 2022 |
| Court Reporter: Tammy Hoffschildt | Interpreter: n/a |
| Probation: n/a | |

**CASE NO.  21-cr-00143-RM**

Parties                                                            Counsel

UNITED STATES OF AMERICA,                         Andrea Surratt
                                                                      Laura Cramer-Babycz

        Plaintiff,

v.

1.  FRANCISCO GARCIA,                                   Timothy O'Hara
                                                                      Matthew Belcher

        Defendant.

---

**COURTROOM MINUTES**

---

**STATUS CONFERENCE**
**COURT IN SESSION:        12:03 p.m.**

Appearances of counsel.   Defendant is not present; presence waived.

Preliminary remarks made by the Court.

Mr. O'Hara advises the Court that the defendant wishes to enter a plea of guilty without a plea agreement.   The Government does not object to the oral or written Notice of Disposition.

**ORDERED:**  The oral Notice of Disposition is accepted.

The Court directs counsel for the defendant to file a written Notice of Disposition by close of business today, May 6, 2022.

Discussion held regarding D.C.COLO.LCrR 11.1 (a).

**ORDERED:**  The four-day jury trial set for May 9, 2022, is VACATED.

**ORDERED:**  A Change of Plea Hearing is set for **May 9, 2022, at 10:00 a.m.**   Counsel for the defendant shall provide the Court with plea documents by email as soon as practicable but no less than 30 minutes prior to the Change of Plea Hearing.

**ORDERED:**  If the Court-approved plea document is not going to be used for the change of plea, counsel for the Government shall provide the Court with the statutory maximum penalty in this case.

Discussion held regarding counsel for the defendant having access to the defendant prior to the Change of Plea Hearing.

**COURT IN RECESS:**       **12:14 p.m.**
**Total in court time:**       **00:11**
**Hearing concluded**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## JUDGE RAYMOND P. MOORE

| | |
|---|---|
| Courtroom Deputy: Cathy Pearson | Date: May 9, 2022 |
| Court Reporter: Tammy Hoffschildt | Interpreter: n/a |
| Probation: n/a | |

**CASE NO. 21-cr-00143-RM**

Parties                                          Counsel

UNITED STATES OF AMERICA,                         Andrea Surratt
                                                  Laura Cramer-Babycz
            Plaintiff,

v.

1.  FRANCISCO GARCIA,                             Timothy O'Hara

            Defendant.

---

## COURTROOM MINUTES

**CHANGE OF PLEA**
**COURT IN SESSION:        10:04 a.m.**

Appearances of counsel.   Defendant is present and in custody.

Defendant sworn and answers true name.   Defendant is 37 years old.

**EXHIBITS:**   Plea documents received.

Defendant waives reading of the Indictment.

Defendant pleads GUILTY to Count 1 of the Indictment.

Defendant advised of maximum penalties.

Defendant's right to trial by jury and other constitutional rights explained.

The Court states findings and conclusions and accepts plea of guilty.

**ORDERED:**   The Probation Department **shall** conduct an independent factual investigation in this case.

**ORDERED:**   Any pretrial motions still pending in this matter are **DENIED** as moot.

**ORDERED:**   Sentencing is set for **August 19, 2022, at 1:00 p.m.**

**ORDERED:**   Any information, release, data, or material provided to the Probation Department by the defendant shall be used by the Probation Department only for the preparation of the report and for no other purposes without further order from the Court.

**ORDERED:**   Defendant is REMANDED to the custody of the U.S. Marshal.

**COURT IN RECESS:**       **10:35 a.m.**
**Total in court time:**       **00:31**
**Hearing concluded**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00143-RM

UNITED STATES OF AMERICA,

            Plaintiff,

v.

**FRANCISCO GARCIA,**

            **Defendant.**

---

### DEFENDANT'S PLEA OF GUILTY AND STATEMENT OF FACTS RELEVANT TO SENTENCING (WITHOUT PLEA AGREEMENT)

---

Defendant, FRANCISCO GARCIA, personally and by counsel, Assistant Federal Public Defender Timothy P. O'Hara, submits this Plea of Guilty and Statement of Facts Relevant to Sentencing:

### I. PLEA OF GUILTY

The Defendant intends to plead guilty to the one count in the Indictment [Doc. 1] which charges him with a violation of:

(1)      18 U.S.C. § 113(a)(6), assault resulting in serious bodily injury.

Mr. Garcia intends to plead guilty to the charge **without a plea agreement**.

### II. ELEMENTS OF THE OFFENSE

Mr. Garcia submits that the elements of the aforementioned offense are as follows:

**Count One:**

*First*:  The defendant knowingly assaulted another person;

Court Exhibit

1

*Second*:  As a result, the victim sustained serious bodily injury; and

*Third*:  The assault occurred within the special maritime and territorial jurisdiction of the United States.

**The United States advises that it agrees ( x ), disagrees ( ), or takes no position ( ). [Check or provide appropriate response].**

## III. STATUTORY PENALTIES

The maximum statutory penalty for Counts One is not more than 10 years' imprisonment; not more than a $250,000 fine, or both; not more than three years of supervised release; a $100 special assessment fee; and restitution as determined by the Court.

A violation of the conditions of probation or supervised release may result in a separate prison sentence and additional supervision.

**The United States advises that it agrees ( x ), disagrees ( ), or takes no position ( ). [Check or provide appropriate response].**

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. FACTUAL BASIS TO SUPPORT THE PLEA OF GUILTY

Mr. Garcia admits to the following:

On September 2, 2019, he was an inmate at the United States Penitentiary (USP) in Florence, Colorado, which is in the special maritime and territorial jurisdiction of the United States.  At that time, he fought with his cellmate, Osiel Cardenas-Guillen.

Mr. Garcia, without justification, struck Mr. Cardenas-Guillen multiple times and caused serious bodily injury to Mr. Cardenas-Guillen as defined in 18 U.S.C. §1365.

**The United States advises that it agrees ( ), disagrees ( x ), or takes no position ( ). [Check or provide appropriate response].**

## VI. GUIDELINE COMPUTATION

Defendant understands that sentencing is determined pursuant to 18 U.S.C. § 3553(a). In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, Mr. Garcia sets forth below his estimate of the advisory guideline range called for by the United States Sentencing Guidelines.

Mr. Garcia estimates the calculation for the advisory guidelines as follows:

A.    The applicable guideline is §2A2.2, with a base offense level of 14.

B.    The victim sustained serious bodily injury, increasing the base offense level by 5-levels. *See* §2A2.2(b)(3).

C.    Since Mr. Garcia has timely pled guilty, he should receive credit for acceptance of responsibility, i.e. a reduction of two offense levels. *See* U.S.S.G. §3E1.1(a).

D.    The adjusted offense level would be 17.

E.    Defendant's criminal history category is estimated as Category III.

F.    The Career Offender guideline does not apply.

G.    The advisory guideline range of imprisonment resulting from an offense level of **17** and a criminal history category of **III** is **30-37 months**. In order to be as

3

accurate as possible, with the criminal history category undetermined at this time, the range could conceivably extend from as low as 24 months (bottom of Category I) to as high as 63 months (top of Category VI).

      H.     Pursuant to guideline § 5E1.2, the fine range for this offense would be $10,000 to $95,000, plus applicable interest and penalties.

      I.     Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term must be at least one year but not more than three years.

**The United States advises that it agrees ( ), disagrees ( x ), or takes no position ( ). [Check or provide appropriate response].**

      Mr. Garcia understands that although the Court will consider the above estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by any estimate calculated herein, regardless of whether agreed to by the government.

      No estimate regarding the guideline range precludes Mr. Garcia or the government from asking the Court, within the overall context of the guidelines, to depart from the guideline range at sentencing if defendant or the government believes a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate regarding the guideline range precludes Mr. Garcia or the government from asking the Court to vary from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

4

Mr. Garcia understands the Court is free, upon consideration and proper

application of all 18 U.S.C. § 3553 factors, to impose a sentence which it deems

appropriate in the exercise of its discretion and that such sentence may be less than

that called for by the advisory guidelines (in length or form), within the advisory

guideline range, or above the advisory guideline range - up to and including

imprisonment for the statutory maximum term, regardless of any computation or position

of any party.

Date: 5/9/22

_____
Mr. Francisco Garcia
Defendant

Date: 5/9/22

_____
Mr. Timothy P. O'Hara
Attorney for Defendant

**As to matters agreed to by the United States:**

Date: 5/9/22

_____
Ms. Laura Cramer-Babycz
Assistant U.S. Attorney

Date: 5/9/22

_____
Ms. Andrea Surratt
Assistant U.S. Attorney

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 21-cr-00143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**FRANCISCO GARCIA,**

      **Defendant.**

---

## STATEMENT BY DEFENDANT IN ADVANCE OF PLEA OF GUILTY

      I acknowledge and certify that I have been advised of and understand the following facts and rights, that all representations contained in this document are true and correct, and that my attorney has assisted me as I have reviewed and completed this document.

      1.     The nature of the charge against me has been explained to me by my attorney. I have had an opportunity to discuss with my attorney both the nature of the charge and the elements which the government is required to prove.

      2.     I know that when the Court sentences me, the Court will consider many factors. These factors are listed in 18 U.S.C. § 3553 and include (a) the nature and circumstances of the offense and my personal history and characteristics, (b) the need for a sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public, and provide me with needed training, care or correctional treatment in the most effective manner, (c) the kinds of sentences available to the court, (d) the advisory sentencing guidelines

Court Exhibit

2

93

established by the U.S. Sentencing Commission, (e) the pertinent policy statements of the U.S. Sentencing Commission, (f) the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct, and (g) the need to provide restitution. No single factor is controlling or determinative. I recognize that it is possible that the Court could, after considering these factors, impose any sentence in my case, including one which is as severe as the maximum term of imprisonment, the maximum fine, full restitution (if applicable), the maximum term of supervised release, and a special assessment, all as set out in paragraph 3 below.

3.      I know that the following penalties may be imposed as a result of my guilty plea to Count One of the Indictment, charging a violation of 18 U.S.C. § 113(a)(6), assault resulting in serious bodily injury:

      a.      Imprisonment for a term of not more than 10 years;

      b.      A term of supervised release of not more than 3 years pursuant to 18 U.S.C. § 3583;

      c.      A fine of not more than $250,000, pursuant to the statute that I admit I violated and/or the alternative fine schedule set out at 18 U.S.C. § 3571;

      d.      Restitution to the victim(s) of my crime(s) of not more than <u>N/A</u>, pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664; and

      e.      A special assessment of $100, pursuant to 18 U.S.C. § 3013.

4.      I know that if I am convicted of more than one count, the sentences imposed may be either concurrent (served at the same time) or consecutive (served separately or back-to-back) unless the statutory penalty for an offense of conviction expressly requires that a sentence be imposed to run consecutively.

<div align="center">2</div>

5. I know that in addition to any punishment that the Court may impose, there are collateral consequences to pleading guilty to a crime. These consequences are neither imposed nor controlled by the Court. For example, pleading guilty may result in a loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

6. I know that if I am given a term of supervised release as a part of my sentence, that supervised release will only begin to run upon my release from custody on all terms of imprisonment imposed by this and any other courts. I understand that any violation of the conditions of that supervised release during its term may lead to an additional prison sentence and additional supervised release being imposed.

7. I know that there is no parole in the federal system and that I will be required to serve the entire sentence of imprisonment which may be imposed in my case, reduced only by such good time and/or program allowances as may be set by Congress and applied by the Bureau of Prisons.

8. I know that if a fine or restitution is imposed as a part of my sentence, I will be required to pay interest on any amount in excess of $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment unless interest is waived by the Court.

9. I know that if a fine or restitution is imposed as a part of my sentence, I will be required to pay it in a timely manner. Failure to do so may trigger monetary penalties, collection efforts by the government, potential revocation of any probation or supervised release, and/or exposure to prosecution for "Criminal Default" under 18 U.S.C. § 3615.

10.     I know that I can be represented by an attorney at every stage of the proceedings in this matter, and I know that, if I cannot afford an attorney, one will be appointed to represent me at no cost or expense to me.

11.     I know that I have a right to plead "not guilty;" and I know that if I do plead "not guilty," I can persist in that plea and demand a trial.

12.     I know that I have a right to and can demand a trial by jury, and I know that if I choose to stand trial:

    a.     I have a right to the assistance of an attorney at every stage of the proceeding;

    b.     I have a right to see and observe the witnesses who testify against me;

    c.     My attorney can cross-examine all witnesses who testify against me;

    d.     I can call and present such relevant witnesses and evidence as I desire, and I can obtain subpoenas to require the attendance and testimony of those witnesses;

    e.     If I cannot afford to pay witness fees and expenses, the government will pay those fees and expenses, including mileage and travel expenses, and including reasonable fees charged by expert witnesses;

    f.     I cannot be forced to incriminate myself and I do not have to testify at any trial;

    g.     However, I can testify at my trial if I choose to, and I do not have to decide whether or not to testify until after I have heard the government's evidence against me;

    h.     If I decide that I do not want to testify at trial, the jury will be told that no guilt or inference adverse to me may be drawn from my decision not to testify;

    i.     In order for me to be convicted, the government must prove each and every element of the offense with which I am charged, beyond a reasonable doubt;

4

j.  In order for me to be convicted, the jury must reach a unanimous verdict of guilty, meaning all jurors must agree that I am guilty; and

k.  If I were to be convicted, I could appeal both my conviction and whatever sentence the Court later imposed, and if I could not afford an appeal, the government would pay the cost of the appeal, including the cost of an appointed attorney.

13.  I know that if I plead guilty, there will not be a trial of any kind.

14.  I know that if I plead guilty, there will be no appellate review of the question of whether or not I am guilty of the offenses to which I have pled guilty.

15.  No representations have been made to me as to what the sentence in this case will be.

16.  The only plea document to which I have agreed is the document entitled "DEFENDANT'S PLEA OF GUILTY AND STATEMENT OF FACTS RELEVANT TO SENTENCING (WITHOUT PLEA AGREEMENT)" which my lawyer and I have signed and which I incorporate herein by reference.

17.  I understand that the Court will make no decision as to what my sentence will be until a Presentence Report has been prepared by the Probation Department and received and reviewed by the Court.

18.  I know that when I enter my plea of guilty, the Court may ask me questions under oath about the offense to which I am pleading guilty. Such questions, if asked of me on the record and in the presence of my attorney, must be answered by me, and if I give false answers, I can be prosecuted for perjury.

19.  I know that I have the right to ask the Court any questions that I have concerning my rights, these proceedings, and my plea to the charges.

5

20. I am 37 years of age. I attended high school and received a GED degree. I can understand the English language. I am not taking any medications which interfere with my ability to understand the proceedings in this matter or which impact or affect my ability to choose whether to plead guilty.

21. No promises and no threats of any sort have been made to me by anyone to induce me or to persuade me to enter my plea in this case.

22. No one has promised me that I will receive probation, home confinement or any other specific sentence desired by me because of my plea of guilty.

23. I have had sufficient opportunity to discuss this case and my intended plea of guilty with my attorney. I do not wish to consult with my attorney any further before I enter my plea of guilty.

24. I am satisfied with my attorney. I believe that I have been represented effectively and competently in this case.

25. My decision to enter the plea of guilty is made after full and careful thought, with the advice of my attorney, and with full understanding of my rights, the facts and circumstances of the case, and the potential consequences of my plea of guilty. I was not under the influence of any drugs, medication, or intoxicants which affect my decision-making ability when I made the decision to enter my guilty plea. I am not now under the influence of any such drugs, medication or intoxicants.

26. I want to plead guilty and have no mental reservations about my decision.

27. Insofar as it shows my conduct, the summary of facts set out in the document entitled "DEFENDANT'S PLEA OF GUILTY AND STATEMENT OF FACTS RELEVANT TO SENTENCING (WITHOUT PLEA AGREEMENT)" is true and correct.

6

28.     I know that I am free to change or delete anything contained in this document and that I am free to list my objections and my disagreements with anything contained in the document entitled "DEFENDANT'S PLEA OF GUILTY AND STATEMENT OF FACTS RELEVANT TO SENTENCING (WITHOUT PLEA AGREEMENT)." I accept both documents as they are currently drafted.

29.     I wish to plead guilty to Count One, 18 U.S.C. § 113(a)(6), assault resulting in serious bodily injury.

Dated this __9th__ day of __May_____, 2022.

_____
FRANCISCO GARCIA
Defendant

I certify that I have discussed this statement and the document entitled "DEFENDANT'S PLEA OF GUILTY AND STATEMENT OF FACTS RELEVANT TO SENTENCING (WITHOUT PLEA AGREEMENT)" with Mr. Garcia. I certify that I have fully explained his rights to him and have assisted him in completing this form. I believe that Mr. Garcia understands his rights and these statements.

Dated this __9th__ day of __May_____, 2022.

_____
TIMOTHY P. O'HARA
Attorney for Defendant

7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

| | |
|---|---|
| Courtroom Deputy: Leigh Roberson | Date: November 22, 2022 |
| Court Reporter: Darlene Martinez | Interpreter: n/a |
| Probation: Sara Johnson | |

**CASE NO. 22-cr-00118-RM**

Parties                                                Counsel

UNITED STATES OF AMERICA,                Andrea Surratt

      Plaintiff,

v.

FRANCISCO GARCIA,                          Timothy O'Hara
                                           Matthew Belcher

      Defendant.

---

**COURTROOM MINUTES**

---

**SENTENCING HEARING**
**Court in session: 9:01 a.m.**

Appearances of counsel. Defendant is present and in custody.

Defendant entered his plea on May 9, 2022, to Count 1 of the Indictment. The plea was entered without a plea agreement.

Discussion held regarding pending motions and objections.

**Court in recess: 10:27 a.m.**
**Court in session: 10:38 a.m.**

**ORDERED:** Government's Motion (Doc. 139) is granted.

**ORDERED:** Defendant's Motion (Doc. 140) is denied.

Argument given regarding sentencing.

Defendant addresses the Court.

Statement by the Court regarding the defendant's offense level, criminal history level, and sentencing guidelines range.

The Court states its findings and conclusions.

**ORDERED:** Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, FRANCISCO GARCIA, is hereby committed to the custody of the Bureau of Prisons to be **imprisoned** for a term of **60 months,** which term shall be served consecutively to the sentence imposed in the District of North Dakota in case number 05-cr-00133.

**ORDERED:** No additional term of supervised release shall be imposed.

**ORDERED:** Defendant shall pay **$100** to **Crime Victim Fund** (Special Assessment), to be paid immediately.

**ORDERED:** **No fine** is imposed because the defendant has no ability to pay a fine.

Defendant is advised of his right to appeal the sentence imposed by the Court.

**ORDERED:** Any notice of appeal must be filed within 14 days.

**ORDERED:** Defendant is REMANDED to the custody of the U.S. Marshal.

**Court in recess:** **12:03 p.m.**
Hearing concluded.
Total time: 2 hours 51 minutes

AO 245B (CO Rev. 11/20)    Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

District of Colorado

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| FRANCISCO GARCIA | Case Number:      1:21-cr-00143-RM-1 |
| | USM Number:      09242-059 |
| | Timothy Patrick O'Hara and Matthew K Belcher |
| | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s)    1 of the Indictment

☐ pleaded nolo contendere to count(s)
     which was accepted by the court.

☐ was found guilty on count(s)
     after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 113(a)(6) | Assault Resulting in Serious Bodily Injury | 09/02/2019 | 1 |

     The defendant is sentenced as provided in pages 2 through      4      of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)      ☐ is    ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 22, 2022
Date of Imposition of Judgment

_Signature of Judge_

Raymond P. Moore, United States District Judge
Name and Title of Judge

November 28, 2022
Date

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: | FRANCISCO GARCIA |
| CASE NUMBER: | 1:21-cr-00143-RM-1 |

Judgment — Page   2   of   4  

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **sixty (60) months,** consecutive to United States District Court, District of North Dakota, Docket No. 05-cr-00133-RRE-1

☐    The court makes the following recommendations to the Bureau of Prisons:

☒    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

     ☐    at _____ ☐ a.m. ☐ p.m. on _____ .

     ☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐    before 2 p.m. on _____ .

     ☐    as notified by the United States Marshal.

     ☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

DEFENDANT: FRANCISCO GARCIA
CASE NUMBER: 1:21-cr-00143-RM-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $  100.00 | $  0.00 | $ 0.00 | $  0.00 | $  0.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement     $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the following page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Publ. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

DEFENDANT: FRANCISCO GARCIA
CASE NUMBER: 1:21-cr-00143-RM-1

Judgment — Page ___4___ of ___4___

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☐ Lump sum payment of  $ _____  due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of  $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of  $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00143-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**FRANCISCO GARCIA,**

      **Defendant.**

---

### DEFENDANT'S NOTICE OF APPEAL

---

      Defendant, Francisco Garcia, through appointed counsel, Timothy P. O'Hara, and the Office of the Federal Public Defender, files this notice of appeal to the Tenth Circuit Court of Appeals and appeals the Judgment and Commitment Order (Doc. # 148) that was entered on November 28, 2022.

                                Respectfully submitted,

                                VIRGINIA L. GRADY
                                Federal Public Defender

                                *s/ Timothy P. O'Hara*
                                TIMOTHY P. O'HARA
                                Assistant Federal Public Defender
                                633 Seventeenth Street, Suite 1000
                                Denver, Colorado  80202
                                Telephone:  (303) 294-7002
                                FAX:  (303) 294-1192
                                Email:  timothy_ohara@fd.org
                                Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2022, I electronically filed the foregoing

## DEFENDANT'S NOTICE OF APPEAL

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

> Laura Cramer-Babycz
> Assistant U.S. Attorney
> Email:  Laura.Cramer-Babycz@usdoj.gov

> Andrea L. Surratt
> Assistant U.S. Attorney
> Email: andrea.surratt@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

> Francisco Garcia      (U.S. Mail)

> s/ *Timothy P. O'Hara*
> TIMOTHY P. O'HARA
> Assistant Federal Public Defender
> 633 Seventeenth Street, Suite 1000
> Denver, Colorado  80202
> Telephone:  (303) 294-7002
> FAX:  (303) 294-1192
> Email:  timothy_ohara@fd.org
> Attorney for Defendant